FILED

2014 NOV 13 PM 4: 46

CLERK U.S. DISTRICT COURT
CENTRAL DISTRICT OF CALIF.
LOS ANGELES

BY:_____

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

January 2014 Grand Jury

| UNITED STATES OF AMERICA, | CR No. **CR 14 00648** |
|---|---|
| Plaintiff, | I N D I C T M E N T |
| v. | [18 U.S.C. § 1956(h): Conspiracy to Launder Money; 18 U.S.C. § 371: Conspiracy to Operate an Unlicensed Money Transmitting Business; 18 U.S.C. §§ 1960(a), (b)(1)(A), (b)(1)(B), (b)(1)(C): Operating an Unlicensed Money Transmitting Business; 18 U.S.C. § 982; 18 U.S.C. § 981(a)(1)(C); 21 U.S.C. § 853; 28 U.S.C. § 2461(c): Criminal Forfeiture] |

GURKARAN ISSHPUNANI,
  aka "Karan,"
SANJEEV BHOLA,
  aka "Vant,"
BALWAT BHOLA,
  aka "Titu,"
BAKSHISH SIDHU,
SANJIV WADHWA,
  aka "Bobby,"
RAMESH SINGH,
  aka "Jag,"
  aka "Ajaib,"
SUCHA SINGH,
HARMEET SINGH,
HARINDER SINGH,
  aka "Sonu,"
BRADLEY JOHN MARTIN,
  Aka "Bob,"
SHANNON AUBUT,
CHRISTOPHER FAGON,
JASON ROBERT CAREY,
JOSE LUIS BARRAZA,
MIGUEL MELINDEZ GASTELUM,
BREIDI ALBERTO ESPINOZA,
JESUS MANUEL RIOS,
JOSE DE JESUS MONTENEGRO,

ALBERTO DIAZ,
FNU LNU,
  aka "Buddy,"
PAUL ALLEN JACOBS, and
TINA PHAM,

          Defendants.

The Grand Jury charges:

**INTRODUCTORY ALLEGATIONS**

**Hawala Money Remittance Systems**

1.    A "hawala" is an alternative money remittance system conducted by brokers known as "hawaladars" that operates outside of the traditional banking and financial systems and is premised on relationships of mutual trust.  The hallmark of a hawala is the transfer and receipt of the value of currency without its actual physical movement.

2.    In its most basic form, a hawala network involves at least two hawaladars.  A customer approaches a hawaladar and gives the hawaladar a sum of money to be transferred to a beneficiary in another city or country.  The customer also provides the hawaladar with an identification code, often referred to as a "token," for the transaction, which he, in turn, had obtained from the beneficiary or a representative of the beneficiary.  The hawaladar then contacts a hawaladar in the recipient city/country, instructs this individual to deliver equivalent funds in the recipient country's currency to the beneficiary, and promises to settle the debt between the two hawaladars at a later time.  The hawaladar in the recipient city/country then contacts the beneficiary, confirms that the beneficiary possesses the code previously provided to the customer,

1   and delivers the funds to the beneficiary.  The recipient typically
2   receives the funds without producing identity documents other than
3   the identification code.

4        3.    In a hawala system there is no recorded agreement or
5   written contract for the transaction and no legal means of
6   reclamation.  Rather, the deal is secured by the trust between the
7   parties which is often forged through familial, ethnic, religious,
8   regional, and/or cultural bonds, and which undergirds the "honor
9   system" that a hawala requires.  Typically, a hawala network is quite
10  extensive, involving the transfer of many types of currencies between
11  various hawaladars in different cities/countries and across different
12  continents, with the value of money moving in a variety of directions
13  from one city/country to another.  In addition, hawaladars in the
14  same country often "pool" together bulk currency to effectuate an
15  "order" from another hawaladar if the amounts they individually
16  possess are insufficient to satisfy an order.

17       4.    Each time a hawaladar gives payment instructions and a
18  transaction occurs, a debt is created.  Hawaladars typically maintain
19  a running tally or balance sheet and settle their debts vis-à-vis one
20  another on a regular basis.  Money inflows and outflows are generally
21  kept in relative balance with respect to the total amount of money
22  each hawaladar puts into the network.  Settlement between hawaladars
23  can occur in several ways.  Mostly, settlement occurs through
24  monetary value being placed upon the "books" of a given hawaladar in
25  either the hawaladar's home country or in another country designated
26  by the hawaladar.  In other instances, hawaladars "settle up" with
27  the receipt of goods, real estate, or other assets in lieu of money.

28       5.    Hawala networks engage in transactions where the source of

the money is legitimate and those where the source and intent of the transactions are illegitimate.   The term "white hawala" refers to transactions involving funds generated through legitimate income. The term "black hawala" refers to transactions involving funds generated through illegitimate means and often involves the transmission of funds from the drug trafficking trade.

COUNT ONE

[18 U.S.C. § 1956(h)]

A.   OBJECTS OF THE CONSPIRACY

Beginning on an unknown date and continuing until on or about December 8, 2012, in Los Angeles County, within the Central District of California, and elsewhere, defendants GURKARAN ISSHPUNANI, also known as ("aka") "Karan" ("KARAN"), SANJEEV BHOLA, aka "Vant" ("VANT"), BALWAT BHOLA, aka "Titu" ("TITU"), BAKSHISH SIDHU ("SIDHU"), SANSIV WADHWA, aka "Bobby" ("WADHWA"), RAMESH SINGH, aka "Jag," aka "Ajaib" ("R. SINGH"), SUCHA SINGH, ("S. SINGH"), HARMEET SINGH ("H. SINGH"), HARINDER SINGH, aka "Sonu" ("SONU"), BRADLEY JOHN MARTIN, aka "Bob" ("MARTIN"), SHANNON AUBUT ("AUBUT"), CHRISTOPHER FAGON ("FAGON"), JASON ROBERT CAREY ("CAREY"), JOSE LUIS BARRAZA ("BARRAZA"), MIGUEL MELINDEZ GASTELUM ("GASTELUM"), BREIDI ALBERTO ESPINOZA ("ESPINOZA"), JESUS MANUEL RIOS ("RIOS"), JOSE DE JESUS MONTENEGRO ("MONTENEGRO"), ALBERTO DIAZ ("DIAZ"), First Name Unknown ("FNU"), Last Name Unknown ("LNU"), aka "Buddy" ("BUDDY"), PAUL ALLEN JACOBS ("JACOBS"), and TINA PHAM ("PHAM"), co-conspirator T. Singh, and others known and unknown to the Grand Jury, conspired and agreed with each other to knowingly and intentionally commit offenses against the United States, namely:

1.   Knowing that property involved in financial transactions represented the proceeds of some form of unlawful activity, and which property was, in fact, the proceeds of a specified unlawful activity, that is, conspiracy to distribute controlled substances, in violation of Title 21, United States Code, Section 846, conducted and attempted to conduct financial transactions, affecting interstate and foreign commerce:

1         a.   With the intent to promote the carrying on of said

2 specified unlawful activity, in violation of Title 18, United States

3 Code, Section 1956(a)(1); and

4         b.   Knowing that the transactions were designed in whole

5 and in part to conceal and disguise the nature, the location, the

6 source, the ownership, and control of the proceeds of said specified

7 unlawful activity, in violation of Title 18, United States Code,

8 Section 1956(a)(1)(B)(i);

9    2.   Transporting, transmitting, and transferring monetary

10 instruments and funds from a place outside of the United States,

11 namely, Canada and India, to a place inside of the United States:

12         a.   With the intent to promote the carrying on of said

13 specified unlawful activity, in violation of Title 18, United States

14 Code, Section 1956(a)(2)(A); and

15         b.   Knowing that the monetary instrument or funds

16 represented the proceeds of some form of unlawful activity, namely,

17 conspiracy to distribute controlled substances, in violation of Title

18 21, United States Code, Section 846, with the intent to conceal and

19 disguise the nature, the location, the source, the ownership, and

20 control of the proceeds of said specified unlawful activity, in

21 violation of Title 18, United States Code, Section 1956(a)(2)(B)(i).

22 B.  MEANS BY WHICH THE OBJECTS OF THE CONSPIRACY WERE TO BE

23     ACCOMPLISHED

24    The objects of the conspiracy were to be accomplished in

25 substance as follows:

26    1.   Drug traffickers in Canada would generate drug proceeds

27 from multi-kilogram and multi-pound-quantity sales and distributions

28 of drugs provided by Mexican cartels, including the Sinaloa Cartel,

1 and their affiliated Mexican-based drug trafficking organizations

2 ("DTOs").

3      2.   The drug traffickers would arrange the transfer of drug

4 proceeds to their confederates in Mexico as either profits or payment

5 for additional purchases of drugs for sale and distribution.

6      3.   To disguise and transfer the money to the cartels and their

7 affiliated DTOs, the drug traffickers would contact defendants KARAN,

8 SIDHU, VANT, and TITU, hawaladars in Canada, and WADHWA, a hawaladar

9 in India, and place an order that a specified amount of money be

10 delivered to couriers (working on behalf of such unindicted drug

11 traffickers or the cartels and affiliated Mexican-based DTOs) in the

12 United States.

13      4.   Defendants KARAN, SIDHU, VANT, TITU, and WADHWA would

14 receive orders and would contact hawaladars in the United States,

15 including defendants R. SINGH, S. SINGH, H. SINGH, and SONU, and

16 co-conspirator T. Singh, to determine whether there were sufficient

17 funds in place to allow for the order to be fulfilled.

18      5.   Hawaladars in the United States, including defendants R.

19 SINGH, S. SINGH, H. SINGH, and SONU, and co-conspirator T. Singh,

20 would confirm to defendants KARAN, SIDHU, VANT, TITU, and WADHWA that

21 sufficient funds were available or could be pooled from other

22 hawaladars as necessary to meet the order.

23      6.   Defendants KARAN, SIDHU, VANT, and TITU would receive bulk

24 Canadian currency from couriers sent by drug traffickers (and in the

25 case of WADHWA, would arrange for bulk Canadian currency to be

26 delivered to Canadian hawala counterparts, including defendant

27 KARAN), as well as a banknote serial number to be used as a "token"

28 by the recipient party or his representative to secure the release of

1   an equivalent amount of United States currency from hawaladars

2   operating in the United States.

3        7.   Defendants KARAN, SIDHU, VANT, and TITU would then instruct

4   defendants R. SINGH, H. SINGH, S. SINGH, SONU, and co-conspirator T.

5   Singh, to deliver the equivalent amount of bulk United States

6   currency to a designated courier in the Los Angeles, California area.

7        8.   Defendants R. SINGH, H. SINGH, S. SINGH, SONU, and

8   co-conspirator T. Singh, would then arrange to meet the courier to

9   deliver this money.

10       9.   Defendants MARTIN, AUBUT, FAGON, ESPINOZA, MONTENEGRO and

11  DIAZ would serve as couriers who would pick up and deliver bulk

12  United States currency to facilitate the transfer of this money to

13  drug traffickers in Mexico.

14       10.  Defendant MARTIN would deliver bulk United States currency

15  that he obtained from hawaladars to defendants BARRAZA, GASTELUM, and

16  RIOS and pick up drugs from undisclosed drug stash locations which

17  were to be sold and distributed in Canada.

18       11.  Defendant FAGON would deliver bulk United States currency

19  to defendant CAREY, who would deliver the money to unindicted

20  co-conspirator(s) to transmit to Mexico.

21       12.  Defendant S. SINGH, at defendant KARAN's direction, would

22  deliver money to defendant JACOBS as payment for picking up cocaine

23  and methamphetamine purchased with the United States currency

24  transferred through the hawala system.

25       13.  At the direction of defendant BUDDY, defendant JACOBS would

26  pick up and deliver drugs and drug proceeds transferred through the

27  hawala system.

28       14.  Defendant PHAM would receive drugs from defendant JACOBS

8

for distribution in Canada.

C.    OVERT ACTS

    In furtherance of the conspiracy and to accomplish the objects of the conspiracy, on or about the following dates and times, defendants KARAN, VANT, TITU, SIDHU, WADHWA, R. SINGH, H. SINGH, S. SINGH, SONU, MARTIN, FAGON, CAREY, AUBUT, BARRAZA, GASTELUM, ESPINOZA, RIOS, MONTENEGRO, DIAZ, JACOBS, BUDDY, and PHAM, co-conspirator T. Singh, and others known and unknown to the Grand Jury, committed various overt acts within the Central District of California, and elsewhere, including but not limited to the following:

### MARCH 20, 2012 TRANSFER OF $522,000

    1.    On March 14, 2012, at 3:38 P.M., using coded language in a telephone conversation, defendant SIDHU confirmed with defendant R. SINGH that defendant R. SINGH would have $500,000 available to distribute in Los Angeles to meet a pending order.

    2.    On March 14, 2012, at 4:00 P.M., using coded language in a telephone conversation, defendant SIDHU confirmed with defendant R. SINGH that the money would be available for delivery that Saturday night.

    3.    On March 15, 2012, at 7:46 P.M., using coded language in a telephone conversation, defendant SIDHU told defendant R. SINGH that "they" (the drug trafficker and his DTO) had increased the order to $1,000,000 and changed the delivery date to that Monday or Tuesday, to which defendant R. SINGH responded by noting that he preferred to satisfy the order through two deliveries of $500,000 because a $1,000,000 delivery would look "weird."

    4.    On March 16, 2012, at 9:57 A.M., using coded language in a

1    telephone conversation, defendant SIDHU told defendant R. SINGH that

2    an unindicted co-conspirator had called to say that he had $75,000

3    that could be included as part of funds pooled by R. SINGH to satisfy

4    this order.

5        5.   On March 17, 2012, at 10:47 A.M., using coded language in a

6    telephone conversation, defendant SIDHU confirmed with defendant R.

7    SINGH that defendant R. SINGH intended to charge a commission fee for

8    the transaction.

9        6.   On March 19, 2012, at 9:16 A.M., using coded language in a

10   telephone conversation, defendant SIDHU told defendant R. SINGH that

11   it would be better to deliver the $1,000,000 in two separate

12   deliveries of $500,000 as defendant R. SINGH previously had

13   suggested.

14       7.   On March 20, 2012, at 7:06 A.M., using coded language in a

15   telephone conversation, defendant R. SINGH informed defendant SIDHU

16   that defendant R. SINGH had scheduled the delivery of bulk cash to

17   the courier for 10:00 A.M. that day and asked defendant SIDHU to

18   confirm when defendant SIDHU received the money drop-off in Canada

19   that morning.

20       8.   On March 20, 2012, at 9:54 A.M., at his residence in

21   Alhambra, California, defendant R. SINGH loaded into his car a Bud

22   Light cardboard drink box and a Diet Coke cardboard drink box that

23   together contained $522,000 and departed for the scheduled meeting

24   with the courier.

25       9.   On March 20, 2012, defendant R. SINGH met defendant MARTIN

26   at a parking lot in Alhambra, California, and the two then drove

27   together to a temple in Alhambra, California.

28       10.  On March 20, 2012, at 10:16 A.M., at the temple in

1 | Alhambra, California, defendant R. SINGH delivered to defendant
2 | MARTIN $522,000 cash, which remained concealed in the two cardboard
3 | drink boxes.

4 |     11. On March 20, 2012, at 10:30 A.M., using coded language in a
5 | telephone conversation, defendant SIDHU confirmed with defendant R.
6 | SINGH that the first installment of $500,000 had been delivered as
7 | previously planned.

8 |     12. On March 20, 2012, at 1:37 P.M., defendant MARTIN arrived
9 | at a residence in Coachella, California, and parked inside the
10 | garage, to deliver the $522,000 to defendants BARRAZA and GASTELUM.

11 |     13. On March 20, 2012, at 5:30 P.M., defendants BARRAZA and
12 | GASTELUM left the residence in Coachella in a green Chevy
13 | Trailblazer, with the $522,000 secreted in hidden compartments of the
14 | vehicle, for the purpose of transporting the money to unindicted
15 | co-conspirators.

16 | **MARCH 21, 2012 TRANSFER OF $600,000**

17 |     14. On March 21, 2012, at 1:19 P.M., using coded language in a
18 | telephone conversation, defendant SIDHU informed defendant R. SINGH
19 | that a courier identified as "Bob" had been told that $600,000 in
20 | bulk United States currency would be delivered to him at 6:00 P.M.

21 |     15. On March 21, 2012, at 6:00 P.M., at a location in Monterey
22 | Park, California, defendant MARTIN (using the cover name "Bob")
23 | received $600,000 in bulk United States Currency from defendant R.
24 | SINGH that defendant MARTIN was responsible for then delivering to
25 | unindicted co-conspirators.

26 |     16. On March 21, 2012, at 6:31 P.M., using coded language in a
27 | telephone conversation, defendants SIDHU and R. SINGH discussed the
28 | delivery of $600,000 to defendant MARTIN, that defendant R. SINGH

remained in possession of $100,000 of defendant VANT's money, and that defendant R. SINGH would be receiving another $100,000 in the near future.

### APRIL 3, 2012 TRANSFER OF $500,330

17.  On April 3, 2012, at 8:39 A.M., using coded language in a telephone conversation, defendant KARAN confirmed with defendant R. SINGH that a delivery of $400,000 was to be done that day on behalf of a drug trafficker customer and asked defendant R. SINGH for a temporary, or "burner," phone number to give to an unidentified co-conspirator.

18.  On April 3, 2012, at 9:24 A.M., using coded language in a telephone conversation, defendant KARAN told defendant R. SINGH that defendant R. SINGH's "cover name" for the transaction would be "Tony" and that defendant KARAN would send the "token number" to defendant R. SINGH's via text once he got it.

19.  On April 3, 2012, at 10:34 A.M., using coded language in a telephone conversation, defendant KARAN requested that defendant R. SINGH turn on his burner phone, told defendant R. SINGH that another $250,000 would be delivered to him, and instructed defendant R. SINGH to give the courier a total of $650,000.

20.  On April 3, 2012, at 10:35 A.M., using coded language in a telephone conversation, defendant KARAN told defendant R. SINGH that defendant H. SINGH would provide defendant R. SINGH with $250,000, and defendant KARAN reminded defendant R. SINGH to turn on his burner phone so that defendant ESPINOSA (using the cover name "Rico") could call him.

21.  On April 3, 2012, at 10:54 A.M., using coded language in a telephone conversation, defendant KARAN informed defendant R. SINGH

1  that the "token number" had been provided to defendant KARAN and

2  asked defendant R. SINGH if defendant ESPINOSA had called.

3      22.  On April 3, 2012, at 5:07 P.M., using coded language in a

4  telephone conversation, defendant H. SINGH asked defendant R. SINGH

5  whether he could give $250,000 directly to defendant ESPINOSA (as

6  opposed to delivering that amount to defendant R. SINGH), in addition

7  to the $250,000 that defendant R. SINGH would give to defendant

8  ESPINOSA, who would be arriving around 6:30 P.M.

9      23.  On April 3, 2012, at 5:12 P.M., using coded language in a

10  telephone conversation, defendant KARAN told defendant R. SINGH that

11  he had instructed defendant H. SINGH to deliver the money to

12  defendant R. SINGH, and defendant KARAN advised defendant R. SINGH to

13  contact defendant ESPINOSA to schedule defendant R. SINGH's delivery

14  of the pooled funds to him.

15      24.  On April 3, 2012, at 5:53 P.M., using coded language in a

16  telephone conversation, defendant H. SINGH told defendant R. SINGH

17  that he would leave the $250,000 at defendant R. SINGH's store.

18      25.  On April 3, 2012, at 5:57 P.M., defendant H. SINGH dropped

19  off $250,000 at defendant R. SINGH's store in Monterey Park,

20  California.

21      26.  On April 3, 2012, at 6:18 P.M., defendant R. SINGH picked

22  up the $250,000 delivered by defendant H. SINGH, and defendant R.

23  SINGH drove to his residence in Alhambra, California.

24      27.  On April 3, 2012, at 6:37 P.M., using coded language in a

25  telephone call, defendant R. SINGH confirmed to defendant KARAN that

26  defendant H. SINGH had delivered the $250,000 as previously planned,

27  that defendant R. SINGH would meet defendant ESPINOSA at 7:00 P.M.,

28  and that defendant R. SINGH would call defendant KARAN after he

1   delivered the money to defendant ESPINOZA.

2       28.   On April 3, 2012, at 6:41 P.M., using coded language in a

3   telephone conversation, defendant SONU told defendant R. SINGH that

4   his uncle, defendant S. SINGH, instructed him to deliver $50,000 to

5   defendant R. SINGH.

6       29.   On April 3, 2012, at 6:56 P.M., defendant SONU arrived at

7   defendant R. SINGH's residence with a large envelope containing

8   $50,000 and gave the money to defendant R. SINGH.

9       30.   On April 3, 2012, at 7:03 P.M., using coded language in a

10  telephone conversation, defendant R. SINGH informed defendant KARAN

11  that the money was $20,000 short and that he would call defendant

12  ESPINOSA to let him know that he needed another 10 to 15 minutes time

13  before he would be ready to meet for the delivery.

14      31.   On April 3, 2012, at 7:24 P.M., using coded language in a

15  telephone conversation, defendant KARAN confirmed that defendant SONU

16  (referred to as "Sucha's person") delivered $50,000 to defendant R.

17  SINGH, and defendant KARAN provided defendant R. SINGH the token

18  number to be used with defendant ESPINOSA.

19      32.   On April 3, 2012, at 7:26 P.M., defendant R. SINGH and two

20  unindicted co-conspirators loaded a vehicle with bags of money at a

21  location in Alhambra, California, after which defendant R. SINGH

22  drove to a parking garage in Alhambra, California.

23      33.   On April 3, 2012, at 7:31 P.M., defendant ESPINOSA met with

24  defendant R. SINGH at this parking lot, took two bags of money from

25  defendant R. SINGH, placed the bags of money into his vehicle, and

26  drove from this location to transport the money to unindicted

27  co-conspirators.

28      34.   On April 3, 2012, at 7:37 P.M., using coded language in a

14

telephone conversation, defendant R. SINGH advised defendant KARAN that the transaction was complete.

35.   On April 3, 2012, at 8:25 P.M., defendant ESPINOZA drove into a parking garage in Norco, California.

36.   On April 3, 2012, at 11:45 p.m., at a location in Norco, California, defendant ESPINOZA possessed approximately $500,330 in bulk cash United States currency, at which time the money was seized by law enforcement.

37.   On April 4, 2012, at 12:45 P.M., using coded language in a telephone conversation, defendant KARAN reassured defendant R. SINGH that the seizure of the $500,330 from defendant ESPINOSA was not defendant R. SINGH's fault because it occurred two hours later and in another city after completion of defendant R. SINGH's delivery.

38.   On April 4, 2012, at 3:08 P.M., using coded language in a telephone conversation, an unindicted co-conspirator gave defendant R. SINGH the moniker and phone number of the courier to whom defendant R. SINGH would deliver $100,000 the following day and the moniker defendant R. SINGH was to use for the transaction.

**APRIL 17, 2012 SEIZURE OF 32.82 KILOGRAMS OF METHAMPHETAMINE**

**AND 9.22 KILOGRAMS OF COCAINE**

39.   On April 17, 2012, at the direction of defendant KARAN, defendant S. SINGH delivered a transportation fee to defendant JACOBS as payment for picking up drugs from an unidentified co-conspirator.

40.   On April 17, 2012, at a location in Venice, California, defendant JACOBS possessed approximately 32.82 kilograms of actual methamphetamine and approximately 9.22 kilograms of a mixture and substance containing a detectable amount of cocaine, which were intended for delivery to a recipient in Canada at defendant BUDDY's

direction.

## MAY 8, 2012 SEIZURE OF 20 KILOGRAMS OF COCAINE AND 15 POUNDS OF METHAMPHETAMINE

41.  On May 8, 2012, at defendant BUDDY's direction, defendant JACOBS delivered to defendant PHAM what defendant PHAM believed to be 10 kilograms of cocaine at a location in West Hollywood, California.

42.  On May 8, 2012, at a location in Los Angeles, California, defendant PHAM possessed approximately 20 kilograms of a mixture and substance containing a detectable amount of cocaine and approximately 15 pounds of a mixture and substance containing a detectable amount of methamphetamine that was to be smuggled into Canada.

## JULY 10, 2012 TRANSFER OF $199,800

43.  On July 10, 2012, at 10:53 A.M., using coded language in a telephone conversation, defendant TITU provided defendant R. SINGH with a telephone number; instructed him to set up a meeting with a courier in Los Angeles, California, at which defendant R. SINGH would provide the courier with $200,000; and informed defendant R. SINGH that defendant TITU would deliver defendant R. SINGH's money in Canada in return the next day.

44.  On July 10, 2012, at 10:55 A.M., using coded language in a telephone conversation, defendant TITU provided defendant R. SINGH with the phone number of the courier and instructed defendant R. SINGH to use the "new number" to call the courier.

45.  On July 10, 2012, at 12:38 P.M., using coded language in a telephone conversation, defendant TITU asked defendant R. SINGH whether he had called the courier because defendant TITU was about to accept delivery of bulk Canadian currency from an unindicted co-conspirator.

46.  On July 10, 2012, at 1:22 P.M., using coded language in a telephone conversation, defendant VANT asked defendant R. SINGH if he had called the courier in Los Angeles, then told defendant R. SINGH that he (defendant VANT) was going to get another $200,000 in Canada tomorrow and would call defendant R. SINGH back.

47.  On July 10, 2012, at 2:02 P.M., using coded language in a telephone conversation, defendant VANT provided defendant R. SINGH with the phone number for defendant FAGON and the token number to be verified by defendant R. SINGH during the money delivery.

48.  On July 10, 2012, at 2:13 P.M., using coded language in a telephone conversation, defendant VANT instructed defendant R. SINGH to take his commission out of the total amount of cash to be delivered to defendant FAGON in Los Angeles, California.

49.  On July 10, 2012, at 3:48 P.M., using coded language in a telephone conversation, defendant TITU confirmed to defendant R. SINGH that he wanted defendant R. SINGH to deliver the money to defendant FAGON.

50.  On July 10, 2012, at 4:06 P.M., using coded language in a telephone conversation, defendant TITU asked defendant R. SINGH if he had delivered the money to defendant FAGON.

51.  On July 10, 2012, at 4:08 P.M., defendant R. SINGH and an unindicted co-conspirator loaded a bag containing $199,800 in United States currency into the trunk of a vehicle and drove to the Hollywood, California area.

52.  On July 10, 2012, at 4:29 P.M., after defendant FAGON arrived at the location in the Hollywood, California area, defendant R. SINGH delivered the bag containing $199,800 in United States currency to defendant FAGON.

53.  On July 10, 2012, at 4:29 P.M., using coded language in a telephone conversation, defendant R. SINGH confirmed to defendant TITU that he had delivered the money to defendant FAGON.

54.  On July 10, 2012, at 8:15 P.M., defendant FAGON delivered the $199,800 to defendant CAREY in the bathroom of a hotel located in Hollywood, California, so that defendant CAREY could then transport the money to unindicted co-conspirators.

## JULY 12, 2012 TRANSFER OF $690,000

55.  On July 9, 2012, at 5:10 P.M., using coded language in a telephone conversation, defendant SIDHU and defendant R. SINGH discussed the use of "code" names instead of defendant SIDHU's real name as a precautionary measure and made arrangements for an upcoming delivery of $1,000,000 in Los Angeles, California, which was to be broken into two separate money deliveries conducted by defendant R. SINGH, including one involving $700,000 for "Thursday" (July 12, 2012).

56.  On July 12, 2012, at 5:00 P.M., defendant R. SINGH and an unindicted co-conspirator loaded a bag containing $690,000 into a vehicle, which defendant R. SINGH then drove to a liquor store located in Monterey Park, California.

57.  On July 12, 2012, at 5:15 P.M., defendant MARTIN met defendant R. SINGH outside this liquor store, at which time defendant SINGH provided defendant MARTIN with $690,000 in United States currency.

58.  On July 12, 2012, at 5:19 P.M., using coded language in a telephone conversation, defendant R. SINGH confirmed to defendant SIDHU that he had delivered the money to defendant MARTIN.

59.  On July 12, 2012, at 8:32 P.M., defendant MARTIN met with

1   defendant RIOS in Coachella, California, and loaded the $690,000 in

2   United States currency into the trunk of defendant RIOS' vehicle so

3   that defendant RIOS could then transport the money to unindicted

4   co-conspirators.

**SEPTEMBER 5-6, 2012 TRANSFERS OF $310,000 AND $41,000**

6   60.  On September 5, 2012, at 9:46 P.M., using coded language in

7   a telephone conversation, defendant WADHWA instructed defendant H.

8   SINGH to deliver $41,000 to another hawaladar who needed additional

9   money to complete an existing order.

10  61.  On September 6, 2012, at 8:53 A.M., using coded language in

11  a telephone conversation, defendant WADHWA informed defendant H.

12  SINGH that the other hawaladar would call defendant H. SINGH to

13  arrange the time to pick up the $41,000 from defendant H. SINGH.

14  62.  On September 6, 2012, at 8:59 A.M., using coded language in

15  a telephone conversation, defendant WADHWA instructed defendant H.

16  SINGH to deliver $310,000 on behalf of defendant KARAN and another

17  $41,000 to an unindicted co-conspirator, after which the "balance"

18  between them would be zero.

19  63.  On September 6, 2012, at 3:34 P.M., using coded language in

20  a telephone conversation, defendant KARAN told defendant H. SINGH

21  that defendant R. SINGH would deliver to defendant H. SINGH $200,000

22  and that defendant H. SINGH would not have to do any money deliveries

23  until the following morning.

**SEPTEMBER 7, 2012 TRANSFERS OF $399,800 AND $249,860**

25  64.  On September 6, 2012, at 6:42 P.M., using coded language in

26  a telephone conversation, defendants H. SINGH and R. SINGH made

27  arrangements for defendant R. SINGH to deliver $245,000 to defendant

28  H. SINGH about 15-to-20 minutes after the completion of the call.

65. On September 6, 2012, at 6:55 P.M., using coded language in a telephone conversation, defendant KARAN asked defendant H. SINGH if he had provided defendant H. SINGH with $245,000.

66. On September 6, 2012, at 7:18 P.M., using coded language in a telephone conversation, defendant WADHWA instructed defendant H. SINGH to pick up $400,000 from co-conspirator T. Singh.

67. On September 7, 2012, at 10:33 A.M., using coded language in a telephone conversation, defendant WADHWA instructed defendant H. SINGH to confirm with defendant KARAN that there would be two separate money deliveries of $400,000 and $250,000.

68. On September 7, 2012, at 10:53 A.M., using coded language in a telephone conversation, defendant WADHWA instructed defendant H. SINGH that he would be responsible for delivering $250,000 to a courier later that day.

69. On September 7, 2012, at 12:17 P.M., using coded language in a telephone conversation, defendant KARAN confirmed to defendant H. SINGH that he had approved the delivery of $250,000 to defendant H. SINGH.

70. On September 7, 2012, at 1:16 P.M., using coded language during a telephone conversation, defendant WADHWA instructed defendant H. SINGH to approve the delivery of $400,000 to the courier and discussed commission payments with defendant H. SINGH.

71. On September 7, 2012, at 1:16 P.M., using coded language during a telephone conversation, defendant KARAN told defendant H. SINGH that he had texted the courier regarding the delivery of $400,000, asked defendant H. SINGH to call the courier to set the time of the delivery, and inquired about the separate delivery of $250,000, which was scheduled to occur in approximately the next 30

1 minutes.

2     72. On September 7, 2012, at 1:40 P.M., defendant H. SINGH

3 loaded a bag containing $249,860 into a car and drove with an

4 unindicted co-conspirator to a parking lot in Chino Hills,

5 California.

6     73. On September 7, 2012, at 1:50 P.M., defendant MONTENEGRO

7 met defendant H. SINGH at the parking lot in Chino Hills, California,

8 at which time defendant H. SINGH delivered the bag containing

9 $249,860 in United States currency to defendant MONTENEGRO so he

10 could transport it to unindicted co-conspirators.

11     74. On September 7, 2012, at 1:52 P.M., using coded language in

12 a telephone conversation, defendant H. SINGH told defendant KARAN

13 that the courier who was supposed to accept delivery of the $400,000

14 did not answer the telephone, while the courier for the $250,000

15 delivery was ready to pick up the money.

16     75. On September 7, 2012, at 2:26 P.M., using coded language in

17 a telephone conversation, defendant H. SINGH informed defendant KARAN

18 that the $250,000 delivery had been completed as scheduled.

19     76. On September 7, 2012, at 3:31 P.M., using coded language in

20 a telephone conversation, defendants KARAN and H. SINGH arranged for

21 defendant H. SINGH to contact the courier who would pick up $400,000

22 from defendant H. SINGH.

23     77. On September 7, 2012, at 3:37 P.M., using coded language in

24 a telephone conversation, defendant H. SINGH told defendant KARAN

25 that the courier's telephone was still "switched off," to which

26 defendant KARAN responded that he would call the drug customer

27 directly to inquire about the problem.

28     78. On September 7, 2012, at 3:45 P.M., using coded language in

1   a telephone conversation, defendant KARAN told defendant H. SINGH

2   that defendant KARAN had given defendant H. SINGH the wrong area code

3   for the courier's telephone number, provided defendant H. SINGH with

4   the correct area code, and told him to call again.

5        79.  On September 7, 2012, at 4:07 P.M., using coded language in

6   a telephone conversation, defendant H. SINGH informed defendant KARAN

7   that he had spoken with the courier and that they would be meeting in

8   40 minutes.

9        80.  On September 7, 2012, at 5:25 P.M., defendant H. SINGH

10  drove to a location in Walnut, California, where he met defendant

11  DIAZ, at which time he provided defendant DIAZ with a bag containing

12  $399,800 so that defendant DIAZ could transport it to unindicted

13  co-conspirators.

14       81.  On September 7, 2012, at 5:27 P.M., using coded language in

15  a telephone conversation, defendant H. SINGH told defendant KARAN

16  that he was in the process of giving the courier (referring to

17  defendant DIAZ) $400,000 after defendant DIAZ had provided him with

18  the correct token number.

19           **OCTOBER 9, 2012 TRANSFERS OF $80,000 AND $90,000**

20       82.  On October 9, 2012, at 1:43 P.M., using coded language in a

21  telephone conversation, defendant H. SINGH told defendant SONU that

22  an order of bulk United States currency had not yet arrived for pick-

23  up.

24       83.  On October 9, 2012, at 3:43 P.M., defendant H. SINGH

25  delivered $80,000 to defendant SONU at a location in Chino Hills,

26  California.

27       84.  On October 9, 2012, at 3:43 P.M., using coded language in a

28  telephone conversation, defendant H. SINGH confirmed to defendant

KARAN that he had given $80,000 to defendant SONU, and the two discussed future money deliveries with defendant SONU.

85.  On October 9, 2012, at 7:56 P.M., using coded language in a telephone conversation, defendant H. SINGH confirmed to defendant KARAN that he had $30,000 in his possession and that he would soon have an additional $20,000.

86.  On October 9, 2012, at 7:56 P.M., using coded language in a telephone conversation, defendant KARAN stated that defendant SONU was counting defendant KARAN's money and instructed defendant H. SINGH to deliver the money to defendant SONU.

87.  On October 9, 2012, at 8:03 P.M., using coded language in a telephone conversation, defendant H. SINGH told defendant SONU that he (defendant H. SINGH) needed another $7,000, for a total of $49,500, to which defendant SONU responded that he would have to call defendant H. SINGH back so that they could set up a time and location when defendant H. SINGH could provide this money to defendant SONU.

88.  On October 10, 2012, at 11:44 A.M., using coded language in a telephone conversation, defendant H. SINGH and co-conspirator T. Singh discussed the plan for co-conspirator T. Singh to receive $90,000 from defendant SONU at the current exchange rate.

### OCTOBER 16, 2012 TRANSFERS OF $274,980 AND $388,100

89.  On October 16, 2012, at 12:26 P.M., defendant SONU drove to a temple located in Alhambra, California, where he retrieved a bag containing $274,980 in United States currency from defendant R. SINGH's vehicle so that he could transport the money to unindicted co-conspirators.

90.  On October 16, 2012, at 1:47 P.M., using coded language in a telephone conversation, defendant H. SINGH told defendant SONU that

1 | he had another $50,000 for defendant SONU.

2 |     91.  On October 16, 2012, at 2:11 P.M., using coded language in

3 | a telephone conversation, defendant H. SINGH told defendant KARAN

4 | that he had spoken with defendant SONU and was going to meet

5 | defendant SONU to give him $50,000.

6 |     92.  On October 16, 2012, at a location in La Mirada,

7 | California, defendant SONU and an unindicted co-conspirator possessed

8 | $388,100 in United States currency, which was subsequently seized by

9 | law enforcement.

10 |     93.  On October 16, 2012, at 5:14 P.M., using coded language in

11 | a telephone conversation, defendant H. SINGH told defendant KARAN

12 | that he had not yet given $50,000 to defendant SONU, who was not

13 | answering his telephones.

14 |     94.  On October 16, 2012, at 5:45 P.M., using coded language in

15 | a telephone conversation, defendant WADHWA told defendant H. SINGH to

16 | "hide" the $50,000 that belonged to defendant WADHWA and not to give

17 | it to defendant SONU because there was likely a "problem" with

18 | defendant SONU.

19 |     95.  On October 16, 2012, at 5:47 P.M., using coded language in

20 | a telephone conversation, defendant S. SINGH advised defendant H.

21 | SINGH that defendant SONU had been arrested on the way to a money

22 | delivery for defendant KARAN after having receiving money from

23 | defendant R. SINGH and that law enforcement was at defendant SONU's

24 | house.

25 |     96.  On October 16, 2012, at 5:59 P.M., using coded language in

26 | a telephone conversation, defendants WADHWA and H. SINGH discussed

27 | the "problem" of defendant SONU's arrest and that the "mistake"

28 | leading to defendant SONU's arrest must have been made by someone

1   other than defendant R. SINGH, who was an experienced hawaladar.

2       97.  On October 16, 2012, at 6:14 P.M., using coded language in

3   a telephone conversation, defendant WADHWA cautioned co-conspirator

4   T. Singh not to keep money at his house and told him to relay this

5   instruction to T. Singh's wife.

6       98.  On October 16, 2012, at 6:20 P.M., using coded language in

7   a telephone conversation, co-conspirator T. Singh informed defendant

8   R. SINGH that he had heard that "Sucha's guy" got arrested with money

9   and cautioned defendant R. SINGH to be "careful," at which time

10  defendant R. SINGH stated that he would find out the details of the

11  arrest.

12      99.  On October 16, 2012, at 6:36 P.M., using coded language in

13  a telephone conversation, co-conspirator T. Singh and defendant R.

14  SINGH discussed the arrest of "Sucha's nephew," after which

15  co-conspirator T. Singh informed defendant R. SINGH that he would

16  send "orders" for a money delivery by "message."

17      100. On October 16, 2012, at 7:14 P.M., using coded language in

18  a telephone conversation, defendants S. SINGH and H. SINGH discussed

19  the seizure of $630,000 from defendant SONU, who needed an attorney

20  and who had to come up with a story for why he had all that money.

21      101. On October 16, 2012, at 7:22 P.M., using coded language in

22  a telephone conversation, defendant S. SINGH told defendant H. SINGH

23  that he had talked to defendant KARAN about obtaining an attorney for

24  defendant SONU, at which time defendant H. SINGH instructed defendant

25  S. SINGH to delete from his telephone all messages from defendant

26  SONU.

27      102. On October 16, 2012, at 8:46 P.M., using coded language in

28  a telephone conversation, defendant R. SINGH told co-conspirator T.

25

1  Singh that "the work" was "messed up" and that the money seized
2  belonged to defendant KARAN in Canada, after which co-conspirator T.
3  Singh told defendant R. SINGH that he would call him back on "the
4  other number."

5      103. On October 16, 2012, at 9:06 P.M., using coded language in
6  a telephone conversation, co-conspirator T. Singh and defendant
7  WADHWA discussed the arrests of defendants SONU and H. SINGH.

8      104. On October 16, 2012, at 9:53 P.M., using coded language in
9  a telephone conversation, defendant S. SINGH told defendant H. SINGH
10 that defendant KARAN had complained that he could not "pay" all of
11 the money seized by himself and accused defendants S. SINGH and SONU
12 of "playing games" and pretending that defendant SONU had been
13 arrested.

14     105. On October 18, 2012, at 8:23 A.M., using coded language in
15 a telephone conversation, defendant WADHWA asked co-conspirator T.
16 Singh if he could pick up $50,000 from defendant H. SINGH and then
17 deliver $250,000 to "someone" (meaning a courier).

18     106. On October 20, 2012, at 3:52 P.M., using coded language in
19 a telephone conversation, defendant H. SINGH asked co-conspirator T.
20 Singh if it would be possible to get the money from co-conspirator T.
21 Singh that day.

22     107. On October 21, 2012, at 9:10 A.M., using coded language in
23 a telephone conversation, co-conspirator T. Singh and an unindicted
24 co-conspirator discussed the deposit of $52,000, and the recent money
25 seizures and arrests of Sikh individuals engaged in the hawala
26 business.

27          **DECEMBER 8, 2012 TRANSFER OF $310,000**

28     108. On December 8, 2012, at 9:43 A.M., using coded language in

26

1  a telephone conversation, defendant WADHWA and co-conspirator T.

2  Singh discussed the planned delivery of $100,000 to co-conspirator T.

3  Singh later that night, and the delivery of $310,000 by

4  co-conspirator T. Singh to another courier.

5      109. On December 8, 2012, at 10:43 A.M., using coded language in

6  a telephone conversation, defendant WADHWA instructed co-conspirator

7  T. Singh to include the $100,000 co-conspirator T. Singh would

8  receive that day as part of the $310,000 delivery to the courier.

9      110. On December 8, 2012, at 2:17 P.M., co-conspirator T. Singh

10 drove a vehicle containing $310,000 in United States currency to a

11 parking lot located in Canoga Park, California.

12     111. On December 8, 2012, at 2:20 P.M., after arriving at the

13 location in Canoga Park, California, defendant AUBUT received

14 $310,000 in United States Currency from co-conspirator T. Singh that

15 defendant AUBUT was responsible for transporting to unindicted

16 co-conspirators.

17     112.  On December 8, 2012, at 3:21 P.M., using coded language in

18 a telephone conversation, co-conspirator T. Singh told defendant

19 WADHWA that the "same girl" (referring to defendant AUBUT) picked up

20 the $310,000 in United States currency, that the courier with the

21 $100,000 had not yet called, and that he may be picking up a "big

22 order" on Monday and therefore might be able to give "a lot" to

23 defendant WADHWA on Tuesday.

24     113. On December 8, 2012, at 7:05 P.M., using coded language in

25 a telephone conversation, defendant WADHWA asked co-conspirator T.

26 Singh about the details of the money delivery to defendant AUBUT.

27     114. On December 8, 2012, at 7:12 P.M., using coded language in

28 a telephone conversation, defendant WADHWA told co-conspirator T.

Singh that there may have been a "problem" with defendant AUBUT, whose telephone was turned off, and defendant WADHWA instructed co-conspirator T. Singh to throw away the telephone he used to speak with defendant AUBUT.

115. On December 8, 2012, at 7:29 P.M., using coded language in a telephone conversation, defendant WADHWA told co-conspirator T. Singh that defendant AUBUT had been arrested, asked T. SINGH to keep the "token number" he had received from defendant AUBUT, and discussed the fact that defendant AUBUT changed her name and telephone number for every money delivery.

116. On December 8, 2012, at 9:24 P.M., using coded language in a telephone conversation, defendant WADHWA and co-conspirator T. Singh discussed the seizure of money from defendant AUBUT, co-conspirator T. Singh's balance within the hawala system, and the perils of the hawala system, including the risk of arrest now that law enforcement seemed to also be arresting Indian individuals handling the money in addition to the non-Indian individuals working on behalf of drug traffickers; but they agreed that the drug traffickers would continue to use the hawala system since the amounts seized were insignificant to them.

1                          COUNT TWO

2                       [18 U.S.C. § 371]

3    A.   OBJECT OF THE CONSPIRACY

4         Beginning on an unknown date and continuing until on or about

5    December 8, 2012, in Los Angeles County, within the Central District

6    of California, and elsewhere, defendants GURKARAN ISSHPUNANI, also

7    known as ("aka") "Karan" ("KARAN"), SANJEEV BHOLA, aka "Vant"

8    ("VANT"), BALWAT BHOLA, aka "Titu" ("TITU"), BAKSHISH SIDHU

9    ("SIDHU"), SANJIV WADHWA, aka "Bobby" ("WADHA"), RAMESH SINGH, aka

10   "Jag," aka "Ajaib" ("R. SINGH"), SUCHA SINGH ("S. SINGH"), HARMEET

11   SINGH ("H. SINGH"), HARINDER SINGH, aka "Sonu" ("SONU"), BRADLEY JOHN

12   MARTIN, aka "Bob" ("MARTIN"), SHANNON AUBUT ("AUBUT"), CHRISTOPHER

13   FAGON ("FAGON"), JASON ROBERT ("CAREY"), JOSE LUIS BARRAZA

14   ("BARRAZA"), MIGUEL MELINDEZ GASTELUM ("GASTELUM"), BREIDI ALBERTO

15   ESPINOZA ("ESPINOZA"), JESUS MANUEL RIOS ("RIOS"), JOSE DE JESUS

16   MONTENEGRO ("MONTENEGRO"), and ALBERTO DIAZ ("DIAZ"), and others

17   known and unknown to the Grand Jury, conspired and agreed with each

18   other to knowingly and intentionally operate an unlicensed money

19   transmitting business affecting interstate and foreign commerce, in

20   violation of Title 18, United States Code, Sections 1960(a),

21   (b)(1)(A), (b)(1)(B), and (b)(1)(C).

22   B.   MEANS BY WHICH THE OBJECT OF THE CONSPIRACY WAS TO BE

23        ACCOMPLISHED

24        The object of the conspiracy was to be accomplished in substance

25   as follows:

26        The Grand Jury re-alleges and incorporates by reference as if

27   fully stated herein paragraphs 1 through 12 of Count One, Section B.

28        13.  Defendants KARAN, VANT, TITU, SIDHU, WADHWA, R. SINGH, H.

                                  29

1  SINGH, S. SINGH, SONU, MARTIN, FAGON, CAREY, AUBUT, BARRAZA,

2  GASTELUM, ESPINOZA, RIOS, MONTENEGRO, and DIAZ were not registered or

3  otherwise licensed as money transmitting businesses either with the

4  State of California or U.S. Department of Treasury Financial Crimes

5  Enforcement Network and were not exempt from licensing.

6      14. Defendants KARAN, VANT, TITU, SIDHU, WADHWA, R. SINGH, H.

7  SINGH, S. SINGH, SONU, MARTIN, FAGON, CAREY, AUBUT, BARRAZA,

8  GASTELUM, ESPINOZA, RIOS, MONTENEGRO, and DIAZ would possess,

9  transport, and deliver funds that they knew had been derived from a

10 criminal offense, namely, drug trafficking, to facilitate the

11 transfer of these funds between and among individuals involved in

12 drug trafficking.

13 C.   OVERT ACTS

14     In furtherance of the conspiracy, and to accomplish the objects

15 of the conspiracy, on or about the following dates and times,

16 defendants KARAN, VANT, TITU, SIDHU, WADHWA, R. SINGH, H. SINGH, S.

17 SINGH, SONU, MARTIN, FAGON, CAREY, AUBUT, BARRAZA, GASTELUM,

18 ESPINOZA, RIOS, MONTENEGRO, DIAZ, and others known and unknown to the

19 Grand Jury, committed various overt acts within the Central District

20 of California, and elsewhere, including but not limited to the

21 following:

22     The Grand Jury re-alleges and incorporates by reference as if

23 fully stated herein paragraphs 1 through 38 and 43 through 116, of

24 Count One, Section C.

25

26

27

28

1                        COUNT THREE

2        [18 U.S.C. §§ 1960(a), (b)(1)(A), (b)(1)(B), (b)(1)(C)]

3      Beginning on a date unknown, and continuing until on or about

4 December 8, 2012, in Los Angeles County, within the Central District

5 of California, and elsewhere, defendants GURKARAN ISSHPUNANI, also

6 known as ("aka") "Karan" ("KARAN"), SANJEEV BHOLA, aka "Vant"

7 ("VANT"), BALWAT BHOLA, aka "Titu" ("TITU"), BAKSHISH SIDHU

8 ("SIDHU"), SANJIV WADHWA, aka "Bobby" ("WADHA"), RAMESH SINGH, aka

9 "Jag," aka "Ajaib" ("R. SINGH"), SUCHA SINGH ("S. SINGH"), HARMEET

10 SINGH ("H. SINGH"), HARINDER SINGH, aka "Sonu" ("SONU"), BRADLEY JOHN

11 MARTIN, aka "Bob" ("MARTIN"), SHANNON AUBUT ("AUBUT"), CHRISTOPHER

12 FAGON ("FAGON"), JASON ROBERT ("CAREY"), JOSE LUIS BARRAZA

13 ("BARRAZA"), MIGUEL MELINDEZ GASTELUM ("GASTELUM"), BREIDI ALBERTO

14 ESPINOZA ("ESPINOZA"), JESUS MANUEL RIOS ("RIOS"), JOSE DE JESUS

15 MONTENEGRO ("MONTENEGRO"), and ALBERTO DIAZ ("DIAZ") (collectively,

16 "defendants") knowingly conducted, controlled, managed, supervised,

17 directed, and owned an unlicensed money transmitting business

18 affecting interstate and foreign commerce that (1) operated without

19 an appropriate money transmitting license in California where such

20 operation is punishable as a felony under state law; (2) failed to

21 comply with the money transmitting business registration requirements

22 under Section 5330 of Title 31, United States Code, and the

23 regulations thereunder; and (3) involved the transportation and

24 transmission of funds that were known to defendants to have been

25 derived from a criminal offense and were intended to be used to

26 promote and support unlawful activity.

27

28

1                     FORFEITURE ALLEGATION I

2                    [18 U.S.C. § 982(a)(1)]

3       1.     Pursuant to Federal Rule of Criminal Procedure 32.2, notice

4 is hereby given to the defendants that the United States will seek

5 forfeiture as part of any sentence in accordance with Title 18,

6 United States Code, Section 982(a)(1), in the event of any

7 defendant's conviction under either of Counts One or Three of this

8 Indictment.

9       2.     Defendants GURKARAN ISSHPUNANI, aka "Karan" ("KARAN"),

10 SANJEEV BHOLA, aka "Vant" ("VANT"), BALWAT BHOLA, aka "Titu"

11 ("TITU"), BAKSHISH SIDHU ("SIDHU"), SANJIV WADHWA, aka "Bobby",

12 ("WADHWA"), RAMESH SINGH, aka "Jag," aka "Ajaib" ("R. SINGH"), SUCHA

13 SINGH ("S. SINGH"), HARMEET SINGH ("H. SINGH"), HARINDER SINGH, aka

14 "Sonu" ("SONU"), BRADLEY JOHN MARTIN, aka "Bob" ("MARTIN"),

15 CHRISTOPHER FAGON ("FAGON"), SHANNON AUBUT ("AUBUT"), JASON ROBERT

16 CAREY ("CAREY"), JOSE LUIS BARRAZA ("BARRAZA"), MIGUEL MELINDEZ

17 GASTELUM ("GASTELUM"), BREIDI ALBERTO ESPINOZA ("ESPINOZA"), JESUS

18 MANUEL RIOS ("RIOS"), JOSE DE JESUS MONTENEGRO ("MONTENEGRO"),

19 ALBERTO DIAZ ("DIAZ"), FNU LNU, aka "Buddy" ("BUDDY"), PAUL ALLEN

20 JACOBS ("JACOBS"), and TINA PHAM ("PHAM") shall forfeit to the United

21 States the following property:

22          a.     All right, title, and interest in any and all

23 property, real or personal, involved in any offense set forth in

24 either of Counts One or Three of this Indictment, or conspiracy to

25 commit such an offense, and any property traceable to such property,

26 including all monies or other property that was the subject of, all

27 commissions, fees, and other property that were derived from, and all

28 monies or other property that was used in any manner or part to

facilitate the commission of any violation of Title 18, United States Code, Sections 1956 or 1960, including, but not limited to:

        i.   Approximately $274,980.00 in U.S. currency seized on or about October 16, 2012, from defendant SONU (13-DEA-573291);

        ii.   Approximately $388,100.00 in U.S. currency seized on or about October 16, 2012, from the wife of defendant SONU (13-DEA-573292); and

        iii. Approximately $399,800.00 in U.S. currency seized on or about September 7, 2012, from defendant DIAZ (13-DEA-571900).

    b.   A sum of money equal to the total value of the property described in subsection 2(a) above.  For each of Counts One and Three for which more than one defendant is found guilty, each such defendant shall be jointly and severally liable for the entire amount forfeited pursuant to that Count.

    3.   Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b), each defendant convicted of Count One or Three of this Indictment shall forfeit substitute property, up to the total value of the property described in the preceding paragraph, if, as a result of any act or omission of a defendant, the property described in the preceding paragraph, or any portion thereof (a) cannot be located upon the exercise of due diligence; (b) has been transferred, or sold to, or deposited with a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been substantially diminished in value; or (e) has been commingled with other property that cannot be divided without difficulty.

1          <u>FORFEITURE ALLEGATION II</u>

2     [18 U.S.C. § 981(a)(1)(C); 28 U.S.C. § 2461(c); 21 U.S.C. § 853]

3          1.    Pursuant to Federal Rule of Criminal Procedure 32.2, notice

4     is hereby given to the defendants that the United States will seek

5     forfeiture as part of any sentence in accordance with Title 18,

6     United States Code, Section 981(a)(1)(C), Title 28, United States

7     Code, Section 2461(c), and Title 21, United States Code, Section 853,

8     in the event of any defendant's conviction under Count Two of this

9     Indictment.

10         2.    Defendants GURKARAN ISSHPUNANI, also known as ("aka")

11    "Karan" ("KARAN"), SANJEEV BHOLA, aka "Vant" ("VANT"), BALWAT BHOLA,

12    aka "Titu" ("TITU"), BAKSHISH SIDHU ("SIDHU"), SANJIV WADHWA, aka

13    "Bobby" ("WADHA"), RAMESH SINGH, aka "Jag," aka "Ajaib" ("R. SINGH"),

14    SUCHA SINGH ("S. SINGH"), HARMEET SINGH ("H. SINGH"), HARINDER SINGH,

15    aka "Sonu" ("SONU"), BRADLEY JOHN MARTIN, aka "Bob" ("MARTIN"),

16    SHANNON AUBUT ("AUBUT"), CHRISTOPHER FAGON ("FAGON"), JASON ROBERT

17    ("CAREY"), JOSE LUIS BARRAZA ("BARRAZA"), MIGUEL MELINDEZ GASTELUM

18    ("GASTELUM"), BREIDI ALBERTO ESPINOZA ("ESPINOZA"), JESUS MANUEL RIOS

19    ("RIOS"), JOSE DE JESUS MONTENEGRO ("MONTENEGRO"), and ALBERTO DIAZ

20    ("DIAZ") shall forfeit to the United States the following property:

21         a.    All right, title, and interest in any and all

22    property, real or personal, which constitutes or is derived from

23    proceeds traceable to any offense set forth in Count Two of this

24    Indictment, including, but not limited to:

25         i.    Approximately $274,980.00 in U.S. currency seized

26    on or about October 16, 2012, from defendant SONU (13-DEA-573291);

27

28

34

ii.   Approximately $388,100.00 in U.S. currency seized on or about October 16, 2012, from the wife of defendant SONU (13-DEA-573292); and

iii.   Approximately $399,800.00 in U.S. currency seized on or about September 7, 2012, from defendant DIAZ (13-DEA-571900).

b.   A sum of money equal to the total value of the property described in subsection 2(a) above.

3.   Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), each defendant convicted under Count Two of this Indictment shall forfeit substitute property, up to the total value of the property described in the preceding paragraph, if, as a result of any act or omission of a defendant, the property described in the preceding paragraph, or any portion thereof (a) cannot be located upon the exercise of due diligence; (b) has been transferred or sold to, or deposited with a third party; (c) has been placed beyond the

//
//
//
//
//
//
//
//
//
//

jurisdiction of the court; (d) has been substantially diminished in value; or (e) has been commingled with other property that cannot be divided without difficulty.

A TRUE BILL

/S/

Foreperson


STEPHANIE YONEKURA
Acting United States Attorney

ROBERT E. DUGDALE
Assistant United States Attorney
Chief, Criminal Division

KEVIN M. LALLY
Assistant United States Attorney
Chief, Organized Crime Drug Enforcement
  Task Force Section

ROB B. VILLEZA
Assistant United States Attorney
Deputy Chief, Organized Crime Drug
  Enforcement Task Force Section

CAROL ALEXIS CHEN
Assistant United States Attorney
Organized Crime Drug Enforcement
  Task Force Section