# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

## [REDACTED] CRIMINAL MINUTES – GENERAL    'O'

| Case No. | 2:14-cr-00648-CAS - 9 | Date | August 17, 2017 |
|---|---|---|---|

| Present: The Honorable | CHRISTINA A. SNYDER |
|---|---|
| Interpreter | N/A |

| Catherine Jeang | Not Present | Carol Chen, Not Present<br>Ellen Lansden, Not Present |
|---|---|---|
| *Deputy Clerk* | *Court Reporter/Recorder, Tape No.* | *Assistant U.S. Attorney* |

| U.S.A. v. Defendant(s): | Present | Cust. | Bond. | Attorneys for Defendants: | Present | App. | Ret. |
|---|---|---|---|---|---|---|---|
| 9) Harinder Singh | NOT | | X | 9) Peter Johnson | NOT | X | |

**Proceedings:**    **(IN CHAMBERS) - [REDACTED]**

SINGH'S MOTION TO SUPPRESS FRUITS OF AN UNLAWFUL SEARCH (Filed July 16, 2017, dkt. 714)

SINGH'S MOTION TO SUPPRESS STATEMENTS (Filed July 17, 2017, dkt. 715)

SINGH'S MOTION FOR A BILL OF PARTICULARS (Filed July 17, 2017, dkt. 716)

SINGH'S MOTION TO STRIKE LANGUAGE FROM THE INDICTMENT (Filed July 17, 2017, dkt. 717)

SINGH'S MOTION IN LIMINE FOR HEARING TO DETERMINE ADMISSIBILITY OF CO-CONSPIRATOR STATEMENTS (Filed July 31, 2017, dkt. 739)

SINGH'S MOTION IN LIMINE TO EXCLUDE COOPERATING WITNESS STATEMENTS (Filed August 2, 2017, dkt. 748)

GOVERNMENT'S MOTION FOR RULING ON THE ELEMENTS WHICH MUST BE PROVEN (Filed August 7, 2017, dkt. 761)

## [REDACTED] CRIMINAL MINUTES – GENERAL    'O'

## I.    INTRODUCTION

On November 13, 2014, a grand jury returned an indictment charging Harinder Singh[1] with (1) conspiracy to launder money in violation of 18 U.S.C. § 1956, (2) conspiracy to operate an unlicensed money remitting business in violation of 18 U.S.C. § 371, and (3) operating an unlicensed money transmitting business in violation of 18 U.S.C. § 1960. Dkt. 1 ("Indictment"). The Indictment also charges 21 other alleged co-conspirators for their involvement in what the Government describes as a "large-scale hawala money laundering organization."

On July 16, 2017, Singh filed a motion to suppress evidence derived from a traffic stop preceding his arrest. Dkt. 714. On July 17, 2017, Singh filed a motion to suppress statements obtained in violation of the Fifth Amendment, dkt. 715, a motion for a bill of particulars, dkt. 716, and a motion to strike surplus language from the Indictment, dkt. 717.

On July 31, 2017, the Government filed an opposition to Singh's motion to strike language from the Indictment, dkt. 732, and an opposition to Singh's motion for a bill of particulars, dkt. 735. The Government also lodged a consolidated opposition to both Singh's motions to suppress.

On July 31, 2017, Singh filed a motion in limine seeking a pretrial hearing regarding the admissibility of co-conspirator statements. Dkt. 739. On August 2, 2017, Singh filed a motion in limine to exclude cooperating witness testimony. Dkt. 748.

On August 7, 2017, the Government filed an opposition to Singh's motion for a pretrial hearing regarding co-conspirator statements. Dkt. 759. Also on August 7, 2017, the Government filed a motion for ruling on the elements which the Government must prove. Dkt. 761. The next day, August 8, 2017, the Government filed an opposition to Singh's motion to exclude cooperating witness testimony. Dkt. 762.

On August 10, 2017, Singh filed a reply in support of his motion to suppress statements obtained in violation of the Fifth Amendment. Dkt. 770. On August 14, 2017, Singh filed an opposition to the Government's motion for a ruling on the elements which the Government must prove. Dkt. 774.

---

[1] For purposes of this order, because the instant motions were filed by Harinder Singh, the Court refers to Harinder Singh as "defendant" or "Singh," although there are other defendants charged in this case who share his last name.

**[REDACTED] CRIMINAL MINUTES – GENERAL    'O'**

On August 17, 2017, the Court held an evidentiary hearing on Singh's motions to suppress and heard oral argument.  Having carefully considered the parties' arguments, the Court finds and concludes as follows.

## II.    SINGH'S MOTIONS TO SUPPRESS

### A.    Background

#### 1.    The Initial Investigation

In or around May 2011, Eric Jolley, a special agent with the Drug Enforcement Agency ("DEA"), along with other law enforcement officers began investigating an international hawala money laundering conspiracy spanning, at least, the United States, India, and Canada.[2] Declaration of Eric Jolley ("Jolley Decl.") ¶ 2.  The investigation involved court-authorized wiretaps, surveillance, and interviews with cooperating witnesses as well as targets of the investigation.  Id.

According to Jolley, one of the two principal case agents assigned to the investigation, **[REDACTED]** Over the course of the investigation, at an unspecified time, Jolley "came to believe that the money being transmitted between defendants constituted proceeds generated from the sale of large-scale quantities of narcotics." Id. ¶ 5.  **[REDACTED]**  Jolley contends that the:

> circumstances of the money pick-ups reflected the illicit nature of the conduct, including the large amounts of cash involved and the use of paper/plastic bags and shoe boxes and/or beer boxes to hide the money, and coded communication over pre-paid cellular telephones, among other things.

Id.  **[REDACTED]**, law enforcement conducted surveillance to observe Singh, among other suspects, exchanging bundles in parking lots. **[REDACTED]**  Jolley instructed the Pomona Police Department ("PPD") to "have a traffic stop conducted on defendant" if he left his residence.  Id.

---

[2] The Indictment alleges that a "hawala" is an alternative money remittance system conducted by brokers known as "hawaladars" that operates outside of the traditional banking and financial systems and is premised on relationships of mutual trust.  Indictment ¶ 1.

## 2.    The Traffic Stop

On October 16, 2012, Darren Nannini, a patrol officer with the California Highway Patrol ("CHP"), was working in the Interstate-5 area near the Santa Fe Springs Office when he received a call on his cellphone from CHP Sergeant Corona.  Declaration of Darren Nannini ("Nannini Decl.") ¶ 3.  Corona informed Nannini that a "walled off"[3] traffic stop had been requested by PPD and that Nannini should expect a phone call from a PPD officer.  Id.  Nannini spoke on the phone with an unidentified PPD officer who described defendant's vehicle and "requested that [Nannini] find independent probable cause to perform a traffic stop" on defendant.  Id. ¶ 5.  The PPD officer informed Nannini over the phone that the surveillance team expected the defendant's car to "contain a large amount of United States currency and possibly narcotics."  Id.

After receiving the phone call from PPD, Nannini claims that he identified defendant's car and "observed that the driver was not wearing a seatbelt.  Based on this California traffic law violation, [Nannini] proceeded to conduct a traffic stop on the car."  Id. ¶ 6.  Singh has submitted a declaration in support of his motions to suppress.  Singh's declaration is at odds with Nannini's account of events.  Singh contends that at the time he was stopped by Nannini he was "driving safely, wearing [his] seatbelt and obeying all other traffic laws."  Dkt. 714-1 ¶ 5.  Both witnesses testified during the evidentiary hearing – Nannini that Singh was not wearing a seatbelt and Singh that he had been wearing his seatbelt.  In his Arrest Report, Nannini claims to have stopped defendant for failing to wear a seatbelt.  Dkt. 714-2 ("Arrest Report") at 3.

Nannini told Singh, over his patrol car loudspeaker, to pull off of the freeway and proceed to a nearby parking lot for the traffic stop.  Nannini testified that he always asks cars to exit the freeway before proceeding with a traffic stop because of concern for his own safety adjacent to fast-moving traffic on the freeway.  After defendant's car came to rest in a nearby parking lot, Nannini approached defendant's vehicle on the left side and spoke with Singh through the driver window.  While Nannini was approaching the vehicle, defendant opened the driver-side door and started to exit the vehicle.  Nannini instructed defendant to remain in the vehicle.  Nannini requested Singh's license, registration, and proof of insurance.  Singh provided a driver's license.  During their conversation, Nannini observed a "white paper bag in

---

[3] A walled off traffic stop is a law enforcement tool used to obtain suspect identifications and seize contraband without compromising any ongoing investigation.  Id. ¶ 4.  One agency will request that a marked patrol officer conduct a lawful traffic stop and conduct independent investigation in order to aid an ongoing investigation.  Properly conducted, the traffic stop and investigation rest upon independent suspicion or probable cause in order to ensure that the wealth of other information known to law enforcement is not at risk of compromise.  Id.

the right rear passenger seat, with a block shaped object that was tightly wrapped in black plastic and sealed with clear plastic tape in a cross shaped manner." Id.  As Nannini returned to his patrol car, he walked around the rear of the vehicle so he could get a better view of the bag. From the right rear window, Nannini observed a separate white plastic bag on the right rear passenger floor board, which contained "a block shape [sic] object that was tightly wrapped in black plastic." Id.

Nannini returned to his patrol car to conduct a wants and warrants check on Singh. While Nannini was in his patrol car, another officer arrived at the scene of the traffic stop. Nannini exited his vehicle to approach the defendant's car again, and Singh opened his door again.  Nannini instructed him to remain in the vehicle.  According to Nannini, "Singh was sweating heavily and appeared to be extremely nervous." Id.  Nannini asked Singh what was in the paper bag and Singh stated that it was his wife's shoes. Id.  According to Nannini, "the object inside the bag did not resemble that of shoes." Id.  Nannini asked if he could look inside, but Singh responded that he "needed to ask his wife." Id.  "At that point Singh made a phone call via his cellular telephone and stated something in his native language which [Nannini] did not understand." Id.  Nannini instructed Singh to hang up the phone, which Singh did.[4] Nannini testified that his brief questioning about the packages in the backseat took approximately 30 seconds or less.

At that time, Nannini contends that he believed that packages in Singh's back seat resembled "packages contain[ing] illegal drugs and or money." Id.  Accordingly, Nannini "conducted a probable cause search" of Singh's vehicle, during which he determined that the packages were each "bricks containing multiple bundles of suspected U.S. currency estimated to be over $100,000.00." Id.  Nannini contends that he placed Singh under arrest for possession of over $100,000 "obtained as a result of sales of a controlled substance." Id.  After the arrest, Corona responded to the scene and took photographs of the Mustang and its contents, which have been filed here. See generally dkt. 718-1.  At an unspecified time after Singh's arrest, Nannini contends that a narcotics dog sniffed the currency bundles and "alerted on the currency, indicating there was an odor of narcotics." Arrest Report at 4-5.

Singh claims that he did not feel free to drive away during the traffic stop and felt that he "had no choice but to answer the police officer's questions.  The police officer never advised

---

[4] During the evidentiary hearing, Singh testified that he had already been on the phone with his brother and that the phone was resting in his legs while the traffic stop occurred.  Singh acknowledged speaking in Punjabi to his brother over the phone before Nannini told him to stop, took the phone, and placed it on the roof of the car.

me of my constitutional rights, such as the right to remain silent, or the right to have an attorney present before answering any questions." Singh Decl. ¶ 10. It is undisputed that no one Mirandized Singh at the time of the October 16, 2012 arrest.

At "approximately 3:30 p.m.," Jolley Decl. Ex. A at 3, a few minutes after the traffic stop commenced, members of the Pomona Police Major Narcotics Unit observed Singh's wife, Pawanjot Kaur, as she exited defendant's residence. Pagtakhan Ex. B at 3. According to Pagtakhan, Kaur "was carrying a white plastic shopping bag" containing approximately $380,000. Id. When officers approached Kaur, she dropped the plastic bag and subsequently claimed that it was not hers. Jolley Decl. Ex. A at 3. After being intercepted by law enforcement, Kaur signed a money disclaimer form and consent to search form for the residence she shared with defendant. Id.

### 3. Post-Arrest Statements

Singh was arrested at approximately 3:30 p.m. After Singh's arrest, Nannini transported him to the Santa Fe Springs Area CHP office. Arrest Report at 4. Nannini contacted Officer Pagtakhan, of the PPD, who indicated that he would meet Nannini and Singh at the Santa Fe Springs Area CHP office. Id. Pagtakhan claims that, at the Santa Fe Springs Area CHP office, he met with Singh, who "gave me verbal and written consent to search his home." Pagtakhan Decl. ¶ 6. Both Kaur's and Singh's consent to search forms have been offered here. See Pagtakhan Decl. Ex. B.

At the Santa Fe Springs Area CHP office, Pagtakhan, Jolley, Sergeant Jaime Gutierrez, and Special Agent Harry Heinonen interviewed Singh. During the interview, "without MIRANDA," Singh stated that the money obtained from the backseat of his vehicle was "for the purchase of a 7 Eleven (a convenience store) or a commercial truck." Jolley Decl. Ex. A at 3. According to Singh, policed interviewed him about the money found in his car and continually suggested Singh was connected to drug smuggling and drug money. Dkt. 770, Singh Reply Declaration ("Reply Decl.") ¶ 5.

Pagtakhan transported Singh from the CHP station to his residence in handcuffs for additional questioning. Jolley Decl. Ex. A at 3; Reply Decl. ¶ 6. While riding to his apartment, police continued to question him and accused him of lying about the money. Reply Decl. ¶ 6. At Singh's apartment, police placed money, passports, and other items in front of Singh for photographs. Id. ¶ 7. Police continued to interrogate Singh about the items they found at the apartment and continued to suggest he was connected to drug dealers. Id. While at the

apartment, Singh explained that he and his wife had a trip planned to India in a few weeks.  Id. ¶ 8.  As a result, police took his passport and that of his sister-in-law.[5]  Id.

At some point that day, October 16, 2012, Singh "admitted to [Jolley and Heinonen] that he collected [the money] from various unidentified couriers, and was directed to provide [the money] to another unidentified courier."  Id.  Singh also signed a "Disclaimer of Ownership" form wherein he stated that he "received bulk currency from an unidentified Sikh Indian male in a parking lot in the City of Castaic, CA, the unidentified Sikh Indian male stated it came from Jaswinder Singh."  Id. ¶ 7.

Before leaving the apartment, Singh contends that the police told him they planned to release him that day, but that he "had to go to the DEA office the next morning."  Id. ¶ 9.  Singh recalls that the two officers who told him to go to the DEA office were named "'Jolly' and 'Harry'."[6]  Id.  Police gave Singh a note with two phone numbers, the name of the person Singh "had to meet – 'Eric' –" and the DEA office address, to which he was told to go the following morning.  Id. ¶ 10.  During the evidentiary hearing, the Government disputed whether any officer told Singh he had to go to the DEA office the next day.  Although he did not recognize the actual note, Jolley acknowledged that the note in Singh's possession was his own handwriting.  **[REDACTED]**

By the time police took Singh from his apartment to a PPD police station, it was dark outside.  Singh was transported to a PPD office "for processing," after which he was released pending further investigation.  Id. at 4.  Singh contends that during the period of his arrest on October 16, 2017, he felt he had no choice but to answer questions and sign the forms presented to him.  Singh Decl. ¶ 12.  Singh's wife picked him up at 10:00 p.m. from the PPD office.  Reply Decl. ¶ 11.  Before being released from police custody, Singh claims that an unidentified law enforcement agent reminded Singh to go to the DEA office the next morning.  Id. ¶ 12.  It is undisputed that, on October 16, 2012, Singh was never told his Miranda rights.  After Singh

---

[5] It is unclear when, if ever, these passports were returned, why Singh's sister-in-law's passport was seized, and on what basis police seized these passports – thereby precluding Singh from traveling internationally.

[6] Based upon his recollection of their names, Singh appears to be referring to Officers Harry Heinonen and Eric Jolley.

was released, Jolley and Pagtakhan spoke about the day and the two discussed the fact that Singh had not been Mirandized all day.[7]

Singh claims to have been repeatedly told he had to go to the DEA office on October 17, 2012, at 9:00 a.m. and to have been given the address on October 16, 2012.  Officer Pagtakhan testified during the evidentiary hearing that he does not remember whether anyone instructed Singh to come to the DEA office the next day and that he does not remember what words were exchanged as Singh was being released from the PPD office.  **[REDACTED]**

According to DEA Special Agent Lindsay Burns, she recalls hearing that Singh had called on October 17, 2012, requesting to speak with the investigators.  Lindsay Burns Declaration ("Burns Decl.") ¶ 4.  On October 17, 2012, Singh drove to the DEA office based on the note he had been given and waited alone in a room for 30 minutes at first.  Reply Decl. ¶ 13.  Then a law enforcement officer he recognized from the day before came in and started asking Singh "many of the same questions" he had answered the day before.  Id.  Ultimately, Singh was subject to additional questioning by Burns, Heinonen, Jose Martinez, and Pagtakhan at the DEA office on October 17, 2012.  Burns Decl. ¶¶ 4-5.  Burns recalls that they sat in an interview room and spoke with Singh for approximately one hour.  Id. ¶ 5.  Although Burns claims to have believed that Singh had voluntarily reached out to speak with the investigators, she advised defendant of his Miranda rights "at the outset of the interview."  Id.  During the interview, Singh made various statements to law enforcement regarding where he obtained the money and who various suspects were.  Burns states in her declaration:

> I do not believe that defendant asked to stop the interview at any time before it finished . . . Defendant was free to leave at any time and did leave the DEA office at the end of the interview.

Id. ¶6.

Singh describes the events following his arrest differently.  Singh claims that:

> During the days and weeks after my arrest, I met with the police several times and spoke with police officers over the telephone.  During these meetings and telephone calls, I do not remember the police officers telling me I had a right to remain silent and the right to an attorney.  I felt like I had no choice but to answer there [sic] question[s].

---

[7] Jolley testified that Miranda came up in conversation, but he was unsure how.

Singh Decl. ¶ 13.  Singh claims that, at all relevant times, he felt he had no choice but to answer the police questions and that, at that time, he "did not speak English very well" because he had only lived in the United States for less than two years.  Reply Decl. ¶ 14.

Jolley testified that, after October 17, 2012, Singh communicated with law enforcement numerous additional times.  Singh appears to acknowledge having spoken with law enforcement several times thereafter, including conversations over the phone.

## B.    Motion to Suppress Fruits of an Unlawful Traffic Stop

Defendant first seeks to suppress evidence derived from Nannini's traffic stop.  The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ."  U.S. Const. amend. IV.  "Temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of this provision."  Whren v. United States, 517 U.S. 806, 809–10 (1996).  Where the Government seeks to justify a traffic stop incident to a traffic violation, the Government must demonstrate that the law enforcement official initiating the stop had, at least, "reasonable suspicion" that a traffic violation had occurred.  United States v. Lopez–Soto, 205 F.3d 1101, 1104 (9th Cir. 2000).  "Reasonable suspicion is formed by specific, articulable facts which, together with objective and reasonable inferences, form the basis for suspecting that the particular person detained is engaged in criminal activity."  Id. at 1105 (internal quotation marks and citation omitted).  Alternatively, if a seizure and subsequent search is not predicated upon a traffic violation and information uncovered thereafter, police may nonetheless conduct a warrantless search of a vehicle "if there is probable cause to believe that the vehicle contains evidence of a crime," in light of the totality of the circumstances.  United States v. Brooks, 610 F.3d 1186, 1193-93 (9th Cir. 2010).

The Government contends that Nannini's traffic stop was justified for two, independent reasons.  First, the Government contends that the collective knowledge of law enforcement before Nannini's "walled-off" stop justifies the stop even though Nannini was, generally, unaware of the information then known to other law enforcement officers.  Second, the Government contends that Singh's failure to wear his seatbelt permitted Nannini to stop Singh for a traffic violation.  Because the Court concludes that the collective knowledge of law enforcement at the time PPD requested a walled-off stop provided probable cause to believe Singh's car would contain evidence of a crime, the Court does not reach the Government's

second argument, which presents a disputed issue of fact regarding whether Singh was actually wearing his seatbelt.

Pursuant to the collective knowledge doctrine, courts evaluate whether probable cause existed to justify an investigatory stop, search, or arrest by "look[ing] to the collective knowledge of all the officers involved in the criminal investigation although all of the information known to the law enforcement officers involved in the investigation is not communicated to the officer who actually makes the stop." United States v. Sutton, 794 F.2d 1415, 1426 (9th Cir. 1986). The collective knowledge rule applies where one officer conducts an investigatory stop based upon directions from other law enforcement officials. Id. Courts apply "the collective knowledge doctrine regardless of whether any *information* giving rise to probable cause was actually communicated to the officer conducting the stop, search, or arrest." United States v. Ramirez, 473 F.3d 1026, 1032 (9th Cir. 2007) (quotation marks and brackets omitted).

In Ramirez, law enforcement learned that a particular vehicle, a Mercury Mountaineer, had a secret compartment in the rear cargo area. Id. at 1028. A surveillance team watched as two suspects who had been driving the Mountaineer received "what appeared to be a weighted-down gym bag," in a parking lot. Id. at 1029. The suspects placed the gym bag in the Mountaineer via the rear driver-side door and got inside the Mountaineer. Id. Then law enforcement saw the vehicle "rocking back and forth," before the suspects exited the Mountaineer, resumed their original seats, and began to drive away. Id. One officer, Sergeant Meier, was aware of the compartment, received reports from others regarding the gym bag, and was told the suspects had potentially exchanged a manila envelope for the gym bag. Thus, Meier "formed the opinion that the [Mountaineer] was transporting narcotics in the hidden compartment." Id. Meier requested that a uniformed officer make a "traffic stop" of the Mountaineer in order to avoid compromising law enforcement's investigation. Id. Responding to the request, a different officer stopped the vehicle for a purported traffic violation, placed the driver under arrest for driving without a California license, and requested a narcotics dog sniff of the Mountaineer. Id. The dog sniff ultimately discovered narcotics in the Mountaineer. Id. at 1030. The Government later conceded that the arrest could not be justified by the driver's lack of California license because he had a valid Mexican driver's license. Thus, the Government could not base its search of the vehicle upon the arrest and argued instead that the collective knowledge doctrine permitted officers to stop and search the suspects' vehicle based upon information known to the surveillance team, but which was unknown to the arresting officer, because that team had communicated to the arresting officer that he should stop the vehicle.

**[REDACTED] CRIMINAL MINUTES – GENERAL**    '**O**'


With respect to the "walled-off" traffic stop, this case is analogous to <u>Ramirez</u>.  A surveillance team monitored Singh's behavior, observed him receiving and traveling with large quantities of suspected narcotics proceeds in the blue Mustang, and instructed an officer outside the investigation to make a traffic stop.  Thus, the only remaining question is whether the information collectively known to the law enforcement team provided probable cause to believe that the Mustang contained evidence of a crime.

"Probable cause does not require proof beyond a reasonable doubt of every element of a crime.  Rather, probable cause exists where under the totality of the circumstances known to the officer, a prudent person would have concluded that there was a fair probability that the suspect had committed or was committing a crime." <u>United States v. Noster</u>, 590 F.3d 624, 629–30 (9th Cir. 2009) (citation omitted); <u>see also</u> <u>Florida v. Harris</u>, 133 S. Ct. 1050, 1055 (2013) ("The test for probable cause is not reducible to precise definition or quantification.  Finely tuned standards such as proof beyond a reasonable doubt or by a preponderance of the evidence . . . have no place in the [probable-cause] decision.  All we have required is the kind of fair probability on which reasonable and prudent [people,] not legal technicians, act." (citation and quotation marks omitted)).

The Court finds that there was probable cause to search Singh's vehicle.  Prior to the traffic stop, **[REDACTED]**, and were related to various exchanges of unidentified bundles, often occurring in parking lots.  Law enforcement observed Singh receiving or transporting multiple packages of suspected bulk cash in his vehicles and also observed phone calls discussing bulk cash, which appeared to be related to the conduct observed during surveillance. **[REDACTED]**  Although the foregoing would not be sufficient to prove any crime beyond a reasonable doubt, the foregoing evidence was sufficient to suggest to law enforcement that there was a "fair probability" that the vehicle contained evidence of a crime at the time PPD requested that CHP conduct a traffic stop.

Because law enforcement could have stopped Singh and searched his vehicle based upon probable cause that he was trafficking illicit bulk cash, it is of no moment whether Nannini actually observed Singh without his seatbelt or was unaware of the evidence developed by other officers.  Law enforcement is permitted to use "walled-off" traffic stops to protect their ongoing investigations.  When it does so, the collective knowledge of the group requesting a traffic stop may be sufficient to satisfy the requirements of the Fourth Amendment regardless of whether the officer personally conducting the stop has a sufficient basis for conducting the stop or subsequent search.

Singh's motion to suppress evidence derived from Nannini's traffic stop is **DENIED**.[8]

## C.  Singh's Motion to Suppress Statements Obtained in Violation of <u>Miranda</u>

"In criminal trials, in the courts of the United States, whenever a question arises whether a confession is incompetent because not voluntary, the issue is controlled by that portion of the Fifth Amendment . . . commanding that no person 'shall be compelled in any criminal case to be a witness against himself.'" <u>Missouri v. Seibert</u>, 542 U.S. 600, 607 (2004) (internal citations omitted).  To reduce the risk of coerced confessions, the Supreme Court, "in <u>Miranda</u> concluded that 'the accused must be adequately and effectively apprised of his rights and the exercise of those rights must be fully honored.'" <u>Id.</u>

In determining whether a statement made to police was voluntary, a court must ask "whether a defendant's will was overborne by looking at the totality of all the surrounding circumstances." <u>Doody v. Schriro</u>, 548 F.3d 847, 858 (9th Cir. 2008) (internal quotations and citations omitted).  The assessment of the totality of the circumstances may include consideration of the length and location of the interrogation; evaluation of the maturity, education, physical and mental condition of the defendant; and determination of whether the defendant was properly advised of his <u>Miranda</u> rights. <u>Id.</u> at 859.

A <u>Miranda</u> warning and a waiver are not dispositive on the issue of voluntariness. <u>Id.</u> ("[A]lthough adequate <u>Miranda</u> warnings provide a measure of protection against coercion in custodial police interrogations, the protection actually provided in any given case depends on how effective the warnings as given and implemented were in conveying their layered

---

[8] Singh's motion does not address the collective knowledge doctrine or the evidence developed prior to Nannini's traffic stop.  The sole reference to the Government's preceding investigation occurs in the following footnote:

> [t]he government may argue that independent probable cause existed based upon Title III wiretap conversations and surveillance of Mr. Singh by other officers in advance of the traffic stop.  However, nothing in CHP Officer Nannini's report references knowledge of wiretap communications, surveillance or any evidence obtained from other officers.

Dkt. 714 at 7.  However, as discussed in <u>Ramirez</u>, there is no requirement that the officer conducting the stop know the information obtained by other officers if he is acting upon their instruction.

messages."). However, giving <u>Miranda</u> warnings and obtaining a waiver has "generally produced a virtual ticket of admissibility; maintaining that a statement is involuntary even though given after warnings and voluntary waiver of rights requires unusual stamina, and litigation over voluntariness tends to end with the finding of a valid waiver." <u>Seibert</u>, 542 U.S. at 608–09.

Without referring to or discussing any particular statements, Singh's motion contends that "[a]ll statements obtained from Mr. Singh during and after the unlawful stop and arrest were obtained in violation of his rights." Dkt. 715 at 4. The concerns raised in Singh's motion appear to be that he contends he was *never* provided with a <u>Miranda</u> advisement and that, at all relevant times during which he gave in-person statements, he did not feel free to leave. For its part, the Government seeks the following affirmative rulings:

> 1) the Government may use Singh's statements during the stop itself during its case-in-chief and as impeachment, including Singh's claim that the bags in his backseat contained shoes and that he would need to call his wife about her shoes;
>
> 2) the Government may use statements made on October 16, 2012, between his arrest and his release that same day as impeachment in the event Singh testifies in his own defense; and
>
> 3) the Government can use all of the statements Singh made during the October 17, 2012 interview with law enforcement.

At bottom, Singh's motion is without merit and the Government's requests are granted. Although Singh does not direct the Court or the Government to consider any particular statements or the circumstances under which they were made, the Court will attempt to address Singh's concerns here by grouping statements based upon their timing.

## 1.    Statements Made During the Traffic Stop

Defendant does not explain when exactly he contends that he was in "custody" requiring that he be given a <u>Miranda</u> warning. "An officer's obligation to administer <u>Miranda</u> warnings attaches, however, only where there has been such a restriction on a person's freedom as to render him 'in custody.'" <u>Stansbury v. California</u>, 511 U.S. 318, 322, (1994) (internal quotes omitted).

Of course, not all questioning by law enforcement officers triggers the warning requirement. The sine qua non of <u>Miranda</u> is custody. . . . The case books are full

of scenarios in which a person is detained by law enforcement officers, is not free to go, but is not "in custody" for <u>Miranda</u> purposes.  A traffic stop is not custody.

<u>United States v. Butler</u>, 249 F.3d 1094, 1098 (9th Cir. 2001).  "The comparatively nonthreatening character of detentions of this sort explains the absence of any suggestion in our opinions that Terry stops are subject to the dictates of <u>Miranda</u>.  The similarly noncoercive aspect of ordinary traffic stops prompts us to hold that persons temporarily detained pursuant to such stops are not 'in custody' for the purposes of <u>Miranda</u>."  <u>Berkemer v. McCarty</u>, 468 U.S. 420, 440 (1984).  Questioning while one believes they are awaiting a traffic citation is "quite different from stationhouse interrogation . . . in which the detainee often is aware that questioning will continue until he provides his interrogators the answers they seek."  <u>Id.</u> at 438.  Simply put, the circumstances of a traffic stop "are not such that the motorist feels completely at the mercy of the police."  <u>Id.</u>

Thus, defendant's contention that he did not feel free to leave the scene of the traffic stop is not an adequate basis for suppressing statements he made while seated in his car.  It appears to be undisputed that Singh was not mirandized at the outset of the traffic stop, but his <u>Miranda</u> rights were not implicated at that time because he was not in custody.  Nannini, who knew little of the broader investigation, might have been interested in Singh's prospective answers to questions, but there is nothing to suggest here that Nannini used coercive techniques akin to custodial interrogation.  Singh was seated in his car in the afternoon in a public parking lot.  Nannini had not drawn his weapon, threatened Singh, handcuffed Singh, or even raised his voice.  Other than approximately 30 seconds of conversation about the packages in plain sight in the backseat of the Mustang, there is nothing to suggest here that, from Singh's perspective, Nannini's coming and going from the Mustang to the patrol vehicle, requests for license and registration, or basic questions about the contents of the bags in the back seat would be perceived as anything other than a routine traffic stop.  The conditions under which Singh spoke during the traffic stop do not suggest that "defendant's will was overborne," <u>Doody</u>, 548 F.3d at 858, in a manner distinguishing this stop from the myriad traffic stops where courts have overwhelmingly found no Fifth Amendment or <u>Miranda</u> concerns.[9]

---

[9] Defendant argues in his reply that reliance upon the collective knowledge doctrine should convert any questioning during the traffic stop into a custodial interrogation.  However, there is no basis for distinguishing this traffic stop merely because the officer involved may have harbored a subjective intent not to let Singh leave.  "A policeman's unarticulated plan has no bearing on the question whether a suspect was 'in custody' at a particular time; the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation."  <u>Berkemer v. McCarty</u>, 468 U.S. 420, 442 (1984).

With respect to Singh's statements during the traffic stop, including his claim that the packages in his backseat were his wife's shoes, Singh's motion is **DENIED**.

### 2.        Statements Between Singh's Arrest and Release on October 16, 2012

After law enforcement arrested Singh, he was transported first to a CHP office, then to his residence, and then to a PPD office before being released.  During that period, he was the subject of between six and seven hours of interrogation.[10]  He also made numerous statements to law enforcement, such as his claim that the recovered money was to purchase a 7-Eleven convenience store.  The Government indicates that it does not intend to offer any of these statements in its case-in-chief at trial.  Accordingly, the Court does not reach the merits of Singh's constitutional arguments and the motion is **GRANTED** with respect to statements he made on October 16, 2012, after the traffic stop.[11]

### 3.        Statements Made During the October 17, 2012 Meeting

The parties dispute what led to the October 17, 2012, interview **[REDACTED]**. However, having heard the testimony of the witnesses, the Court concludes that Singh was not in "custody" for purposes of <u>Miranda</u> on October 17, 2012.  The question of custody is a "threshold inquiry."  <u>United States v. Medina-Villa</u>, 567 F.3d 507, 518, n.5 (9th Cir. 2009).  If a person was not subject to custodial interrogation, then law enforcement is not required to issue a <u>Miranda</u> advisement.  "A person is in custody only where there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.  We must examine the totality of the circumstances from the perspective of a reasonable person in the suspect's position."  <u>United States v. Norris</u>, 428 F.3d 907, 912 (9th Cir. 2005).

---

[10] During the evidentiary hearing, it was unclear to what extent the Government contests the length of the detention estimated by Singh.  Only Singh appears to have offered evidence of when exactly he was released from law enforcement custody on October 16, 2012.

[11] Notwithstanding the Court's ruling here, the Government would still be permitted to use these statements as impeachment evidence at trial if Singh testified in his own defense.  <u>See</u> <u>Oregon v. Hass</u>, 420 U.S. 714, 722 (1975) ("the impeaching material would provide valuable aid to the jury in assessing the defendant's credibility [and] the benefits of this process should not be lost," even if a <u>Miranda</u> violation occurred.)

The following factors are pertinent in assessing the custody question: "(1) the language used to summon the individual; (2) the extent to which the defendant is confronted with evidence of guilt; (3) the physical surroundings of the interrogation; (4) the duration of the detention; and (5) the degree of pressure applied to detain the individual."

United States v. Barnes, 713 F.3d 1200, 1204 (9th Cir. 2013) (quoting United States v. Kim, 292 F.3d 969, 973–74 (9th Cir. 2002)).

Here, Singh contends that he was told he had to visit the DEA office on the morning of October 17, 2012, and that he was provided a note with an address and phone numbers. Additionally, Singh contends that the Government had seized his passport and that of a family-member, preventing him from traveling and effectively requiring some action on his part.[12] However, the foregoing two considerations do not, standing alone, convert the October 17, 2012 meeting into a custodial interrogation. Singh was released from custody the night of October 16, 2012, and was not charged with a crime or placed under arrest. The note Jolley evidently gave Singh is handwritten, contains no instructions, and does not name the building to which the address applies. Nothing about the note indicates that Singh would have faced serious consequences if he failed to appear **[REDACTED]**.

Even accepting Singh's account of October 16, 2012, and his claim that he was told he "had to" go to the DEA office the next day, there is nothing to suggest that a reasonable person would have felt unable to leave.[13] Singh was met on a public sidewalk outside the building and brought inside a federal building, but he was not handcuffed, no one took his car keys, and there is no indication that the interview occurred behind a locked or blocked door. The interview lasted only an hour. During the interview, there is nothing to suggest that Singh was subjected to pressure, intimidated, or coerced. Officer Burns appears to have asked most of the questions

---

[12] There is no indication in the record whether the passport was ever discussed after it was seized. Singh does not claim to have asked about it on October 17, 2012.

[13] The Court need not resolve the precise factual dispute about whether Singh was told to go to the DEA's office the next day or not because even if he was, the Court would resolve the motion in the same way. However, having heard the evidence, the Court finds Singh's contention that he was *ordered* to go the DEA office unlikely. Whatever precise words were exchanged on October 16, 2012, they may have been misunderstood or confusing to Singh. If the Government had wanted to compel additional questioning, it could have kept Singh in custody from the night prior or provided a more explicit written instruction than the nondescript, handwritten note from Jolley. **[REDACTED]**

on that day, even though she had not seen Singh the day before.  Although the Government had collected ample evidence from Singh's vehicle and home on October 16, 2012, not to mention its ongoing wiretap investigation, Singh does not claim to have been confronted with that evidence on October 17, 2012.  Nor is there evidence that the Government challenged Singh's statements during the October 17, 2012 interview **[REDACTED]**.  Instead, Singh appears to have arrived at the DEA office and, after being <u>Mirandized</u>, very quickly started making incriminating statements.  Although it is unclear how the meeting ended, it is clear that Singh was allowed to walk out in much the same manner he came in for the meeting – on his own.  Taken together, the totality of the circumstances here do no suggest that the October 17, 2012 interview was custodial in nature such that it may have overborne a suspect's will to resist questioning.  <u>See</u> <u>Oregon v. Mathiason</u>, 429 U.S. 492, 493 (1977) (defendant was not subject to custodial interrogation where officer left his card for defendant to call back, setup an interview at a government building housing multiple state agencies, escorted defendant into a closed office, suggested that defendant's truthfulness would be evaluated by a prosecutor, confronted defendant with fabricated incriminating evidence, defendant confessed five minutes into the interview, and defendant left interview of his own volition); <u>California v. Beheler</u>, 463 U.S. 1121, 1122 (1983) (not in custody where police obtained evidence at suspect's home and suspect came to police station for 30 minutes of questioning about the suspected murder); <u>United States v. Norris</u>, 428 F.3d 907, 912 (9th Cir. 2005) (fact that suspect was transported to substation for questioning and unable to drive himself home did not convert interview into custodial interrogation because suspect was told he could terminate it and was never meaningfully restrained); <u>United States v. Antone</u>, 412 F. App'x 10, 11 (9th Cir. 2011) (affirming denial of suppression motion where defendant voluntarily came to police station for questioning, was told he was free to leave, and was questioned in a cordial manner).

      In light of the foregoing, defendant's motion to suppress statements made on October 17, 2012, is **DENIED**.[14]

---

[14] Other than evidence of his own statements on October 17, 2012, and presumably the law enforcement report documenting them, it is unclear what else defendant contends should be suppressed.  The evidence obtained from Singh's vehicle on October 16, 2012, was lawfully found and seized; defendant's home was lawfully searched because his wife gave law enforcement consent to search; and defendant has not sought to suppress any of the wiretap evidence.  Thus, although the Court grants defendant's motion as to his own post-arrest statements on October 16, 2012, that ruling does not appear to require suppression of any other evidence in this case.  Notably, defendant acknowledges that he had other communications with law enforcement after October 17, 2012.  Because defendant's briefing does not address any statements potentially made after October 17, 2012, the Court assumes for present purposes that defendant's motion to suppress is limited to the periods discussed herein.

## III.    MOTION FOR BILL OF PARTICULARS

Criminal Rule of Procedure 7(f) provides that "[t]he court may direct the government to file a bill of particulars."  A bill of particulars "is appropriate where a defendant requires clarification in order to prepare a defense." United States v. Long, 706 F.2d 1044, 1054 (9th Cir. 1983).  More specifically, its purposes are (1) to "inform the defendant of the nature of the charges against him with sufficient precision to enable him to prepare for trial," (2) "to avoid or minimize the danger of surprise at the time of trial," and (3) to enable a defendant "to plead his acquittal or conviction in bar of another prosecution for the same offense when the indictment itself is too vague, and indefinite for such purposes." United States v. Ayers, 924 F.2d 1468, 1483 (9th Cir.1991) (quoting United States v. Giese, 597 F.2d 1170, 1180 (9th Cir.1979)).  "A bill of particulars should be limited to these purposes: '[a] defendant is not entitled to know all the evidence the government intends to produce but only the theory of the government's case.'" United States v. Cerna, No. CR 08–0730 WHA, 2009 WL 2998929, at *2 (N.D.Cal. Sept. 16, 2009) (quoting United States v. Ryland, 806 F.2d 941, 942 (9th Cir.1986)).  It is not the role of the Government, nor is it the purpose of a bill of particulars, to wade through the evidence to formulate a defendant's case. See United States v. Mitchell, 744 F.2d 701, 705 (9th Cir. 1984) (the purposes of a bill of particulars "are served if the indictment itself provides sufficient details of the charges and if the Government provides full discovery to the defense."); United States v. Ortiz, 2013 WL 6842541, at *6 (N.D. Cal. Dec. 27, 2013) ("[A] defendant may not use a motion for a bill of particulars to obtain full discovery of the government's evidence.") (citing Giese, 597 F.2d at 1181); United States v. Smith, 776 F.2d 1104, 1111 (3d Cir. 1985) (a bill of particulars "is not intended to provide the defendant with the fruits of the government's investigation.").  "In determining if a bill of particulars should be ordered in a specific case, a court should consider whether the defendant has been advised adequately of the charges through the indictment and all other disclosures made by the government." Long, 706 F.2d at 1054. "The decision whether to grant a request for a bill of particulars is directed to the trial court's discretion." Id. (citing Will v. United States, 389 U .S. 90, 99 (1967)).

Defendant's motion is properly denied as untimely.  Rule 7(f) permits a defendant to file a motion for a bill of particulars "before or within 14 days after arraignment."  Here, Singh was arraigned over two years ago.  On this basis alone, Singh's motion is appropriately denied. See United States v. Rodriguez, No. 11-cr-296-WBS, 2016 WL 8730864, *2 n. 3 (E.D. Cal. Oct. 14, 2016) ("such motion, brought on the eve of trial, is untimely"); United States v. Damante, No. 11-cr-64-JCM, 2011 WL 4007623, *1 (D. Nev. Sept. 8, 2011) (denying motion for bill of particulars filed nearly four months after arraignment because "[d]efendant cannot wait this long and then, when the case approaches trial, feign uncertainty as to the charges against him").  Relatedly, because the bulk of discovery in this case has already been provided to defendant,

## [REDACTED] CRIMINAL MINUTES – GENERAL     'O'

there is little basis for ordering the Government to provide additional information.  See Giese, 597 F.2d at 1180–81 ("full discovery obviates the need for a bill of particulars").

Additionally, the two pieces of additional information requested by defendant are unnecessary to apprise him of the charges he faces.  Defendant requests a bill of particulars listing the names of other alleged co-conspirators who are referred to in the Indictment as "others known and unknown to the Grand Jury."  Indictment at 5:19 & 9:16-17.  However, there is no requirement that the Indictment include the names of all alleged co-conspirators. See United States v. DiCesare, 765 F.2d 890, 897 (9th Cir.), amended, 777 F.2d 543 (9th Cir. 1985) (affirming the denial of a bill of particulars seeking to obtain the names of unknown conspirators).  Defendant further requests a bill of particulars describing the specific criminal offense relating to Count three from which the Government alleges that the bulk cash derives.  However, to prove Count three, the Government will not be required to prove any specific criminal origin of the bulk cash.  See 18 U.S.C. § 1960(b)(1)(A), (b)(1)(B); see also dkt. 759 (stating that the Government does not intend to proceed under sub-section (b)(1)(C), which *would* require proof of the nature of the money).  Accordingly, the Government has apprised defendant of its theory of the charges and there is no further need for a bill of particulars describing *evidence* rather than the charge.

Singh's motion for a bill of particulars is **DENIED**.

## IV.    MOTION TO STRIKE SURPLUSAGE FROM THE INDICTMENT

Federal Rule of Criminal Procedure 7(d) permits the Court to strike surplusage from the Indictment.  "The purpose of a motion to strike under Fed. R. Crim. P. 7(d) is to protect a defendant against prejudicial or inflammatory allegations that are neither relevant nor material to the charges."  United States v. Terrigno, 838 F.2d 371, 373 (9th Cir. 1988).  "While surplusage is not *per se* improper, '[t]he inclusion of surplusage must not be allowed to prejudice a defendant in the context of his case.'"  United States v. Daniel, No. 09-cr-993-MMM, 2010 WL 11507585, at *4 (C.D. Cal. July 28, 2010).  Singh moves to strike the words "cartel," "Mexican cartels," and "Sinaloa Cartel" from the Indictment.

The Indictment alleges that defendant joined in a conspiracy, the object of which was to facilitate illegal movement of "drug proceeds . . . provided by Mexican cartels, including the Sinaloa Cartel . . . ."  Indictment Count One § (B)(1).  The Government claims that, at trial, it:

> intends to introduce evidence that the drugs trafficked as part of the hawala, in fact, derived from the cartels such as the Sinaloa Cartel, including through wiretap communications and the testimony from at least one cooperating defendant and

**[REDACTED] CRIMINAL MINUTES – GENERAL    'O'**

law enforcement who seized drugs with a branding known to be associated with
the Sinaloa Cartel.

Dkt. 732 at 5.  In his motion, Singh offers several arguments why the terms "cartel" and
references to the "Sinaloa Cartel," in particular risk prejudice to him; however, Singh does not
explain why evidence relating to the Sinaloa Cartel, or cartels in general, would be irrelevant to
the charges against him.  Instead, Singh avers that different language could have been chosen,
and remains in the indictment, which would pose less risk of prejudice.

Ultimately, the Court has discretion to strike surplusage, but may not do so if "evidence
of the allegation is admissible and relevant to the charge."  <u>Terrigno</u>, 838 F.2d at 373.  Based
upon the alleged conspiracy here, the Court cannot rule here that the Government's cartel-
evidence would be irrelevant to the charges.  Accordingly, defendant's motion to strike is
**DENIED**.

## V.    MOTION FOR A HEARING REGARDING CO-CONSPIRATOR TESTIMONY

At trial, the Government intends to offer testimony by "several" cooperating "co-
conspirators" with Singh pursuant to Federal Rules of Evidence 801(d)(2)(E). Dkt. 759 at 2.
Pursuant to Rule 801(d)(2)(E), a party may offer a statement against a party if it was "made by
the party's coconspirator during and in the furtherance of the conspiracy."  Thus,

[a] coconspirator's statement may be admitted against a defendant where the
prosecution shows by preponderance of the evidence that (1) the conspiracy
existed when the statement was made; (2) the defendant had knowledge of, and
participated in, the conspiracy; and (3) the statement was made "in furtherance of"
the conspiracy.

<u>United States v. Larson</u>, 460 F.3d 1200, 1211 (9th Cir. 2006).  Because it concerns the
admissibility of evidence, the foregoing inquiry is for the Court, not the jury.  <u>United States v.
Eubanks</u>, 591 F.2d 513, 519 (9th Cir. 1979).  Here, Singh requests a hearing for the Court to
determine whether the Government can show by a preponderance of the evidence that Singh
had knowledge of, and participated in, the conspiracy.  Singh contends that the Government
lacks evidence that he joined in a conspiracy "with knowledge that the offenses involved drug
trafficking money."  Dkt. 739 at 5.

In response, the Government first contends that defendant has misunderstood the
elements of the charge against him – an issue that the Court takes up below – however, the
Government has also submitted voluminous reports from its investigation, including

**[REDACTED] CRIMINAL MINUTES – GENERAL    'O'**

**[REDACTED]**, and the circumstances under which Singh was originally arrested on October 16, 2012, the Court is satisfied for present purposes that the Government can show by a preponderance of the evidence that defendant had knowledge of, and participated in, the alleged conspiracy.

Insofar as defendant may wish to cross-examine the Government's evidence, defendant's motion for a pretrial hearing is **DENIED**.  If the evidence at trial is inconsistent with the Government's showing here, defendant's objection is denied without prejudice to his right to renew any objection to the admissibility of evidence at that time.

## VI.    MOTION TO EXCLUDE COOPERATING WITNESS TESTIMONY

Singh next moves to preclude testimony from cooperating witnesses about his own purported mental state during the alleged conspiracy and, specifically, whether the cooperating witnesses perceived defendant to be a knowing participant in the conspiracy. **[REDACTED]**

Singh avers that the foregoing statements about what he purportedly knew would not be admissible at trial because they are speculative.  In response, the Government agrees that its witnesses cannot speculate about someone else's mental state, but argues that its cooperating witnesses, **[REDACTED]**, should be permitted to offer lay witness opinions that will be helpful to the jury so long as those opinions are based upon the witnesses' perceptions and those perceptions are explained to the jury.

At this stage, it is unclear exactly what testimony may be offered by cooperating witnesses.  The reports which have been disclosed by the Government are summaries of interviews and it is not clear whether every detail was recorded or whether, at trial, a cooperating witness may be more likely to explain the perceptions that cause them to reach a lay opinion.  The precise line between helpful, admissible opinion and speculation may depend upon the precise foundation laid and the statements offered.  Federal Rule of Evidence 701 "recognizes the common sense behind the saying that, sometimes, 'you had to be there.'" United States v. Garcia, 413 F.3d 201, 212 (2nd Cir. 2005).  However, in the context of the reports, **[REDACTED]**, for example, appears to be at least somewhat based upon speculation. **[REDACTED]** offers little detail about why he perceived defendant to be in-the-know about the source of the currency.

As with defendant's prior motion in limine regarding the admissibility of co-conspirator statements in general, the Court is satisfied for present purposes that the evidence is admissible.

However, the motion is **DENIED without prejudice** to defendant's renewing his objection at trial if the opinions lack sufficient foundation.

## VII.  MOTION FOR AN ORDER REGARDING THE ELEMENTS THE GOVERNMENT MUST PROVE

18 U.S.C. § 1956(h) provides that "[a]ny person who conspires to commit any offense defined in this section or section 1957 shall be subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy." As for the substantive money laundering offense, the Government intends to prove a conspiracy to launder money in violation of 18 U.S.C. § 1956(a)(1)(B), which provides:

(a)(1) Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity—
. . .
(B) knowing that the transaction is designed in whole or in part—
(i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity; or
(ii) to avoid a transaction reporting requirement under State or Federal law,

shall be sentenced to a fine of not more than $500,000 or twice the value of the property involved in the transaction, whichever is greater, or imprisonment for not more than twenty years, or both. For purposes of this paragraph, a financial transaction shall be considered to be one involving the proceeds of specified unlawful activity if it is part of a set of parallel or dependent transactions, any one of which involves the proceeds of specified unlawful activity, and all of which are part of a single plan or arrangement.

The Government, acknowledging that its motion is unorthodox, requests pretrial adjudication of the elements of the charged crimes because it has identified a disagreement with the defendant about the elements of the charged crime. As an initial matter, insofar as the Government's motion only requests a ruling, the motion is **GRANTED**. In light of the parties' dispute, there is good reason to resolve this matter in advance of trial.

Defendant contends that, at least with regard to Count One for violation for conspiracy to launder money in violation of 18 U.S.C. § 1956(h), the Government must prove beyond a reasonable doubt that defendant joined in the conspiracy knowing that the money involved was

proceeds from drug trafficking.  The Government contends that it is only required to prove beyond a reasonable doubt that defendant joined in the conspiracy with knowledge that the money was the proceeds "of some form of unlawful activity."[15]  Dkt. 761 at 7.

Neither party directs the Court to authority that is squarely on-point.  However, it is axiomatic that "knowledge of the objective of the conspiracy is an essential element of any conspiracy conviction."  United States v. Krasovich, 819 F.2d 253, 255 (9th Cir. 1987).  The parties here dispute the requisite scope of knowledge in the context of money laundering conspiracy, as charged here because the statute provides for slightly different language and types of knowledge in different places.  The substantive money laundering offense, 18 U.S.C. § 1956(a), itself requires "knowledge" that a financial transaction represents the proceeds of "some form of unlawful activity" *and* knowledge that the transaction is to conceal proceeds of "specified unlawful activity."  Thus, the parties dispute whether knowledge of the "objective" of the conspiracy requires knowledge of the *specific* unlawful activity at issue or just knowledge that money came from *some form* of unlawful activity.

"[A] defendant need not have known all the conspirators, participated in the conspiracy from its beginning, participated in all its enterprises, or known all its details."  United States v. Herrer-Gonzalez, 263 F.3d 1092, 1095 (9th Cir. 2001).  Thus, courts routinely describe the requisite knowledge of the offense charged here in general terms, without requiring that the defendant have knowledge of what *specific* crime resulted in the money at issue.  See United States v. Martinelli, 454 F.3d 1300, 1312 n.8 ("Martinelli only had to know that the property involved . . . represented the proceeds of some form of unlawful activity." (brackets and quotation marks omitted)); United States v. Diamond, 378 F.3d 720, 727 (7th Cir. 2004) (evidence that defendant thought company was a "scam" was sufficient to show defendant knew the money was derived from an illegal activity).  The Ninth Circuit has approved jury instructions regarding money laundering conspiracy without any reference to specific unlawful activity, see United States v. Sumeru, 449 Fed.Appx. 617, 623 (jury instructions adequately apprised the jury that defendant must "know that either the property or funds involved in the transaction represents some form of unlawful activity") (affirming no. 2:05-cr-00121-SJO, dkt. 296 (C.D. Cal. Sept. 16, 2008)), and the model instruction for the substantive money laundering offense similarly does not require proof that the defendant knew the specific unlawful source of the proceeds, see 9th Cir. Model Crim. Jury Instr. 8.147 (2017) ("the defendant knew that the property represented the proceeds of some form of unlawful activity . . . . The phrase 'knew that

---

[15] Although defendant expressly reserves the right to object to jury instructions regarding the elements of Counts One and Two, defendant's opposition does not address either of those two crimes.  Accordingly, the Court assumes for present purposes that defendant only disputes whether Count One requires proof of knowledge that the money derived from drug trafficking.

the property represented the proceeds of some form of unlawful activity' means that the defendant knew that the property involved in the transaction represented proceeds from some form, though not necessarily which form, of activity that constitutes a felony.").

In light of the foregoing, the Court agrees with the Government that it will not be required to prove defendant joined in the conspiracy with knowledge that the money derived from drug trafficking specifically.[16] With respect to jury instructions, the Court declines to endorse any specific language before the parties have met and conferred regarding all of their respective instruction submissions.

## VIII. CONCLUSION

Defendant's motion to suppress evidence obtained as a result of the traffic stop is **DENIED**.

Defendant's motion to suppress his own statements is **GRANTED in part** and **DENIED in part**. The motion is **GRANTED** with respect to defendant's post-arrest statements on October 16, 2012. The motion is **DENIED** in all other respects.

Defendant's motion for a bill of particulars is **DENIED**.

Defendant's motion to strike surplusage from the Indictment is **DENIED**.

Defendant's two motions in limine are **DENIED without prejudice**.

---

[16] In at least one *similar* context, courts require knowledge of the specific form of unlawful activity at issue. See United States v. Calderon, 169 F.3d 718, 723 (11th Cir. 1999) (conviction under 18 U.S.C. § 371 for conspiracy to knowingly conduct financial transactions "with intent to promote the carrying on of the specified unlawful activity" requires proof that defendant agreed to "conduct financial transactions with the intent to promote the carrying on of the specified unlawful activity of narcotics trafficking"). However, unlike in Calderon, or other cases evaluating the "intent to promote" provisions of the money laundering statute, 18 U.S.C. § 1956(a)(1)(B)(i) does not describe an "intent" to conceal proceeds of a specific unlawful activity. Rather, it requires "knowledge" of what the transaction will do – conceal the nature of the proceeds. Thus, the sub-section at issue here does not describe a necessary objective of the conspiracy, per se, but rather a feature of the underlying substantive offense.

## [REDACTED] CRIMINAL MINUTES – GENERAL     'O'

The Government's motion for ruling on the elements of the charged offenses is **GRANTED**.

IT IS SO ORDERED.

|  | 00 | 00 |
|---|---|---|
| Initials of Deputy Clerk | CMJ | |

Cc:     Pretrial Services