1                    UNITED STATES OF AMERICA
                  UNITED STATES DISTRICT COURT
2                 CENTRAL DISTRICT OF CALIFORNIA
                        WESTERN DIVISION
3
                            - - -
4                 HONORABLE CHRISTINA A. SNYDER
            UNITED STATES DISTRICT JUDGE PRESIDING
5                           - - -

6
     UNITED STATES OF AMERICA,          )
7                                       )
                    PLAINTIFF,          )
8                                       )
     VS.                                )   CASE NO.:
9                                       )   CR 14-648-CAS
     HARINDER SINGH,                    )
10                                      )
                    DEFENDANT.          )
11                                      )
     _____)
12

13

14
                 REPORTER'S TRANSCRIPT OF PROCEEDINGS
15                       (P.M. SESSION)

16                   TUESDAY, JANUARY 9, 2018

17                    LOS ANGELES, CALIFORNIA

18

19

20

21
                  LAURA MILLER ELIAS, CSR 10019
22                FEDERAL OFFICIAL COURT REPORTER
                 350 WEST FIRST STREET, ROOM 4455
23                LOS ANGELES, CALIFORNIA 90012
                      PH: (213)894-0374
24

25

```
 1

 2    APPEARANCES OF COUNSEL:

 3    ON BEHALF OF PLAINTIFF:

 4              BY:  CAROL CHEN
                     ELLEN LANSDEN
 5              ASSISTANT UNITED STATES ATTORNEY

 6              1100 UNITED STATES COURTHOUSE
                312 NORTH SPRING STREET
 7              LOS ANGELES, CA 90012

 8
      ON BEHALF OF DEFENDANT:
 9
                LAW OFFICES OF PETER JOHNSON
10              BY:  PETER JOHNSON, ESQ.
                409 N. PACIFIC COAST HIGHWAY, 651
11              REDONDO BEACH, CA 90027

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1

2

INDEX

3

4     PROCEEDINGS                                        PAGE

5

      JURY SELECTION                                     4

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1    LOS ANGELES, CALIFORNIA; TUESDAY, JAN. 9, 2018; 1:40 P.M.
 2                            - - -
 3              THE COURT:  Okay.  So I think we have all the new
 4    jurors seated.  So I'm going to proceed to ask you the
 5    questions that we asked this morning and hopefully, you will
 6    remember most of them.
 7              I think we seated Ms. Trevino first.  So
 8    Ms. Trevino, could you tell us how you and the other adults
 9    in your household are employed?
10              MS. TREVINO:  I'm a contract program monitor and my
11    husband is retired and my son is in construction.
12              THE COURT:  Okay.  For whom do you work?
13              MS. TREVINO:  Los Angeles County.
14              THE COURT:  Okay.  And have you been on a jury
15    before?
16              MS. TREVINO:  Yes, years ago.
17              THE COURT:  Okay.  Do you remember if it was civil
18    or criminal?
19              MS. TREVINO:  It was criminal.
20              THE COURT:  Did the jury reach a verdict?
21              MS. TREVINO:  Yes, we did.
22              THE COURT:  Were you satisfied with that
23    experience?
24              MS. TREVINO:  Yes.
25              THE COURT:  Okay.  Do you remember the other
```

```
 1    questions I asked of the jurors this morning?
 2              MS. TREVINO:  A lot of them, yes.
 3              THE COURT:  Okay.
 4              MS. TREVINO:  Not all of them, but a lot.
 5              THE COURT:  Well, let's start with what you
 6    remember.  Is there anything you should bring to our
 7    attention?
 8              MS. TREVINO:  No.
 9              THE COURT:  Okay.  Um, just to kind of review
10    quickly the caption areas, you heard the names of various
11    people.  Do you know any of them?
12              MS. TREVINO:  No.
13              THE COURT:  And do you have any biases of any kind
14    based upon someone's religion or nationality?
15              MS. TREVINO:  No.
16              THE COURT:  And do you have any experience with the
17    law enforcement that you need to bring to our attention?
18              MS. TREVINO:  My sister's a deputy sheriff.
19              THE COURT:  And are you close to your sister?
20              MS. TREVINO:  Uh, not too close, but we're close.
21              THE COURT:  Okay.  Well, my question really at the
22    end of the day is going to be would you be able to evaluate
23    the testimony of a law enforcement officer by the same
24    standards that you apply to everyone else in the case?
25              MS. TREVINO:  Definitely.
```

```
 1              THE COURT:  Okay.  And there's nothing in this case
 2    that would give you pause that you couldn't be fair and
 3    impartial?
 4              MS. TREVINO:  No.
 5              THE COURT:  Okay.  All right.  Then let's move on
 6    if we can.  I think we seated Mr. Kopooshian next.
 7              Mr. Kopooshian, how are you and the other adults in
 8    your household employed?
 9              MR. KOPOOSHIAN:  Um, I'm self-employed.  Uh, I run
10    a basketball program for older youth.  Um, my mom is a teller
11    at a bank.  Uh, my brother is, uh, he works for PRN as an
12    EMT, um, and my father is self-employed, he's salesman.
13              THE COURT:  And who are the youth that you provide
14    was basketball coaching?
15              MR. KOPOOSHIAN:  Armenian youth.
16              THE COURT:  Okay, okay.  Is that some organization
17    or anything of that nature?
18              MR. KOPOOSHIAN:  I have my own organization.
19              THE COURT:  And have you been on a jury before?
20              MR. KOPOOSHIAN:  I have not.
21              THE COURT:  And do you remember the other questions
22    I asked?
23              MR. KOPOOSHIAN:  I do.  Um, I had a father in the
24    program that we're pretty close to.  He was an ex-police
25    officer, um, and I mean he didn't tell us very many details,
```

```
 1    but he was, um, in his own trial, um, he sued the City a

 2    while ago.  Um, and, I mean, he didn't say, he didn't tell us

 3    any details, but that's pretty much it.

 4              THE COURT:  Well, let me ask you this.  Do you feel

 5    that knowing that particular father would impact your ability

 6    to be fair and impartial in this case?

 7              MR. KOPOOSHIAN:  Um, I don't think so.

 8              THE COURT:  Okay.  Um, when you say I don't think

 9    so, that may not be a strong enough answer for everyone.

10              Do you think you could judge this case based on the

11    evidence and the instructions I give to you?

12              MR. KOPOOSHIAN:  I can definitely do that.

13              THE COURT:  Okay.  Anything else you need to bring

14    to our attention?

15              MR. KOPOOSHIAN:  No, that's about it.

16              THE COURT:  All right.  Then I think the next

17    person is Ms. Berry.  Ms. Berry, why don't tell us how you

18    and the other adults in your household are employed?

19              MS. BERRY:  I am a fundraiser for a small

20    biomedical research, uh, organization.  My husband is a

21    botanical manager in a large botanic garden in L.A.

22              THE COURT:  Have you been on a jury before?

23              MS. BERRY:  Yes, I have.

24              THE COURT:  Civil or --

25              MS. BERRY:  Civil.
```

```
 1              THE COURT:  Okay.  Did the jury reach a verdict?
 2         MS. BERRY:  Yes.
 3              THE COURT:  And were you satisfied with your
 4    experience as a juror?
 5         MS. BERRY:  Yes.
 6              THE COURT:  And the other questions I asked today,
 7    do you have them generally in mind?
 8              MS. BERRY:  Um, I've lived -- I was an exchange
 9    student and I lived in India for 12 weeks with an Indian
10    family.  And it was not an overall pleasant experience.
11              THE COURT:  Okay.  Um, when you say you lived with
12    an Indian family, was it a Seik family?
13         MS. BERRY:  No.
14         THE COURT:  It was --
15         MS. BERRY:  It was a Hindu family.
16              THE COURT:  And when you say it wasn't an overall
17    pleasant experience, were you in high school or college at
18    the time?
19         MS. BERRY:  I was in college.
20              THE COURT:  Okay.  And is there anything in that
21    experience -- can you tell us why it was unpleasant or would
22    you want to do that at side bar?
23         MS. BERRY:  Uh, probably at side bar.
24              THE COURT:  Okay.  We'll come back to it.  I think
25    the bottom line where I'm going so maybe you can tell me do
```

1    you think there's something in that experience that would

2    prevent you from being fair and impartial in this case?

3             MS. BERRY:  Yes.

4             THE COURT:  Okay.  We'll talk to you at side bar.

5             Okay.  So then next is Ms. Morriss.  Ms. Moriss, do

6    you want to tell us about yourself?

7             MS. MORISS:  Um, yes.  I'm interior designer

8    working for a restaurant brand as a project manager.  My

9    husband codes stuff.

10            THE COURT:  What kind of stuff?

11            MS. MORISS:  I think website stuff.

12            So I work for a man, uh, pretty directly that

13   pleaded guilty to fraud with another man with the IRS.

14            THE COURT:  Okay.  When you say work pretty

15   directly with him, uh, are you familiar with the

16   circumstances of his case?

17            MS. MORISS:  Yes, because I Googled it when I

18   started.

19            THE COURT:  Okay.  And do you think that that would

20   prevent you from being fair and impartial in this case?

21            MS. MORISS:  Possibly.  I think the answer is yes.

22            THE COURT:  Okay.  We'll talk to you at side bar,

23   also and get a few more facts.

24            Okay.  Let me do this.  May I see counsel at side

25   bar, and I'm going to invite Ms. Berry to join us first.

1             (Proceedings held at side bar:)

2             THE COURT:  Good afternoon.  So what occurred in

3    India?

4             MS. BERRY:  So the family I lived with, they were

5    diamond merchants.  I think they had lost their place of

6    business so they were doing their business in the building

7    that we were living in, and it just seemed to me that some of

8    what their business dealings were less than ethical.

9             THE COURT:  Okay.  And if that is the case, do you

10   think that's going to cause you to have that view of all

11   people who are of Indian heritage?

12            MS. BERRY:  Probably not.  I mean that's pretty far

13   reaching.

14            THE COURT:  Okay.  Because, I guess, tell me what

15   you think about that experience would cause you to be less

16   than fair and impartial in this case?

17            MS. BERRY:  Well, just that I, I guess, maybe it

18   was with just that family then.

19            THE COURT:  Okay.  Counsel, do you have some

20   follow-up questions?

21            MR. JOHNSON:  Where in India?

22            MS. BERRY:  Mumbai.

23            MR. JOHNSON:  Were they Punjabi?

24            MS. BERRY:  No.

25            MR. JOHNSON:  You said that you probably would not

1   be fair and impartial.  Can you explain that for me?

2          MS. BERRY:  I'm sorry?

3          MR. JOHNSON:  When you said that --

4          MS. BERRY:  Well, you know, I was young and it just

5   left a bad taste in my mouth.  I don't want to generalize

6   Indians, but it was just not a good experience with Indian

7   people at a very young age.

8          MR. JOHNSON:  Did you go on to have any Indian

9   friends or people in the community that you would associate

10  with?

11         MS. BERRY:  No, I've never had any opportunity,

12  actually.

13         MR. JOHNSON:  What brought you to India in the

14  first place?

15         MS. BERRY:  It was an exchange program.  I did not

16  chose the venture.

17         THE COURT:  Okay.  Anything from the government?

18         MS. LANSDEN:  I don't think so.

19         THE COURT:  Okay.  Thank you.

20         MR. JOHNSON:  Thank you.

21         THE COURT:  So what do you say?

22         MR. JOHNSON:  I would move to strike that juror for

23  cause.  Probably not is insufficient in evaluating whether

24  she could be fair and impartial.

25         THE COURT:  Okay.  Any response to that?

1       MS. CHEN:  I think in the beginning she did say

2    that.  Though, Indian people in general, there's a large

3    number of people and she would try to stay impartial.  And so

4    I don't know if that is for cause or more of a peremptory.

5    It's getting close.

6           THE COURT:  Probably for cause based on how she

7    presented her experience.  I think we ought to excuse her for

8    cause, and then let's find out what --

9           MR. JOHNSON:  Is the Court prepared to continue?

10          THE COURT:  Well, we need to bring the other juror

11   down.

12          MR. JOHNSON:  That's Juror No. 10.  Then I would

13   have she said she works with a man who pleaded guilty and

14   would that impact her ability to judge the case, and I marked

15   down she said yes.

16          THE COURT:  Anyone else who wants to speak to that

17   issue?  Should we let her go for cause?

18          MS. LANSDEN:  I thought we were going to bring her

19   over.

20          MR. JOHNSON:  I thought she was pretty clear, but

21   it's up to you.

22          THE COURT:  We can bring her over.

23          Okay.  Ms. Morriss, may we ask to fill in the

24   details about your boss?

25          MS. MORRISS:  I work for Panda Restaurant Group and

1    when I first started there, someone told me to Google him

2    because he's a bad man.  And so the other lady that I started

3    work with, we Googled him and read the details.  He pleaded

4    guilty to assisting another man -- they had -- I don't know,

5    a thing going on to defraud the IRS.  He got involved and he

6    pleaded guilty.

7              THE COURT:  Okay.  And have you formed -- you still

8    work for him?

9              MS. MORRISS:  Yes, I do.

10             MR. JOHNSON:  And do you think based on your

11   experience with him and having Googled him, it's going to

12   impact your ability to be fair and impartial in this case and

13   if so, how?

14             MS. MORRISS:  Well, I'm not sure other than the

15   fact that I work with him and regardless if he's a nice man

16   or not, I have no respect for him.

17             THE COURT:  Okay.

18             MS. MORRISS:  And he's not from this country so...

19             MR. JOHNSON:  So you have a problem with him

20   because he's not from this country?

21             MS. MORRISS:  No, just -- not particularly.

22             MR. JOHNSON:  We're not gonna share this with

23   anyone else.  But I understand it's a difficult situation

24   when you're talking about your employer.  I take it you might

25   not be able to give Mr. Singh a fair break because you have

1    these pre-existing views about your boss?

2              MS. MORRISS:  Yes, because I'm still upset.  I feel

3    like he got away with it, and he's in a much more senior

4    position because that's how life is.

5              THE COURT:  Do you have any further things you want

6    to ask?

7              MS. LANSDEN:  Are you able to separate the bad

8    things he did from everyone else in the world and give

9    everyone else the benefit of the doubt?

10             MS. MORRISS:  I suppose, yeah.

11             MS. LANSDEN:  You're able to understand he's just

12   one person who did some bad things.  That doesn't mean anyone

13   else --

14             MS. MORRISS:  So absolutely.  I just don't

15   understand how, like, if I'm supposed to be impartial --

16             MS. LANSDEN:  Just as to this person.

17             MS. MORRISS:  But I have these underlying feelings.

18             MS. LANSDEN:  About your boss?

19             MS. MORRISS:  Yes.

20             MS. LANSDEN:  But they're two different --

21             THE COURT:  Well, I guess this is what we're trying

22   to figure out.  We're going to tell you that you have to

23   decide this case and the evidence in this case on the law as

24   I give to you.  Do you think you can do that?

25             MS. MORRISS:  I think so, yes.

```
 1              THE COURT:  What I think Mr. Johnson is concerned

 2    about to the extent you have any concerns or antipathy to

 3    your boss, are you going to take it out on his client?

 4              MS. MORRISS:  I can't answer that.  Still today,

 5    it's only three years, I'm resentful.  I would say regardless

 6    if he's a nice man or where he's from, I work in a very

 7    diverse company, but --

 8              THE COURT:  Now, he plead guilty; right?

 9              MS. MORRISS:  Yes.

10              THE COURT:  And so when you say he got away with

11    it, he obviously plead guilty and suffered some consequence.

12    As far as you know, he suffered no consequence or what?

13              MS. MORRISS:  If I look at the way he's living his

14    life, there's no consequences.  He's gone on to be an

15    extremely wealthy man simply because of the friends he has

16    and the connections.

17              THE COURT:  Okay.  Thank you.

18              MR. JOHNSON:  Renew my objection for cause,

19    Your Honor.

20              THE COURT:  What do you have to say?

21              MS. LANSDEN:  She seemed to speak on both sides.

22    I'm not sure if she was rehabilitated.  It seemed like when

23    rehabilitated, she would go back the other way.

24              THE COURT:  It's close, but I think while she said

25    she could decide the case based on the evidence, she wasn't
```

```
 1    sure if she would unleash her antipathy on Mr. Singh.  That's
 2    what worries me.  I'm going to excuse her for cause.
 3            Okay.  So let's get two more people up and see
 4    where we go from here.
 5            MS. CHEN:  Your Honor, with respect to I believe it
 6    was Juror No. 1 who his mom works at a bank, I had a couple
 7    follow-up questions.  I think she's a teller at the bank.
 8    How long she's worked at the bank?  If he has any feelings
 9    about whether people who don't want to use the bank for
10    certain transactions?  I think he's also the juror who had a
11    dad of a person in a basketball program who sued the City.
12    I'd ask a little more details.
13            THE COURT:  Let's have him come over then.
14    Mr. Kopooshian, please come over.
15            First of all, you said your mother is a bank
16    teller.
17            MR. KOPOOSHIAN:  Yes.
18            THE COURT:  How long has she been with the bank?
19            MR. KOPOOSHIAN:  Really long time.
20            THE COURT:  Okay.  There may be some testimony in
21    this case, and I'm going to maybe let the government tell you
22    what it is.  Some people don't like to use banks.
23            MS. CHEN:  Yes, Your Honor.  Some people prefer to
24    transfer money outside of the banking system, like
25    informally.  Would you have any issues for anybody who might
```

```
 1   have issues with using the bank because it might be too much
 2   paperwork or the fees are too large?
 3            THE COURT:  I think what she's asking is if there's
 4   testimony that someone doesn't like to use banks, likes to
 5   transfer money through other systems, does that cause you
 6   either to be trustful or distrustful of that person?
 7            MR. KOPOOSHIAN:  I mean, I don't really have a -- I
 8   don't really see that as any kind of problem.
 9            THE COURT:  Okay.  Either way?
10            MR. KOPOOSHIAN:  Yeah, either way.
11            THE COURT:  Okay.
12            MR. JOHNSON:  So if someone decided not to use a
13   bank, you wouldn't think one way or the other that the person
14   is distrustful or trustful?
15            MR. KOPOOSHIAN:  No, but I've been brought up with
16   the whole bank system, but I would not.  No, I would not.
17            THE COURT:  Okay.  And then you said your dad sued
18   someone?
19            MR. KOPOOSHIAN:  Not my dad.  In my program we have
20   a parent who was an ex-police officer who sued the City for
21   discrimination.  He told us briefly about that, and he was
22   like a mentor to us because he's older than us.  So I just
23   wanted to bring that up, didn't want to leave anything
24   unsaid.
25            THE COURT:  You don't think there's anything about
```

```
1    that which would cause you to have some bias in this case?
2              MR. KOPOOSHIAN:  I don't think so.  I'm not
3    normally a biassed person, however, that did, obviously, I
4    mean, when someone tells me something of that nature, I tend
5    to listen and collect information, but I don't think I'll be
6    biased in any way, but I just wanted to put that out there.
7              THE COURT:  Okay.  That's helpful.  Thank you.
8              I don't think there's any challenge for cause as to
9    him.  Let's fill up the box again after we send these two on
10   their way and try again and see if we can move ahead.
11                       (Side bar concluded.)
12             THE COURT:  So we are going to thank and excuse
13   Ms. Berry and Ms. Morriss, and ask you to go back to the jury
14   assembly room.  Let's call up two additional jurors.
15             THE CLERK:  John Dinkha.  If you could have a seat
16   in the first row, second seat.
17             Derek Garcia.  If you would have a seat in the
18   second row, fifth seat.
19             THE COURT:  Okay.  Mr. Dinkha, could you tell us
20   how you and the other adults in your household are employed?
21             MR. DINKHA:  So I currently live alone, and my
22   employment is, um, I'm a procurement manager for an aerospace
23   company.
24             THE COURT:  Okay.  Have you been on a jury before?
25             MR. DINKHA:  Yes, once before.
```

1          THE COURT:  Civil or criminal?

2          MR. DINKHA:  It was criminal.

3          THE COURT:  And did you reach a verdict?

4          MR. DINKHA:  No, I think it was a mistrial is what

5     they call it.

6          THE COURT:  Okay.  Did you come away from that

7     experience with any strongly positive or negative feelings

8     about jury service?

9          MR. DINKHA:  Probably.  I felt like it was a waste

10    of time so maybe negative.

11         THE COURT:  A waste of time because a mistrial was

12    declared or why was it a waste of time?

13         MR. DINKHA:  Yeah, just I think the instructions

14    weren't followed the way -- my personal opinion was it wasn't

15    efficient, but maybe that wasn't grounds for saying that it

16    was a negative experience.

17         THE COURT:  Okay, okay.  The questions I asked this

18    morning, do you have them generally in mind?

19         MR. DINKHA:  Generally, yes.

20         THE COURT:  Is there anything you should bring to

21    our attention?

22         MR. DINKHA:  No.  I think the only thing that I

23    would bring up is that I've had a family member who's been in

24    trouble with the law for drug-related issues.  And it wasn't

25    a very pleasant experience, but I think I could get past that

1    in a situation like this.

2            THE COURT:  Okay.  I appreciate that.

3            Okay.  Mr. Escudero, tell me and how you and the

4    other adults in your household are employed?

5            MR. ESCUDERO:  I live alone right now, divorce.

6    Um, I am here when I was 31 years old so my English was very

7    hard.  I couldn't manage.  Uh, I work in Huntington Hospital

8    for 25 years as data entry clerk.  I manage numbers.

9            Oh, I used to make transaction with company to send

10   money to my relatives in Peru.  Um, since I was here, uh,

11   31 years old, I had bad experiences with, uh, corruption,

12   money laundering in my country, you know, Latin America, that

13   kind of situation so I feel kinda okay in this case.

14           THE COURT:  Let me see if I understand a little

15   better.  You're familiar with the concept of money

16   laundering?

17           MR. ESCUDERO:  Yeah, I like to read, I watch TV.  I

18   like to read so I know of things in general.  I never live

19   through those situations.

20           THE COURT:  Okay.  Well, let me do this.  Let me if

21   someone wants to be heard, fine.  Otherwise, I am probably

22   going to excuse Mr. Escudero for a couple of reasons, but if

23   anyone objects?

24           MR. JOHNSON:  No objection.

25           MS. CHEN:  No objection.

1          THE COURT:  Okay.  Mr. Escudero, then we're going

2    to thank and excuse you.  Let you go back to the jury

3    assembly room, and we'll call someone up in your place.

4          THE CLERK:  Livija Lipaite.

5          THE COURT:  So Ms. Lipaite, how are you and the

6    other adults in your household employed?

7          MS. LIPAITE:  In our household is three people.  My

8    brother, he's retired, my sister, she's retired and I work

9    for City of L.A. Cultural Affairs Department.

10          THE COURT:  What did your brother and sister do

11    before they retired?

12          MS. LIPAITE:  My sister is engineer, structural

13    engineer and brother is artist.

14          THE COURT:  Have you been on a jury before?

15          MS. LIPAITE:  Never.

16    Q.   You remember the questions I asked this morning?

17          MS. LIPAITE:  Yes.  The one thing I could say I was

18    born in Lithuania so I'm immigrant.  And then, um, after

19    graduating from college in United States, I lived in Germany

20    for two years.

21          THE COURT:  Is there anything from that experience

22    that would cause you to think you would not be able to fair

23    and impartial in this case?

24          MS. LIPAITE:  No.

25          THE COURT:  Okay.  Then let me see counsel, if I

1    may, at side bar.

2                  (Proceedings held at side bar.)

3         THE COURT:  So let's start at the beginning.  Do we

4    have any challenges for cause?

5         MR. JOHNSON:  Would the Court follow-up with Juror

6    No. 2 with two issues?  Number one, he was pausing and saying

7    he was dissatisfied with the process and thought it was a

8    waste of time.  And I would like the Court to inquire further

9    as to his feelings about a two-week trial in this case as

10   well as he said a family member was involved in a case and

11   just have some background information about that and whether

12   he could still be fair and impartial in this case.

13        THE COURT:  Well, I thought we covered it, but let

14   me ask him from afar or Mr. Dinkha, could you come over for a

15   minute?

16        Okay.  So you talked about the prior case you were

17   on where there was a mistrial.  I think you said there was a

18   problem with the instructions or following them.  This is

19   scheduled to be an eight-day trial give or take a couple of

20   days.  Do you think in light of that experience, assuming I

21   give you clear instructions, we all are clear, will you pay

22   attention and not be disenchanted with all of us?

23        MR. DINKHA:  Absolutely.

24        THE COURT:  Just what were the particulars of that

25   case?

```
 1            MR. DINKHA:  To be honest I don't think we were

 2    thinking logically.  Emotions get involved, didn't stick to

 3    the facts.  A lot of it I felt just wasted time.

 4            THE COURT:  So the jury hung essentially?

 5            MR. DINKHA:  Essentially, yes.

 6            THE COURT:  You understand when you sit on a jury,

 7    you're dealing with 12 people each of whom is independently a

 8    judge and you have to attempt to come to a conclusion with

 9    them if you can?

10            MR. DINKHA:  Absolutely.

11            THE COURT:  But on the other hand, you don't have

12    to reach a verdict if you disagree with everyone else.

13            MR. DINKHA:  Yes, it's part of the process.  I

14    understood that.

15            THE COURT:  Then you mentioned someone else in your

16    family had a run-in with the criminal system about a drug

17    problem?

18            MR. DINKHA:  Yes, my younger brother.

19            THE COURT:  What happened to him?

20            MR. DINKHA:  I think he was still in high school at

21    the time, but essentially got busted with some drugs,

22    marijuana and some other things.  And it was a very

23    unpleasant experience for the family, but it was entirely his

24    fault.

25            THE COURT:  Was he convicted of something or did he
```

```
 1    plead guilty or do something?
 2            MR. DINKHA:  He did plead guilty.  He did go to a
 3    program.  I believe it's still on his record.  And today he
 4    works, he's working today, but he works in like an auto shop
 5    kind of thing.
 6            THE COURT:  But you don't think that would prevent
 7    you from being a fair and impartial juror?
 8            MR. DINKHA:  I don't think so, Judge.
 9            THE COURT:  Anything else?
10            MR. JOHNSON:  No, thank you.
11            THE COURT:  Thank you.
12            Anyone else we have to follow-up with?
13            MR. JOHNSON:  No.
14            MS. LANSDEN:  No, Your Honor.
15            THE COURT:  Okay.  So it's that time again.  I
16    think we're back to you, Mr. Johnson.
17            MR. JOHNSON:  I would like the Court to thank and
18    excuse Juror No. 2.
19            THE COURT:  Okay.  That's Mr. Dinkha.
20            Anyone for the government?
21            MS. LANSDEN:  The government would thank and excuse
22    Juror No. 7, Mr. Velarde.
23            THE COURT:  Do you have anyone else?
24            MR. JOHNSON:  I do, Your Honor.  Defense would
25    thank and excuse juror number -- actually, Juror No. 4.
```

```
 1              THE COURT:  That's Mr. Cu.  Okay.

 2          Do you have anyone else right now?

 3              MR. JOHNSON:  No.

 4              THE COURT:  Okay.  Government, do you have anyone

 5     right now or should we just wait?

 6              MS. LANSDEN:  We can wait.

 7              THE COURT:  Okay.  Then let's go back and excuse

 8     these people and bring up two more.

 9                      (Side bar concluded.)

10              THE COURT:  Okay.  At this juncture, we would like

11     to thank and excuse Mr. Dinkha and Mr. Cu and ask you to

12     report back to the jury assembly room.  Thank you very much

13     for your time and attention.  Oh, and also Mr. Velarde.  My

14     apologies.  Thank you.

15          Who are the next three?

16              THE CLERK:  Thomas Fulkerson, take seat number two.

17          Quan Tran, take seat number six.

18          Jennifer Mullin Aimaro, take seat number four.

19              THE COURT:  Okay.  So let us begin with

20     Mr. Fulkerson.  Mr. Fulkerson, how are you and the other

21     adults in your household employed?

22              MR. FULKERSON:  Um, actually, it's myself.  I'm a

23     general foreman for a sheet metal and air conditioning

24     company.  I run a shop here in the City of Commerce, and I

25     have my wife which works for a dispatcher for the California
```

```
 1    Highway Patrol.
 2              THE COURT:  Okay.  And have you served on jury
 3    previously?
 4              MR. FULKERSON:  No.
 5              THE COURT:  Do you recall the questions I asked the
 6    assembled group this morning?
 7              MR. FULKERSON:  Yes.
 8              THE COURT:  Is there anything you need to bring to
 9    our attention?
10              MR. FULKERSON:  No.
11              THE COURT:  Okay.  Then let's move ahead to
12    Mr. Tran.  How are you and the other adults in your household
13    employed?
14              MR. TRAN:  I'm a compliance auditor for the State
15    of California Department of Business Oversight and my wife is
16    an administrator for Social Services Disability Division
17    State of California.
18              THE COURT:  Have you been on a jury before?
19              MR. TRAN:  No.
20              THE COURT:  Do you remember the questions I asked
21    this morning regarding the universe?
22              MR. TRAN:  Yes.  I have two.  Um, the first one my
23    department is, uh, for me I assist in the regulations of
24    Consumer Financing Law, however, my department oversees also,
25    uh, money transmitter and money service businesses within the
```

1    department.

2              THE COURT:  Okay.  Tell me what kinds of businesses

3    are those?  Do they have to be licensed?

4              MR. TRAN:  Yes, the department licenses those money

5    transmitter and money services businesses, however, I'm not

6    on that side, that program.  I deal with consumer lending.

7              THE COURT:  Okay.  We may have some follow-up, but

8    I'm not sure what it might be.  Anything else you wanted to

9    bring to our attention?

10             MR. TRAN:  My brother about ten years ago pleaded

11   guilty to possession and intent to distribute methamphetamine

12   so that's it.

13             THE COURT:  Was he tried or did he plead?

14             MR. TRAN:  Plead guilty, yes.

15             THE COURT:  Do you think that experience is going

16   to affect your ability to be fair and impartial in this case?

17             MR. TRAN:  No.

18             THE COURT:  Okay.  All right.  Then let's move on

19   to Ms. Aimaro.

20             MS. AIMARO:  I am the CEO of a media company here

21   in Los Angeles and my husband is retired recently.

22             THE COURT:  Okay.  What did he do previously?

23             MS. AIMARO:  He worked for the federal government

24   as an FBI agent.

25             THE COURT:  Okay.  Did he -- what general area did

1    he work in?

2              MS. AIMARO:  Uh, various over his 30-year history.

3    White collar crime, um, criminal, everything.  SWAT.

4              THE COURT:  So now the question is obviously, there

5    will be FBI agents testifying in this case, possibly DEA

6    agents and other federal agents.  Do you think that given

7    your husband's background, you'll be able to be fair and

8    impartial?

9              MS. AIMARO:  I do.

10             THE COURT:  You do?

11             MS. AIMARO:  Yes.

12             THE COURT:  You would not accord or give credence

13   to some law enforcement officer's testimony simply because he

14   or she is a law enforcement officer?

15             MS. AIMARO:  No, I wouldn't.

16             THE COURT:  Have you been on a jury before?

17             MS. AIMARO:  I have not.

18             THE COURT:  Counsel, let's go to side bar and see

19   what we're doing here.

20                  (Proceedings held at side bar.)

21             THE COURT:  Okay.  I guess first question is do we

22   have follow-up?

23             MR. JOHNSON:  I'm considering whether there's any

24   follow-up or overlap in this case and the job

25   responsibilities of Juror No. 7.  It sounds as though he said

he worked in another division, but his familiarity with the

division that he doesn't work in was my concern.

And I just wanted the Court to follow-up with his

understanding of that and whether he can be fair and

impartial.  And understand the Court's instruction and set

aside his own personal experience and his employment.

THE COURT:  Well, I guess, two questions in my

mind.  First of all, is he even with an agency that registers

the entities that are the subject of this case?

MR. JOHNSON:  I don't know the answer to that, but

it sounded as though he said I'm a compliance auditor so I

assume that he is or works for those agencies to determine

whether they have a license.

MS. LANSDEN:  I thought he said that was a separate

part of the company.

THE COURT:  He did, but the question is factually,

because I don't know the evidence the way you do, would there

be any reason for anyone in this case being required to be

registered with the State of California?

MS. LANSDEN:  Yes, there would be, however, I think

it's analogous to when lawyers sit on juries.

THE COURT:  I know.  Let's ask him to come over and

we'll ask him quickly.  Mr. Tran, could we ask you to come

over briefly?

Let me see if I understand or we all understand.

UNITED STATES DISTRICT COURT

1    Your work is with the consumer side?

2              MR. TRAN:  Yes.

3              THE COURT:  With the State.  So you really are not

4    in charge of determining who needs to register as a money

5    exchanger or something like that?

6              MR. TRAN:  No.

7              THE COURT:  Now, in the course of this case, I'm

8    going to be giving you instructions and telling you must

9    follow those instructions.  Do you feel you could follow my

10   instructions even if you had a different understanding

11   anecdotally about who has to register and about people who

12   have to register?

13             MR. TRAN:  Yes.

14             MR. JOHNSON:  Do you have any strong feelings one

15   way or another regarding your -- whether people have avoided

16   licensing procedures or not avoided licensing procedures or

17   do you have any experience like that?

18             MR. TRAN:  No.  I'm an examiner on the regulatory

19   side.  We mainly do examinations on those who are licensed.

20   I don't involve myself with unlicensed activity.

21             ATTY2:  What would be an example of the type of

22   services that you would provide to a licensee?

23             MR. TRAN:  Oh, well, we would go in and we would do

24   an examination, like an audit, to make sure they're

25   compliant.  For us it's the California financing law.  Make

```
 1    sure they're in compliance, not overcharging fees, interest,
 2    that kind of thing.  We look at -- in the loan file.
 3            ATTY2:  And the typical business or company that
 4    you would normally audit?
 5            MR. TRAN:  Oh, we do payday lenders, that's one of
 6    them.  We also look at car loans, consumer loans, but most of
 7    them are $5,000 or less, the type of loans they make and we
 8    regulate those.
 9            ATTY2:  Would there be anything about that
10    experience that you were bringing to this case or feel like
11    you can't keep out of this case?
12            MR. TRAN:  No.  I think that as an examiner, we
13    look for a lot of factual evidence, that's how we present to
14    see if there's any kind of possible violation of law.  That's
15    how we look at it so only factual.
16            THE COURT:  Thank you very much.
17            So I don't think we have any challenges for cause
18    that I would be inclined to sustain which then gets me back
19    to the land of peremptories.
20            Do you have someone, Mr. Johnson?
21            MR. JOHNSON:  I do.  Thank and excuse Juror No. 7.
22            THE COURT:  Anyone from the government?
23            MS. CHEN:  The government would thank and excuse
24    Juror No. 3, Ms. Moon.
25            THE COURT:  Okay.  Do you have anyone else right
```

```
 1    now, Mr. Johnson?
 2              MR. JOHNSON:  If I could just have a moment,
 3    Your Honor?  I did have a follow-up and frankly, I can't
 4    remember what the Court followed up with him and that is
 5    Juror No. 2.  I think the Court did, but I don't know if you
 6    asked about the overlap of his wife being a dispatcher and
 7    whether that would impact his ability to believe officers
 8    more or not.
 9              THE COURT:  I think I asked that.
10              MR. JOHNSON:  I definitely know you asked Juror
11    No. 4.
12              THE COURT:  Did he even say she was a dispatcher
13    with a law enforcement agency?
14              MR. JOHNSON:  Yes, he's a foreman and his wife is a
15    dispatcher with the California Highway Patrol.
16              THE COURT:  I guess that's right.
17              MR. JOHNSON:  I would like some follow-up.
18              THE COURT:  Mr. Fulkerson, could we ask you a quick
19    question over here?
20              Your wife, she's a dispatcher for CHP?
21              MR. FULKERSON:  Yes.
22              THE COURT:  The question on the table is we will
23    have law enforcement officers testifying.  Do you think you
24    would give them more credence because they're law
25    enforcement?
```

1          MR. FULKERSON:  I want to say, you know, no, but,

2    you know, I don't know.  I've never done one of these so I

3    don't know.

4          THE COURT:  Here's the question.  I'm going to tell

5    you that you have to evaluate the testimony of a law

6    enforcement officer the same way of anyone else.  Do you have

7    any doubt that you could do that?

8          MR. FULKERSON:  I think I could do it.

9          THE COURT:  You think you can?

10         MR. JOHNSON:  What are your personal feelings when

11   you say you think you can?

12         MR. FULKERSON:  I'll be honest.  I've associated

13   with a lot of people in law enforcement.  I don't know their

14   names.  I know the name you said.  I don't know who that

15   person is off the top of my head.  I don't know if I had been

16   around that person.

17         MR. JOHNSON:  Just in general when you say you

18   think you can be fair, what's behind that feeling?

19         MR. FULKERSON:  I mean, they're like my family.  My

20   wife has been doing this for years.  I'm not saying I would

21   make a bad decision.

22         THE COURT:  I think in light of that, we should let

23   you go back to the jury assembly room.  Thank you.

24         MR. JOHNSON:  I think the Court has asked Juror

25   No. 4 those same questions.

1          THE COURT:  I have and I'm satisfied that she

2     doesn't have a problem.

3          Okay.  Why don't I bring up someone to replace

4     Mr. Fulkerson, and then come back to side bar.

5          MR. JOHNSON:  Can I ask how many strikes I have?

6          THE COURT:  Yeah.  You have, I believe, five

7     remaining and the government has two remaining.

8          MR. JOHNSON:  So at this point, I would like to

9     thank and excuse Juror No. 4.

10          THE COURT:  Okay.  That's Ms. Aimaro.

11          Anyone else?

12          MR. JOHNSON:  No.

13          THE COURT:  We'll bring up four.  Okay.

14                    (Side bar concluded.)

15          THE COURT:  So we are going to thank and excuse

16     Mr. Tran, Ms. Moon, Ms. Aimaro and Mr. Fulkerson and ask you

17     all to report back to the jury assembly room.

18          THE CLERK:  Anthony Munoz.  If you could come

19     forward, you will take seat number seven.

20          Ariel Galloway.  If you could have a seat in number

21     three.

22          Eun Chong.  If you could have a seat in number two.

23          David Breihan.  If you could have a seat in number

24     four.

25          THE COURT:  Okay.  Mr. Munoz, how are you and the

```
 1    other adults in your household employed?
 2              MR. MUNOZ:  I perform inside sales and customer
 3    service for a skateboarding and snowboarding manufacturing
 4    company.  Um, my father is retired management EDD for the
 5    State of California and my mother's an insurance adjustor for
 6    AAA.
 7              THE COURT:  Okay.  Have you served on a jury
 8    before?
 9              MR. MUNOZ:  No, I have not.
10              THE COURT:  Do you recall my other questions this
11    morning?
12              MR. MUNOZ:  Yes, I do.
13              THE COURT:  Is there anything you should bring to
14    our attention?
15              MR. MUNOZ:  No.
16              THE COURT:  Then let us now go to I believe
17    Ms. Galloway.  How are you and the other adults in your
18    household employed?
19              MS. GALLOWAY:  I am currently a student and front
20    desk agent and my mom is a coding supervisor.
21              THE COURT:  Okay.  Have you served on a jury
22    before?
23              MS. GALLOWAY:  No.
24              THE COURT:  Is there anything you need to bring to
25    our attention based on my questions this morning?
```

1          MS. GALLOWAY:  No.

2          THE COURT:  Okay.  Then let's move on to Ms. Chong.

3          MS. CHONG:  I live alone, and I am the senior

4     manager of product integrity at an apparel corporation.

5          THE COURT:  Okay.  Have you served on a jury

6     before?

7          MS. CHONG:  I've gone through the selection

8     process, but I've never served.

9          THE COURT:  And based on the questions I asked

10    earlier today, do you need to bring anything to our

11    attention?

12         MS. CHONG:  Uh, yes.  The first five years of my

13    life were spent in South Korea.

14         THE COURT:  Okay.  And do you think that has any

15    impact on --

16         MS. CHONG:  No.

17         THE COURT:  -- how you would evaluate the case?

18         MS. CHONG:  No.

19         THE COURT:  Okay.  Mr. Breihan, let's go to you.

20         MR. BREIHAN:  Um, I'm the executive director of

21    operations at a market research firm.  Um, and during lunch I

22    got a phone call that one of my managers, my top manager, um,

23    was placed on executive leave.  Um, and so I don't think I

24    would be able to serve on this jury because I have to go deal

25    with the fallout of, uh, somebody.

1      THE COURT:  Okay.  Well, let me confer with

2  counsel.  Does anyone want to come to side bar and discuss

3  this matter or shall we excuse him?

4      MR. JOHNSON:  I have no objection to excusing him.

5      MS. CHEN:  The government believes that as well.

6      THE COURT:  Then Mr. Breihan, we're going to thank

7  and excuse you.  You still have to go back to the jury

8  assembly room, however, and we now come to someone else.

9      THE CLERK:  Lyla Wakut.  Please take seat number

10  four.

11      THE COURT:  We know a little bit about you, but why

12  don't you tell us how you and the other adults in your

13  household are employed?

14      MS. WAKUT:  Um, so right now I'm a children's

15  social worker with the Department of Children Family

16  Services, L.A. County, and my boyfriend is an architect.

17      THE COURT:  Have you served on a jury before?

18      MS. WAKUT:  No.

19      THE COURT:  Okay.  And then the next issue, of

20  course, is, uh, of the questions I asked this morning, I know

21  you plan to go to Chicago on Friday.  Leaving that aside is

22  there anything else you need to bring to our attention?

23      MS. WAKUT:  Um, just that I have a lot of

24  interaction with law enforcement with my job and not all the

25  interactions have been pleasant.  Um, and personally, I've

```
 1    had friends that have had really bad interactions with police
 2    officers as well.  I want to say it won't impact my judgment,
 3    but I don't know.  I guess it depends.
 4              THE COURT:  Well, let me follow a little further.
 5    I'm going to instruct you that in this case you're gonna have
 6    to evaluate a law enforcement officer's testimony in the same
 7    manner you would evaluate any other witness in the case.  Do
 8    you think you can do that?
 9              MS. WAKUT:  Yes.
10              THE COURT:  Okay.  And is there any other reason
11    that would cause you to think you could not be fair and
12    impartial?
13              MS. WAKUT:  No, that's it.
14              THE COURT:  And when you say you've had bad
15    experience with law enforcement officers is that in your life
16    as a civilian?
17              MS. WAKUT:  No, in my job.
18              THE COURT:  In your job.  And can you generally
19    describe what you're talking about?
20              MS. WAKUT:  Yeah.  So, um, as a social worker,
21    sometimes we remove children from their homes in dangerous
22    situations, um, and there have been instances when officers
23    won't assist with that.  They'll be present kind, but kind of
24    just let us take the lead and that's not protocol.
25              THE COURT:  Right.
```

1    MS. WAKUT:  They're supposed to be there protect us

2    and the children.  Um, and just sexual harassment,

3    misconduct, stuff like that.  My office is actually filing a

4    grievance against one of the LAPD officers that serve our

5    area.

6    THE COURT:  I take it that your concern is that

7    they have basically treated things as sort of family disputes

8    they don't want to become involved in.  You feel that they're

9    falling down on the job?

10    MS. WAKUT:  Yeah, and their judgment, I think, is

11    off sometimes.  And when interacting with families, um, when

12    it comes down to the policeman's story and the family's

13    story, it could be clear to us the policeman might not be

14    telling the truth, and yet they're here promoting that this

15    happened, this happened.  It's at the expense of our

16    families.

17    THE COURT:  Have you also had experiences with

18    police officers you view favorably?

19    MS. WAKUT:  Um, yeah, a couple.  It's not a general

20    thing.

21    THE COURT:  What I'm trying to understand is you're

22    able to discern between circumstances where you think

23    officers have not behaved well and where you think they have

24    behaved well?

25    MS. WAKUT:  Yes.

```
 1              THE COURT:  All right.  Anything else you should
 2    bring to our attention?
 3              MS. WAKUT:  No.
 4              THE COURT:  Okay.  Counsel, may I see you all at
 5    side bar?
 6                   (Proceedings held at side bar.)
 7              THE COURT:  Okay.
 8              MR. JOHNSON:  May I have a moment, Your Honor?
 9    Okay.
10              MS. CHEN:  I believe that Juror No. 4 should be
11    struck for cause.  When she tried to rehabilitate herself,
12    there was an extremely long pause, very tentative.  When the
13    Court asked her did she have any counter-veiling positive
14    experiences, she said a couple.  I don't believe she would be
15    fair and impartial.
16              THE COURT:  I'm not sure I agree, but.
17              MR. JOHNSON:  I would object to that as a cause.
18    She did say that she can be fair and impartial.  She affirmed
19    and said yes.
20              THE COURT:  I guess, I understand your concern and
21    why she may not be the ideal juror, but on the other hand,
22    she did state that she thought when I asked her point blank
23    did she think she could evaluate the officer's testimony just
24    as anyone else's and follow my instructions she said yes.
25              Secondly, even though she answered some, she
```

```
 1    certainly felt that evaluation of the officer had to be on a
 2    case-by-case basis, but I'm not sure there's a basis for
 3    dismissing her for cause.
 4              MS. LANSDEN:  Would the government have the same
 5    opportunity as the defense counsel to inquire whether her
 6    feelings would come into this case?
 7              THE COURT:  Sure.  Ms. Wakut, could you come
 8    forward?
 9              I think you have couple questions.
10              MS. LANSDEN:  I think you said that you think
11    police their judgment is off some times and some times
12    they're not telling the truth.  And it seems like you've had
13    a lot of bad interactions.
14              I just want to ask you a little bit more about
15    whether you think those interactions could infect the way you
16    feel about the officers who come up here to testify in this
17    case.
18              MS. WAKUT:  I don't know.  Because I know in the
19    context of working with families, it's different.  I've never
20    interacted with an officer in this context so I'll say no, it
21    won't impact that.
22              THE COURT:  All right.  Thank you.  So I believe I
23    will deny the challenge for cause and let's go back to
24    peremptories.  I think we're with Mr. Johnson.
25              MR. JOHNSON:  I will pass at this time and reserve.
```

1            MS. CHEN:  Your Honor, the government would thank

2    and excuse Juror No. 4.

3            THE COURT:  We'll excuse Ms. Wakut.  Before I call

4    someone else up, do you have anyone else?

5            MR. JOHNSON:  Just one minute.  I do not have

6    anyone at this time.

7            THE COURT:  Okay.  All right.  Then let's go back

8    and see who is next.

9                    (Side bar concluded.)

10           THE COURT:  Okay.  We're going to thank and excuse

11   Ms. Wakut and let you go back to the jury assembly room.

12           THE CLERK:  Jose Hernandez.  Please take seat

13   number four.

14           THE COURT:  Okay.  Good afternoon.

15           MR. HERNANDEZ:  Good afternoon.

16           THE COURT:  How are you and the other adults in

17   your household employed?

18           MR. HERNANDEZ:  Uh, I work at Diplomat Specialty

19   Pharmacy so does my brother and my dad, he works for

20   California Community News.

21           THE COURT:  Have you served on a jury before?

22           MR. HERNANDEZ:  No.

23           THE COURT:  Okay.  And do you remember the

24   questions I asked this morning?

25           MR. HERNANDEZ:  Yes.

```
 1              THE COURT:  Do you need to bring anything to our
 2    attention?
 3              MR. HERNANDEZ:  No.
 4              THE COURT:  Then while Ms. Jeang is working with
 5    the microphone, let me see counsel at side bar.
 6                   (Proceedings held at side bar.)
 7              THE COURT:  Any challenges for cause?
 8              MR. JOHNSON:  I don't.
 9              MS. LANSDEN:  Nothing from the government.
10              THE COURT:  So we're back to the peremptories and
11    Mr. Johnson it's your turn.
12              MR. JOHNSON:  I would like to thank and excuse
13    Juror No. 8, please.
14              THE COURT:  That would be Ms. Karagaryan.
15              MS. CHEN:  Ask for follow-up questions for, I
16    believe, Juror No. 4.  I think he said his dad worked for
17    California Community News.  Just get some more information
18    about what that is.
19                   (Side bar concluded.)
20              THE COURT:  Mr. Hernandez, I'm sorry.  Do we have a
21    working microphone for him?  Tell us a little more about what
22    your father does.
23              MR. HERNANDEZ:  He just manages making sure that
24    the newspaper comes out the correct way.
25              THE COURT:  What's the newspaper again?
```

```
 1            MR. HERNANDEZ:  It's California Community News, but
 2    they produce like the New York Times, L.A. Times.  They print
 3    out all those types of newspapers.
 4            THE COURT:  Okay.  But he's not involved in writing
 5    articles?
 6            MR. HERNANDEZ:  No, just making sure that they come
 7    out correct.
 8            THE COURT:  When you say come out correct, what
 9    does that mean?
10            MR. HERNANDEZ:  Yeah, that they're printed
11    correctly.
12            THE COURT:  And how does he do that, if you know?
13            MR. HERNANDEZ:  He makes sure that they come out
14    and then he reviews them.
15            THE COURT:  He reviews the printed article?
16            MR. HERNANDEZ:  Yeah, well, the newspaper.  Once it
17    comes out, just makes sure it's correct like the, I'm not
18    sure what you call it.  The plate that's printed just need to
19    make sure it matches.
20            THE COURT:  So he compares like an article from the
21    New York Times to what's printed in his newspaper?
22            MR. HERNANDEZ:  No.  So say like you have a
23    blueprint, he just needs to make sure it's correct.
24            THE COURT:  Okay.  I think you work in a pharmacy,
25    don't you?
```

```
 1              MR. HERNANDEZ:  Yeah, pharmacy.

 2              THE COURT:  Are you a tech in the pharmacy?

 3              MR. HERNANDEZ:  No, a prior authorization

 4    coordinator.

 5              THE COURT:  So you have to see if there's an

 6    authorization for prescriptions?

 7              MR. HERNANDEZ:  Yeah, and I deal with insurance

 8    trying to get prescriptions approved.

 9              THE COURT:  Thank you very much.

10                  (Proceedings held at side bar.)

11              THE COURT:  One way or the other, if we don't have

12    challenges for cause, we're back to Mr. Johnson.

13              MR. JOHNSON:  I would like to thank and excuse

14    Juror No. 1, please.

15              THE COURT:  Okay, that's Mr. Kopooshian.

16              MR. JOHNSON:  I would like to thank and excuse

17    Juror No. 12, that's Kwok.

18              THE COURT:  Okay.  And government do you wish to

19    wait or do you have someone in mind?

20              MS. CHEN:  We'll wait.

21              THE COURT:  You have one peremptory remaining as

22    does Mr. Johnson.

23              MS. CHEN:  Thank you.

24              THE COURT:  Okay.

25                      (Side bar concluded.)
```

1          THE COURT:  We are going to thank and excuse

2    Ms. Karagaryan, and then Mr. Kopooshian and Ms. Kwok.

3          MR. MERRITT:  Just after that last round of

4    questioning with his father being involved in the media, I

5    just wanted to disclose my roommate is a camera person for

6    ABC 7.  It's something I didn't say before, but if that is

7    important, I wanted to make sure to do that.

8          THE COURT:  Okay.  Well, general news?

9          MR. MERRITT:  Yeah, general news.  I mean, anything

10   that's happening around L.A., he's buzzing around covering

11   it.

12         THE COURT:  Okay.  So probably car chases and

13   things of that nature.

14         MR. MERRITT:  Car chases, murders, football games,

15   you know, the whole gamut.

16         THE COURT:  Thank you.

17         So now who do we have coming up?

18         THE CLERK:  Jennifer Newman, take seat number

19   eight.

20         Manuel Paguio, if you could have a seat in number

21   one.

22         Minjae Sung, if you could take seat in No. 12.

23         THE COURT:  Let's start with Ms. Newman.  Can you

24   tell us how you and the other adults in your household are

25   employed?

```
 1              MS. NEWMAN:  I'm a scientist.  I work for the State
 2    of California and I live alone.
 3              THE COURT:  Have you served on a jury before?
 4              MS. NEWMAN:  Yes.
 5              THE COURT:  Civil or criminal?
 6              MS. NEWMAN:  Criminal.
 7              THE COURT:  Did the jury reach a verdict?
 8              MS. NEWMAN:  On the one count, but not the other.
 9              THE COURT:  Did you come away from that experience
10    with any strong positive or negative feelings?
11              MS. NEWMAN:  Negative.
12              THE COURT:  Do you think those feelings are gonna
13    impact your ability to be a good juror in this case?
14              MS. NEWMAN:  No.
15              THE COURT:  Why did you have negative feelings
16    about the other experience?
17              MS. NEWMAN:  It was a murder trial so the subject
18    matter was really difficult.  Um, and then, um, I felt like
19    the prosecution really played on the emotions of the jurors
20    and, um, the jurors just followed their emotions and did not,
21    um, I didn't think consider the facts.
22              THE COURT:  Okay, okay.  Do you think you would
23    have a bias against prosecutors in this case based on this
24    experience?
25              MS. NEWMAN:  Um, I think so.
```

```
 1              THE COURT:  Okay.  Well, then I think we should let
 2    go right now and send you back to the jury assembly room.
 3              And who will we call up to replace Ms. Newman?
 4              THE CLERK:  Thomas Philips.
 5              THE COURT:  Good afternoon, Mr. Philips.  How are
 6    you and the other adults in your household employed?
 7              MR. PHILIPS:  I'm a high school band and orchestra
 8    director.  My wife is a manager of a travel agency and my
 9    mother-in-law is retired.  She worked at a bowling alley for
10    years.
11              THE COURT:  Have you been on a jury before?
12              MR. PHILIPS:  I have before.
13              THE COURT:  Civil or criminal?
14              MR. PHILIPS:  Civil.
15              THE COURT:  Did the jury reach a verdict?
16              MR. PHILIPS:  Uh, no we didn't have to.  They --
17    they stopped the proceedings after a little bit.
18              THE COURT:  They settled?
19              MR. PHILIPS:  After some testimony, yeah.
20              THE COURT:  Okay, okay.  You recall the questions I
21    asked everyone in morning?
22              MR. PHILIPS:  I think so.  The only thing I do have
23    a problem with is the money part.  And only because as a
24    music teacher many years ago, we had a parent that took
25    student money as a booster parent and took PTA money as a PTA
```

```
 1    parent, and then put it through her own checking account and
 2    then began to spend it on all kind of things.  And never had
 3    any accountability, and then she left the state.
 4             But you don't steal from kids and you don't steal
 5    from parents so I have a problem with money not going in the
 6    right account.  So I'm not sure about the facts in this case,
 7    but I'm biased on just that alone.  Money needs to go where
 8    it's supposed to go.
 9             THE COURT:  I think we can represent that's not the
10    issue in this case.  Does anyone disagree, Counsel?
11             MR. JOHNSON:  I think that's correct, Your Honor.
12             MS. CHEN:  There's no disagreement, Your Honor.
13             THE COURT:  Okay.  All right.  Aside from that do
14    you know of any reason why you couldn't be fair and
15    impartial?
16             MR. PHILIPS:  No.
17             THE COURT:  Okay.  Then let me next go to, I guess,
18    what, Mr. Paguio, tell us how you and the other adults in
19    your household are employed?
20             MR. PAGUIO:  I am city employee retiree.  I worked
21    for 35 years City of Los Angeles.
22             THE COURT:  What did you do?
23             MR. PAGUIO:  I worked as an accountant.
24             THE COURT:  Okay.
25             MR. PAGUIO:  Controller's Office.  And my wife is
```

| | |
|---|---|
| 1 | retiree, too and she works in private. |
| 2 | THE COURT:  In probate? |
| 3 | MR. PAGUIO:  No, private company. |
| 4 | THE COURT:  Oh, a private company.  What kind of |
| 5 | company? |
| 6 | MR. PAGUIO:  It's a nonprofit organization. |
| 7 | THE COURT:  Okay.  And does she still do that or is |
| 8 | she retired? |
| 9 | MR. PAGUIO:  Retired. |
| 10 | THE COURT:  So you're both retired now? |
| 11 | MR. PAGUIO:  Yes, both retired. |
| 12 | THE COURT:  Have you been on a jury before? |
| 13 | MR. PAGUIO:  Yes. |
| 14 | THE COURT:  Civil or criminal? |
| 15 | MR. PAGUIO:  Civil. |
| 16 | THE COURT:  And did that jury reach a verdict? |
| 17 | MR. PAGUIO:  Yes, ma'am. |
| 18 | THE COURT:  Were you satisfied with your experience |
| 19 | as a juror? |
| 20 | MR. PAGUIO:  Very satisfied. |
| 21 | THE COURT:  Okay.  Do you recall the other |
| 22 | questions I asked this morning? |
| 23 | MR. PAGUIO:  Uh, yes, most of them, I guess, but I |
| 24 | would like to say one thing is I have a younger daughter who |
| 25 | works in the police department, but she's not the police. |

```
1    She's in charge of computer operation.
2              THE COURT:  Okay.
3              MR. PAGUIO:  Used by the police, West Covina.
4              THE COURT:  All right.  Do you think that the fact
5    she works with law enforcement would impact your ability to
6    be fair and impartial?
7              MR. PAGUIO:  Uh, it will not affect me.
8              THE COURT:  Okay.  Thank you.  All right.
9              Anything else you need to bring to our attention?
10             MR. PAGUIO:  Uh, no, no more.
11             THE COURT:  Okay.  Then I think, Mr. Sung you're up
12   next.  How are you and the other adults in your household
13   employed?
14             MR. SUNG:  I work for a broadcasting company as an
15   engineer and my wife is a student.
16             THE COURT:  Okay.  What -- when you say work for a
17   broadcasting company, can you tell us TV?  Radio?
18             MR. SUNG:  TV.  It's a Korean broadcasting company.
19             THE COURT:  Okay, okay.  And you are a?
20             MR. SUNG:  Engineer.  I do some interviewing with
21   reporters, too some times.
22             THE COURT:  Okay.  Have you been on a jury?
23             MR. SUNG:  Was not picked.
24             THE COURT:  Okay.  Called, but not picked?
25             MR. SUNG:  Yeah.
```

1    THE COURT:  Okay.  And in light of the questions I

2  asked this morning, are there things that you need to bring

3  to our attention?

4    MR. SUNG:  Yeah, I thought I was able to

5  participate if I try, I wanted to, but it is really hard to

6  understand some questions and I don't even know what's --

7  what was that, cash laundering?

8    THE COURT:  Money laundering.

9    MR. SUNG:  I don't even know what it is.

10    THE COURT:  Well, I don't think I would expect you

11  to.  There's gonna be someone who will give you an expert

12  opinion what it is or isn't.

13    MR. SUNG:  And I only like understood two or three

14  questions you asked.

15    THE COURT:  Okay.  Counsel, do you want to see me

16  at side bar or what should we do?

17    MR. JOHNSON:  I have no objection to the Court's, I

18  guess, suggestion that it's cause.

19    THE COURT:  Ms. Chen?

20    MS. CHEN:  And the government would agree.

21    THE COURT:  So Mr. Sung, we're going to let you go

22  back to the jury assembly room.  Thank you very much for your

23  time and effort today.

24    And who is next?

25    THE CLERK:  Michael DeLazzer, take seat number 12.

1           THE COURT:  So once again, Mr. DeLazzer, we've met,

2    but why don't you tell us how you and the other adults in

3    your household are employed?

4           MR. DE LAZZER:  I'm a television director and a

5    journalist reporter and my wife is a mental health therapist.

6           THE COURT:  Okay.  Have you served on a jury

7    before?

8           MR. DE LAZZER:  Yes.

9           THE COURT:  Civil or criminal?

10          MR. DE LAZZER:  It was civil.

11          THE COURT:  Did you reach a verdict?

12          MR. DE LAZZER:  Yes, a positive experience.

13          THE COURT:  Okay.  Um, other than the things you

14   brought to our attention earlier today, is there anything

15   else you should bring to our attention based upon my

16   questions?

17          MR. DE LAZZER:  Yes, we should side bar.

18          THE COURT:  Okay.  We'll do that.

19              (Proceedings held at side bar.)

20          MR. DE LAZZER:  I'm party to a lawsuit out of the

21   Central District of Illinois.  And there was a woman, her

22   name is need chat.  She basically hired me to do a film for

23   her and an Indian director.  They signed me for $600,000

24   contract.  I quit my job to do this project and we started

25   making the film.  And when the money came due, everybody

 1    disappeared.  So I took it to the L.A. DA who decided not to

 2    prosecute because they would have to extradite her from

 3    Chicago.

 4           Flash forward to last June.  She was -- I got a

 5    call from the Central District Illinois, the IRS saying that

 6    they were making a case against her which they have now

 7    filed.  I'm named in the case.  There's 17 counts against

 8    this woman and my the check that she bounced to me all got

 9    rolled into her --

10           THE COURT:  You're named as a victim.

11           MR. DE LAZZER:  I'm named in the suit.  I was

12    deposed in it, they took my evidence.

13           THE COURT:  Is this a private suit?

14           MR. DE LAZZER:  U.S. versus.

15           THE COURT:  Are you named as a defendant?

16           MR. DE LAZZER:  No, I'm in the government's case.

17           THE COURT:  That's what I thought.

18           MR. DE LAZZER:  Yeah, in the government's case.  So

19    can I be impartial?  Yes.  Will I ever do business with

20    anybody from India again?  Not a chance, not a chance.

21           THE COURT:  Okay.

22           MR. DE LAZZER:  I'm being brutally honest.

23           MR. JOHNSON:  I appreciate your honesty.  What is

24    behind not doing business with a person from India as you've

25    expressed that feeling?

1          MR. DE LAZZER:  Too many places that I could go.

2     The problem that I had is people can disappear over there and

3     I can't -- there's no accountability system.  Like they can

4     flat out ghost, vanish.  Too many other places I can do

5     business that won't happen.  I don't know why that is, but

6     that's just not going to happen again.  I lost like half my

7     career because of this.  It was a life altering, marriage

8     altering experience.  It was not pretty.

9          THE COURT:  Well, I understand that, but the

10     question we have here, of course, I think what you're telling

11     me is that it is exceedingly difficult to proceed against

12     someone in India because the legal system doesn't encourage

13     the enforcement of obligations.

14          MR. DE LAZZER:  Yeah, I mean, honestly, I'm glad

15     that the IRS and the, I guess, the District Attorney in

16     Illinois she actually took 14 million from two colleges.

17     That's what tripped them up.  Came across my name in the

18     process because I filed a police report in L.A., and I got

19     roped into it.  They rolled my charges into their

20     prosecution.

21          THE COURT:  What we're concerned about here,

22     Mr. Johnson may have a different concern, but do you think

23     that your experience with this particular person is going to

24     infect your ability to be fair and impartial in this case?

25          MR. DE LAZZER:  I will say I would be as fair and

1     impartial as any person can and, you know, I'm a good guy.  I

2     think I can be fair and impartial, but it's awfully -- when

3     you've had that experience, it's a little rough.

4              THE COURT:  You know a lot of people in India

5     that's why I'm asking you.

6              MR. DE LAZZER:  Totally understand that.  I've been

7     everywhere in the world.

8              THE COURT:  Have you had occasion to deal with

9     other people of Indian citizenship or descent?

10             MR. DE LAZZER:  Yeah, through certainly

11    celebrities.

12             THE COURT:  Have you had any bad experience with

13    them?

14             MR. DE LAZZER:  Not with them.  This case is still

15    ongoing.  That's why I bring it up.

16             THE COURT:  I appreciate that.

17             MR. JOHNSON:  Would you trust or distrust the

18    person from India more or less because of your experience?

19             MR. DE LAZZER:  I would say I would be skeptical,

20    be very cautious from this point forward about people from

21    India.  Specifically, living in the country, I would be very

22    cautious because it literally blew my life up.

23             MS. CHEN:  With respect to the prior issue that was

24    raised, you may have interviewed the police officer in

25    question.  Was that -- I don't think they're the same

```
 1   person -- was that a positive or negative experience?
 2              MR. DE LAZZER:  Good police officer if I'm
 3   remembering the person correctly.  There are a lot of James
 4   Guiterrez's on the LAPD.  I think it's somebody else or in
 5   the police department.  The name triggered a memory so if it
 6   was him, it was a positive experience.  I have not had a
 7   negative experience.
 8              MS. CHEN:  Thank you, sir.
 9              THE COURT:  Okay.
10              MR. JOHNSON:  Your Honor, I would move for cause
11   for this individual after hearing from him.  There's a
12   presumption of innocence in a criminal case.  I think the
13   Court repeated that a couple of times.  He's actually now
14   reversing it saying he's skeptical of a person from India.
15   As the Court already advised in voir dire that the defendant
16   is from India and to have skepticism from the beginning, it's
17   a cause challenge.
18              THE COURT:  What do you all have to say?
19              MS. CHEN:  Your Honor, I think it's a close call.
20   I think he was very adamant he would not do business with
21   somebody from India, but when asked if he would -- I think
22   his direct quote was he would be try to be fair and impartial
23   as anyone can be.  I'm not particularly sure this should be
24   for cause, but I think it's a close one.
25              THE COURT:  I think it's close enough that to avoid
```

```
 1    any problem we ought to let him go.  I realize that he was

 2    all over the lot.  At some point he said he could be fair and

 3    impartial and at some point said he would be skeptical.  At a

 4    third point he indicated that he had very good relationships

 5    with other people of Indian descent.

 6              I think coupled with the fact there's ongoing

 7    litigation, he may be problematic.  Based upon that I'm going

 8    to excuse him for cause which then means we have to go back

 9    and call someone else up.

10              Okay.  Thank you.

11                        (Side bar concluded.)

12              THE COURT:  We're going to thank and excuse

13    Mr. De Lazzer and let you report back to the jury assembly

14    room.  Thank you for all of your candor and time and

15    attention.

16              THE CLERK:  Chun Chen, please take Seat No. 12.

17              THE COURT:  Okay.  Good afternoon.

18              MR. CHEN:  Good afternoon.

19              THE COURT:  How are you and the other adults in

20    your household employed?

21              MR. CHEN:  Uh, I work for a company, sales stuff in

22    Amazon and my girlfriend works for a furniture company as a

23    purchasing assistant.

24              THE COURT:  Have you served on a jury before?

25              MR. CHEN:  No.
```

```
 1            THE COURT:  And do you recall the questions I asked
 2    this morning?
 3            MR. CHEN:  Yes, Your Honor.
 4            THE COURT:  Is there anything you need to bring to
 5    our attention?
 6            MR. CHEN:  Uh, yes.  Actually, my family got a
 7    history with IRS and it kind of bothers me.
 8            THE COURT:  When you say they have a history, are
 9    you telling us you don't think you could be fair and
10    impartial if the IRS is a witness?
11            MR. CHEN:  Yeah.
12            THE COURT:  Okay.  Do we want to do any follow-up,
13    everybody?
14            MS. CHEN:  I don't believe follow-up is necessary,
15    Your Honor.
16            MR. JOHNSON:  If the Court wants to follow-up,
17    that's fine with me, but I have no objection.
18            THE COURT:  Why don't we excuse Mr. Chen for cause.
19    Thank you very much.
20            And let us bring up?
21            THE CLERK:  Jasbit Sandhu, please take Seat No. 12.
22            THE COURT:  Good afternoon.
23            MR. SANDHU:  Afternoon, Your Honor.
24            THE COURT:  Okay.  Mr. Sandhu, why don't you tell
25    us how are you and the other adults in your household
```

```
 1   employed?
 2            MR. SANDHU:  Uh, my household is me and two
 3   roommates and all three of us are government contractors.
 4            THE COURT:  Okay.  What kind of government
 5   contracting do you do?
 6            MR. SANDHU:  I'm a flight test technician for
 7   Northrup Gruman.
 8            THE COURT:  And have you served on a jury
 9   previously?
10            MR. SANDHU:  I have not.
11            THE COURT:  And do you recall the other questions I
12   asked this morning?
13            MR. SANDHU:  Yes, Your Honor.
14            THE COURT:  Is there anything you need to bring to
15   our attention?
16            MR. SANDHU:  Yes.  I did grow up speaking Punjabi
17   and my family follows Seikh religion.
18            THE COURT:  Okay.  Do you think that would impact
19   your ability to be fair and impartial?
20            MR. SANDHU:  It would not impact me.
21            THE COURT:  Then let me see counsel at side bar.
22            Well, before we proceed any further, and I'll give
23   this instruction later, but given that you speak Punjabi, do
24   you understand that this case is going to be decided in
25   English?  And there are going to probably, you know, be times
```

1    when we have Punjabi translators, but you're going to be

2    directed to listen to the English translation whether you

3    agree with it or not.

4            MR. SANDHU:  Yes, ma'am.  Honestly, I don't speak

5    it nearly as well as I used to.

6            THE COURT:  If we had a dispute over translation,

7    two Punjabi interpreters telling us what they think the

8    passage means, would you listen to their English testimony

9    rather than trying to apply whatever you know of Punjabi?

10           MR. SANDHU:  Yes, ma'am.

11           THE COURT:  Okay.  Thank you.

12               (Proceedings held at side bar.)

13           THE COURT:  All right.  So here we are again.  You

14   have any challenges for cause?

15           MR. JOHNSON:  Not at this time, Your Honor.  Pass,

16   Your Honor.

17           MS. CHEN:  No challenges.

18           THE COURT:  We're back to peremptories.  I think

19   we're back to the government.  Do you have a peremptory?

20           MS. CHEN:  Your Honor, if we could have one moment?

21           THE COURT:  Sure.

22           MS. LANSDEN:  The government would thank and excuse

23   Juror No. 5, Mr. Merritt.

24           THE COURT:  Do you have anyone?

25           MR. JOHNSON:  No, Your Honor, I do not.  Not at

```
 1    this time.
 2              THE COURT:  So we will bring someone up, and then
 3    you will have the last word, Mr. Johnson.
 4                        (Side bar concluded.)
 5              THE COURT:  All right.  So at this juncture, we're
 6    going to thank and excuse Mr. Merritt and report back to jury
 7    assembly room.  Thank you for all your time and attention
 8    today.
 9              And in place of Mr. Merritt, who do we have?
10              THE CLERK:  Martha Rodriguez.
11              THE COURT:  Good afternoon, Ms. Rodriguez.  How are
12    you and the other adults in your household employed?
13              MS. RODRIGUEZ:  I am employed at a law firm.  We do
14    products liability and aviation litigation.  And my husband
15    is an on-air supervisor for Fox College Sports, and I have
16    two children, but they're away at college.  And I have never
17    served on a jury.
18              THE COURT:  Okay.  What do you exactly do at the
19    law firm?
20              MS. RODRIGUEZ:  I am a legal assistant for, um,
21    three partners and an associate.
22              THE COURT:  All right.  As you know, we will at the
23    end of the case give you legal instructions.  And my question
24    to you is will you be able to follow those instructions and
25    not apply whatever you may believe is a better statement of
```

1    the law?

2              MS. RODRIGUEZ:  Yes.

3              THE COURT:  Okay.  And with regard to the questions

4    I asked this morning, is there anything you want to bring to

5    my attention?

6              MS. RODRIGUEZ:  Yes.  I do a very good friend of

7    mine who, um, it's upsetting because she has been accused of

8    money laundering.  Um, she's not the "ring leader" quote,

9    unquote, but she in my opinion was kind of dragged into a

10   situation which she's awaiting trial.  So it's very upsetting

11   because she's a good person, but, you know, she got caught

12   up.

13             THE COURT:  Well, my question to you is do you

14   think that your friend's situation will impact your ability

15   to be fair and impartial in this case?

16             MS. RODRIGUEZ:  Um, I would like to think so.  I

17   would like to be given the opportunity to hear the evidence

18   and be impartial, but the situation is kind of close to home.

19             THE COURT:  Do you have doubts?

20             MS. RODRIGUEZ:  I do have some doubts.

21             THE COURT:  Then I think the best thing for us to

22   do is let you report back to the jury assembly room.

23             MS. RODRIGUEZ:  I appreciate that.

24             MR. JOHNSON:  Can the Court follow-up with some

25   more questions or if the Court has already ruled --

1          THE COURT:  I think I've ruled based on what she
2     said.  I think you have some reluctance.
3          MS. RODRIGUEZ:  I do, I do regretfully.
4          THE COURT:  Why don't you go back to the jury
5     assembly room.
6          THE CLERK:  Katherine McCunney.
7          THE COURT:  Good afternoon.  How are you and the
8     other adults in your household employed?
9          MS. McCUNNEY:  I am a civil engineer and my husband
10    is an architect and there's no other occupants of the home.
11    And I've been on four juries before.
12         THE COURT:  Okay.  Did they reach verdicts?
13         MS. McCUNNEY:  Two, yes.  Two, yes.  One -- both --
14    two verdicts and two undecided.
15         THE COURT:  Okay.  Civil or criminal?
16         MS. McCUNNEY:  All criminal.
17         THE COURT:  All criminal.  With that wealth of
18    experience, do you have any pre-existing views about the jury
19    system?
20         MS. McCUNNEY:  Well, when I was 22 and first
21    started, I thought it was fascinating and that was a homicide
22    trial.  And a lot of years down the road, I'm not as
23    fascinated with it.
24         THE COURT:  Okay.  Notwithstanding your lack of
25    fascination and probably the fact that you've done this a few

```
 1    times, do you think that you could perform your duties as a
 2    juror in this case if selected?
 3              MS. McCUNNEY:  Yes, I can.
 4              THE COURT:  You're a civil engineer.  For whom do
 5    you work?
 6              MS. McCUNNEY:  I have my own business.
 7              THE COURT:  All right.  Anything else you should
 8    bring to our attention based upon the questions we asked this
 9    morning?
10              MS. McCUNNEY:  Yes.  I have a health condition that
11    requires some regular intervals of breaks.
12              THE COURT:  Okay.  How often?
13              MS. McCUNNEY:  At least every three hours.
14              THE COURT:  Okay.  I think we can accommodate that.
15    My schedule, let me just run it by you.  Usually, we start at
16    9:30 in the morning.  I take a 15-minute recess in the
17    morning, and then we go to lunch for a half hour to an hour
18    between usually 12:30 and 1:30.  Then we come back and we
19    have an afternoon break of 15 minutes, and then typically go
20    to 4:30 or 5:00, but sometimes we'll break early.
21              MS. McCUNNEY:  I like the early part.
22              THE COURT:  Yeah, okay.  We all do, but we have to
23    get through.  Are those hours that you can live with because
24    we don't want to cause you health problems?
25              MS. McCUNNEY:  Yes, ma'am.
```

```
 1              THE COURT:  All right.  Counsel, let me see you at
 2     side bar.
 3                    (Proceedings held at side bar.)
 4              THE COURT:  Challenges for cause?
 5              MR. JOHNSON:  I don't have any challenges.
 6              MS. CHEN:  None from the government.
 7              THE COURT:  So do you have a peremptory?
 8              MR. JOHNSON:  I do, and I would like to thank and
 9     excuse Juror No. 5.
10              THE COURT:  Ms. McCunney.  Okay.  We will do that,
11     and then the last person subject to there being a challenge
12     for cause will be the 12th juror.
13              We are going to have to grab some more people from
14     the jury assembly room.  Get four more, five more and
15     hopefully, they'll be down and not interrupt us, but we'll
16     see.
17                    (Side bar concluded.)
18              THE COURT:  Okay.  We're going to thank and excuse
19     you, Ms. McCunney.  We thank you very much for your time and
20     effort.  And who do we have next?
21              THE CLERK:  Juan Ramos.
22              THE COURT:  Mr. Ramos, tell us how you and the
23     other adults in your household are employed?
24              MR. RAMOS:  I'm a special education teacher.  My
25     mom's a preschool teacher.  My brother's a dropout prevention
```

```
 1    counselor.
 2            THE COURT:  Have you served on a jury before?
 3            MR. RAMOS:  No.
 4            THE COURT:  Okay.  Do you remember my questions
 5    from the morning?
 6            MR. RAMOS:  Yes.
 7            THE COURT:  And do you have anything to bring to
 8    our attention?
 9            MR. RAMOS:  Um, none that will like obscure my
10    judgment.
11            THE COURT:  None that --
12            MR. RAMOS:  Like, um, makes me like not --
13            THE COURT:  Yeah.  In other words, you think you
14    can be fair and impartial?
15            MR. RAMOS:  Okay.
16            THE COURT:  Um, anything you have a question about
17    when you say --
18            MR. RAMOS:  No.
19            THE COURT:  Okay.  Fair enough.  All right.
20    Counsel, let me see you at side bar for a minute.
21                  (Proceedings held at side bar.)
22            THE COURT:  So do we have any challenges for cause?
23            MR. JOHNSON:  No.
24            MS. CHEN:  No, Your Honor.
25            THE COURT:  These people will be the jury.  Let's
```

1    start with the alternates and hopefully when we run out of

2    these people, we'll take a recess.

3                    (Side bar concluded.)

4            THE COURT:  Okay.  Ladies and gentlemen, you are

5    going to be the jury in this case.  We will have to pick two

6    alternates, um, because if any of you are unable to serve,

7    then the alternates who will sit through the entirety of the

8    case will in the order selected assume the position of a

9    juror.  For those sitting out there, it's very important that

10   you understand the importance of being an alternate.

11           Now, we do not have a lot of people left so we have

12   some more people coming down which means that I am going to

13   have to go through the litany of questions that I asked all

14   of you this morning because they haven't had benefit of

15   hearing them.  Uh, that means if you guys need to take a

16   restroom break or something like that while we're in that

17   process, we understand.

18           Please plan to report back to the seat you're

19   sitting in because as I say, you'll be the jury in the case.

20   We will swear you in as soon as we get the alternates in

21   place.

22           THE CLERK:  Michele Carson.  If you could have a

23   seat there at the end.

24           Steven Yu.  Take the seat at the end, second row.

25           THE COURT:  Good afternoon.  Can you tell us how

```
1    you and the other adults in your household are employed?
2              MS. CARSON:  Sure.  I work in the fire, life safety
3    and security industry and my spouse she is a dental -- she
4    runs a dental office.  She's an office manager.
5              THE COURT:  Okay.  Have you served on a jury
6    before?
7              MS. CARSON:  Never.
8              THE COURT:  Okay.  And you heard the questions I
9    asked this morning?  Is there anything you need to bring to
10   our attention?
11             MS. CARSON:  Yes, I have to be honest.  Throughout
12   the years, and I know this sounds really mean, but I've
13   actually turned in a few people to different government
14   agencies.  Um, the IRS, um, the FBI, Department of Real
15   Estate.  So I've already sided with the government so I would
16   not be fair for him.
17             THE COURT:  Okay.  Does anyone want any follow-up?
18             MS. CHEN:  Not from the government, Your Honor.
19             THE COURT:  Well, I think I know Mr. Johnson's
20   position.  Okay.  Ms. Carson, we are going to thank and
21   excuse you.  Send you back to the jury assembly room.
22             Okay, Mr. Yu, how are you and the other adults in
23   your household employed?
24             MR. YU:  Uh, my dad is a cook and my mom is an
25   accountant, and then me and my brother are both full-time
```

1      college students.

2                THE COURT:  Okay.  And are you in school right now?

3                MR. YU:  Yeah.

4                THE COURT:  Are you gonna tell me that jury service

5      is going to interfere with your ability to go to class?

6                MR. YU:  Well, the last day you said it would be

7      Friday or Monday, and then my classes start next Wednesday.

8                THE COURT:  Well, there's going to be a couple of

9      days next week where we might be in trial.  You should be

10     aware of that.  Have you served on a jury before?

11               MR. YU:  No.

12               THE COURT:  Is there anything in the questions I

13     asked this morning that would cause you to think you need to

14     bring anything to our attention?

15               MR. YU:  No.

16               THE COURT:  Then here's what I think we ought to

17     do.  Wait until we get the next group down and then we're

18     going to have some fairly long questioning again.  Why don't

19     we take a short recess while we're waiting for people to come

20     down.  Let's plan to return at quarter to 4:00.  Hopefully,

21     by then we'll have new candidates and we'll go from there.

22                          (Recess taken.)

23               THE COURT:  Okay.  Good afternoon, everyone.

24               Thank you for joining us.  Summarize where we are

25     and what I'm going to be doing in an effort to be efficient

as possible.  We are in the process of selecting a jury for
this case which is a criminal case which I will tell you
about in a second.  We have picked a jury and we're in the
process of selecting alternates.  You folks have been brought
down as potential alternates and I'm going to be asking all
of you a series of questions just to satisfy myself that we
know as much about you as possible.  We have one potential
alternate, Mr. You, who is stepping down now, but what we're
going to have to do is get some background information about
all of you.  Then the attorneys will have the opportunity to
make a challenge for cause or assert a peremptory challenge
which is a challenge in the nature of they just don't think
you're the best person for the jury.

Let me tell you about the case.  Let me tell you
about the timing of the case and so then I will ask each of
you some questions about your background and whatever else.
This is a criminal case.  The defendant is Harinder Singh.
Mr. Singh is charged in three counts in the indictment.

First, with conspiracy to commit money laundering
in violation of Title 18 United States Code Section 1956 H.
Second, with conspiracy to operate an unlicensed money
transmitting business in violation of Section 371 of Title 18
of the United States Code, and third with operating an
unlicensed money transmitting business in violation of
Section 1960 of Title 18 of the United States Code.

1          Mr. Singh has pleaded not guilty to these charges

2     and he is presumed to be innocent.  The government has the

3     burden of proving his guilt beyond a reasonable doubt, and we

4     will give you instructions at the conclusion of the case.

5          We want to appraise you of who are the anticipated

6     witnesses in the case because I'm going to inquire of each of

7     you to see if you have reason to know any of those witnesses

8     or believe that you have family members who know those

9     witnesses.  So I'm going to first ask government counsel to

10    introduce herself, her co-counsel, the case agent and tell us

11    who you might be calling.

12          MS. CHEN:  Thank you, Your Honor.

13          Good afternoon, everybody.  My name is Carol Chen.

14    This is Ellen Lansden and we are both Assistant United States

15    Attorneys.  Also sitting at counsel table is Donald Claussen,

16    who is a Special Agent with Internal Revenue Service IRS.

17          The government anticipates calling the following

18    witnesses.

19          THE COURT:  We have a fifth missing prospective

20    alternate who is on his way up.  Hold that thought so you

21    don't have to repeat yourself.

22          Who approached you in the restroom and what was

23    said?

24          MS. CHEN:  Yes, Your Honor.  I believe it was Juror

25    No. 10.

```
 1            MR. JOHNSON:  Should this be in front of the other

 2   jurors?

 3            THE COURT:  I don't think it's a problem, but if

 4   you think it's a problem?

 5            MS. CHEN:  Your Honor, out of an abundance of

 6   caution, I did let your clerk know, uh, very briefly I was in

 7   the women's bathroom and Juror No. 10 was having a

 8   conversation with another juror, and Juror No. 10 approached

 9   me and said I have a question.  I said ma'am, I'm sorry.  I

10   cannot talk to you.

11            She said no, I just had a scheduling question.

12   Specifically, wanted to know if we would be in session next

13   Friday.  And so, again, out of abundance of caution, I told

14   her I could not talk to her and I raised it with your clerk.

15            THE COURT:  And told her to confer with Ms. Jeang.

16            MS. CHEN:  Yes, that's correct, Your Honor.

17            MR. JOHNSON:  I have no problem.  Thank you.

18            THE COURT:  But we are going to explain to the jury

19   if I ever get to the preliminary instructions, that the

20   attorneys are not to communicate with them either verbally or

21   nonverbally.  And don't think they're rude if they don't

22   because I've instructed them not to do so.  Obviously, my

23   instruction is coming too late today.

24            But I told Ms. Jeang the answer to that question is

25   we don't know if we're going to be in session next Friday or
```

1    not.  It depends on how quickly we move.

2            The reason you're here is we're in the process of

3    selecting a jury and I'm about to explain various issues to

4    people and we wanted to wait for your arrival.  Basically, we

5    have a jury selected.  We have a potential single alternate,

6    but we need a second alternate.

7            Alternates are extremely important because they sit

8    through the trial and in the event someone cannot serve, the

9    first selected alternate will step into the shoes of the

10   juror who has to, uh, resign, if you will.  And so it's very

11   important that the alternates hear the evidence and that they

12   understand the case.

13           What we have here is we have several of you, five

14   of you specifically, who have been brought down and I was

15   about to describe what the case was about.  So let me again

16   repeat what the charges are against the defendant.

17           The defendant is Harinder Singh who is seated at

18   counsel table here.  His counsel will introduce himself and

19   Mr. Singh in a minute, but in this case which is a criminal

20   case, there is an indictment charging Mr. Singh in Count 1

21   with conspiracy to commit money laundering in violation of

22   Title 18 United States Code Section 1956 H.

23           There is also a charge of conspiracy to operate an

24   unlicensed money transmitting business in violation of

25   Section 371 of Title 18 of United States Code and finally,

```
 1    there is a charge that defendant operated an unlicensed money

 2    transmitting money business in violation of Section 1960 of

 3    the United States Code.

 4            Mr. Singh has plead not guilty to these charges.

 5    He is presumed innocent and need do nothing to establish his

 6    innocence.  Rather, the burden is on the government to prove

 7    guilt beyond a reasonable doubt.

 8            We were in the process of asking Ms. Chen, who is

 9    the United States Attorney, the lead attorney on the case

10    introduce herself, the case agent and let you folks, all five

11    of you know who are potentially witnesses in the case.

12    Because I'm going to want to be sure that none of you know

13    knows any potential witness or has a family member who knows

14    a witness.  Why don't we let Ms. Chen pick up where she left

15    off.

16            MS. CHEN:  Thank you, Your Honor.

17            My name is Carol Chen, this is Ellen Lansden.  We

18    are both Assistant United States Attorneys.  Also sitting at

19    the table is Donald Claussen and he is a special agent with

20    the Department of Internal Revenue Service otherwise known as

21    the IRS.  The government anticipates calling the following

22    individuals as witnesses during the trial:

23            Special Agent Lindsay T. Burns from the Drug

24    Enforcement Administration, DEA.

25            Officer Mary Campuzano from Santa Ana Police
```

1    Department.

2            Officer Arturo Cruz from Pomona Police Department.

3            Sergeant Jaime Gutierrez from Pomona Police

4    Department.

5            Gurkaran Isshpunani.

6            Paul Allen Jacobs.

7            Corporal Manny Ramos from the Pomona Police

8    Department.

9            Officer Fred Kittman from the Pomona Police

10   Department.

11           Officer Darren Nannini from the California Highway

12   Patrol Department.

13           Christian Pagtakhan from the Pomona Police

14   Department.

15           Expert witness Donald Semesky.

16           Ramesh Singh.

17           Taran Singh.

18           Special Agent Khanh Vo from DEA.

19           Officer Ariel Popoy from the Beverly Hills Police

20   Department.

21           Sanjiv Wadhwa.

22           THE COURT:  Okay.

23           MR. JOHNSON:  Good afternoon.  My name is Peter

24   Johnson and I represent Harinder Singh.  We have no additions

25   to that witness list.

1          THE COURT:  Okay.  And just so you're clear, the

2    defendant may down the road decide to call other witnesses,

3    but because as I indicated earlier, the defendant is presumed

4    innocent and has no obligation to put on any case, uh, there

5    is no need at this point in time for the defense to identify

6    any witnesses until the conclusion of the government's case.

7          We plan to be in trial the balance of this week.

8    We may have Friday off, we may not, and for the four days of

9    next week, although, again, we may have to take a break due

10   to some other commitments.  But the first question is does

11   any of you have a problem serving those days, this week and

12   next week?  Assume all four days this week and all four days

13   next week.  Please raise your hand if you have an issue.

14         MS. DISTEFANO:  My name is Mary Distefano.  Next

15   week I have an important meeting I have to go to at my school

16   for my club and so we can get financing and recognition to

17   continue next semester.

18         THE COURT:  When is the meeting?

19         MS. DISTEFANO:  It's going to be Wednesday.

20         THE COURT:  What time?

21         MS. DISTEFANO:  It's in the morning.  I don't know

22   the time exactly.

23         THE COURT:  Okay.  Well, we can -- do you know how

24   long is the meeting gonna last?

25         MS. DISTEFANO:  It's gonna be the majority of the

```
1   morning and afternoon time.

2           THE COURT:  Okay.  Well, let me say this.  I have a

3   civil case that I may have to adjourn to try next week so at

4   this moment, I'm not quite prepared to let you go.  It may be

5   that this is not going to affect you in any event because you

6   are fifth on the list.  So there's a good probability that

7   you aren't even going to be included as an alternate in the

8   case.  So let me just for now assume we don't have a problem.

9           Anyone else with a problem?

10          MS. LI:  My name is Jing Jing Li.  I have to take

11  from January 2nd to January 15th so next week from Tuesday, I

12  have been booked for work.

13          THE COURT:  Okay.

14          MS. LI:  I already take two weeks off for this.

15          THE COURT:  For jury duty.

16          MS. LI:  Yeah.

17          THE COURT:  So that may be a different problem.

18  You are a dentist, I take it?

19          MS. LI:  Yes.

20          THE COURT:  Are you self-employed?

21          MS. LI:  No, I work for Western Dental.

22          THE COURT:  So you have scheduled patients.

23          MS. LI:  Yeah.

24          THE COURT:  I'll have to address that with counsel.

25          Again, that may not be a problem.  I'll just make a
```

```
 1    note of it.  Anyone else?
 2              Next issue.  Does any of you based on what you know
 3    right now believe that in light of the charges that I just
 4    described, namely, money laundering and related offenses that
 5    you could not be fair and impartial in this case because of
 6    some personal experience in your life?
 7              If so, please raise your hand?
 8              We may have to see you at side bar.
 9              Okay.  Now, let me start asking a group of
10    questions which I asked the other jurors and because you
11    haven't had the benefit of my asking them, I'm going to have
12    to reask them so let me just grab my papers.
13              So I'm going to ask some general questions and
14    indicate to you that if you have a yes answer and sometimes a
15    no answer, I want you to raise your hand and tell us about
16    it.  First of all, as I just asked, is there anything about
17    the charges in this case that makes you unwilling or
18    reluctant to serve as a juror?
19              I don't think we saw a hand for that.
20              Do you have any difficulty with your language
21    skills, hearing or sight or have any medical problems that
22    could impair your ability to devote your full attention to
23    the trial?  If so, please raise your hand.
24              If you are selected as a juror to hear this case,
25    you will be required to deliberate with 11 other jurors.
```

This will require you to discuss the evidence and the law in this case with the 11 other jurors.  Is there anything that leads you to believe that you would be unable or unwilling to engage in such discussions?  Please raise your hand if you think there is?

Do you have any feelings about the laws against money laundering or other financial crimes that would affect your ability to be an impartial juror in this case?

Please raise your hand if you do.

Do any of you feel the money laundering laws in this country are unconstitutional or unfair in any way?

Please raise your hand if the answer is yes.

Have you or someone close to you ever been accused of or charged with a money laundering offense?  Raise your hand if the answer is yes.

Have you or someone close to you ever been accused or charged with a financial crime offense other than money laundering?  If so, please raise your hand?

Do any of you believe that the government should stop prosecuting certain financial crimes like money laundering?  If so, please raise your hand.

Have any of you been a member of or associated in any manner with a group, society or organization that advocates or supports the revision of the laws relating to money laundering or other financial crimes?

1          Raise your hand if your answer is yes.

2          Do you or someone close to you own or operate a

3    business that conducts a significant amount of transactions

4    in cash?  Please raise your hand if the answer is yes.

5          Have you or someone close to you ever used an

6    informal value transfer system to transfer money?  Sometimes

7    referred to as a hawala.  Please raise your hand if the

8    answer is yes.

9          Do you believe that the laws prohibiting the

10   distribution of illegal drugs such as cocaine or

11   methamphetamine should be abolished or not enforced?

12          Please raise your hand if you have that belief.

13          Do you believe that the laws prohibiting the

14   distribution of illegal drugs such as cocaine or

15   methamphetamine should be changed in any way?

16          Please raise your hand if answer is yes.

17          Is there anything about the way the Drug

18   Enforcement Agency, DEA, the Internal Revenue Service, IRS,

19   Pomona Police Department, the Santa Ana Police Department,

20   the Beverly Hills Police Department, the California Highway

21   Patrol Department or any law enforcement agency conducts

22   money laundering or drug investigations that would make it

23   difficult for you to render a fair and impartial verdict in

24   this case?

25          Please raise your hand if the answer is yes.

1          Okay.  Have you or a family member or close friend

2     ever suffered from a drug dependency problem?

3          If so, would you feel more comfortable discussing

4     the matter privately.  Okay.  I see a hand.

5          MS. DISTEFANO:  It was my cousin who passed away

6     from overdose when I was young.

7          THE COURT:  Do you think that would interfere with

8     your ability to be fair and impartial if you were a juror?

9          MS. DISTEFANO:  Yes.

10         THE COURT:  You do.

11         MS. DISTEFANO:  I was close to my cousin.

12         THE COURT:  Okay.  How old were you when that

13    happened?

14         MS. DISTEFANO:  I was in elementary school.  I was

15    around eight years old.

16         THE COURT:  How do you think that would interfere

17    if this case involves money laundering as opposed to someone

18    overdosing?

19         MS. DISTEFANO:  I will be emotionally affected

20    cause it will remind me of that.

21         THE COURT:  Okay.  Well, let me just see if you're

22    actually picked.  I think probably your other problem is a

23    bigger problem.

24         Do you or someone close to you operate or own a

25    business that conducts a significant amount of transactions

```
 1    in cash?
 2            MR. JOHNSON:  I apologize, Your Honor.  I think
 3    there was one other hand.
 4            THE COURT:  All right.
 5            MR. RODRIGUEZ:  I wasn't sure if you said friend
 6    and family or --
 7            THE COURT:  I said someone close to you.
 8            MR. RODRIGUEZ:  Okay, yeah, but I rather discuss
 9    that privately.
10            THE COURT:  Okay.  We will have you come up and
11    we'll do that right now.
12                (Proceedings held at side bar.)
13            MR. RODRIGUEZ:  It's my girlfriend.  Her brother
14    right now is actually currently on drugs so that's kind of
15    what we're going through right now.
16            THE COURT:  All right.  Well, this case is not
17    going to involve anyone on drugs.  The question is the
18    allegation is that there has been money laundering of drug
19    proceeds.
20            MR. RODRIGUEZ:  Oh, okay.
21            THE COURT:  So that's not a problem for you?
22            MR. RODRIGUEZ:  No.
23            THE COURT:  Okay.  Thank you.
24                (Side bar concluded.)
25            THE COURT:  Okay.  Do any of you feel that the drug
```

1   laws of this country are unconstitutional or unfair in any

2   way?

3           Do any of you believe that the government should

4   stop prosecuting certain drug cases?

5           Have any of you been a member of or associated in

6   any manner with a group or society or organization that

7   advocates or supports the abolition or revision of the laws

8   relating possession use and sale of marijuana,

9   methamphetamine, cocaine, crack cocaine, heroin or other

10  controlled substances?

11          If your answer is yes, raise your hand.

12          Do you have any reservations or doubts in your

13  ability to be fair to both sides in a case charging someone

14  with the laundering of drug proceeds?

15          Raise your hand if the answer is yes.

16          Okay.  Have you or any of your close friends or

17  relatives ever been arrested, charged with or convicted of

18  any crime?

19          If the answer is yes and you need to discuss it at

20  side bar, that's fine.  We want an honest answer.  Okay.  I

21  will move on since there is no hands.

22          Have you or any of your close friends or relatives

23  ever had any contact with any law enforcement officer?

24          Okay.  What I want to know favorable or

25  unfavorable?  Can you tell us about or do you need to go to

1    side bar?

2        MR. OMELCZENKO:  Yesterday I was at a public safety

3    commission meeting in the city where I live, and a friend of

4    mine was afraid of something that had happened in the

5    neighborhood.  And after that commission meeting, we went to

6    the Sheriff's Department and we spoke with the sergeant there

7    and got some advice and so my -- it was a favorable

8    experience.

9        THE COURT:  Okay.  And then I think I saw another

10   hand up; is that correct?

11       MS. DISTEFANO:  Well, they weren't like contacts.

12   Both of my parents are police officers and my dad has worked

13   30-plus years before retiring from Northeast Division.

14       THE COURT:  Which gets me to my next question.

15   Given that your parents are both police officers, do you

16   believe that you could evaluate a law enforcement officer's

17   testimony the same way as any other witness?

18       MS. DISTEFANO:  I would be slightly bias because

19   I've lived with them for so long.

20       THE COURT:  Okay.  I think probably in light of

21   everything that has been said, she should be excused.

22       MR. JOHNSON:  No objection.

23       MS. CHEN:  No objection.

24       THE COURT:  Okay.  So you are excused,

25   Ms. DiStefano.  We'll let you report back to the jury

1    assembly room.

2              So now, did you have something to say, Mr. Bagsik?

3              MR. BAGSIK:  Uh, no, I don't.

4              THE COURT:  Mr. Rodriguez, was that you?

5              MR. RODRIGUEZ:  I know two.  My sister's, actually,

6    her boyfriend is a police officer and my cousin is also

7    dating, um, I don't exactly what he is, but I do know he is

8    in law enforcement.

9              THE COURT:  Do you think those relationships are

10   such that if you were a juror in this case, you would give

11   the law enforcement officers more credence than you would

12   other witnesses?

13             MR. RODRIGUEZ:  Oh, possibly.

14             THE COURT:  Well, the possibly isn't -- I'm going

15   to instruct you that you will have to evaluate a law

16   enforcement officer's testimony the same way as anyone else.

17   Could you do that?

18             MR. RODRIGUEZ:  Uh, no.

19             THE COURT:  Okay.  Then I think we have to send you

20   back to the jury assembly room.  I can't excuse you, though.

21   You're going to have to sit by and see if there is another

22   jury to serve on.  Thank you very much.

23             Have you any of your close friends or relatives

24   ever filed a lawsuit or complaint concerning the conduct of

25   law enforcement officer?

1          Please raise your hand if the answer is yes.

2          Do you believe that you or any close friends or

3    relatives have ever been falsely accused of committing a

4    crime?

5          Please raise your hand if the answer is yes.

6          Do you think that law enforcement or the criminal

7    justice system is not fair or needs to be changed?

8          Have you or any of your close relatives or friends

9    had any contact with federal agents and police officers

10   including DEA, IRS, Pomona Police Department, Santa Ana

11   Police Department, Beverly Hills Police Department,

12   California Highway Patrol Department?

13         If so, well, first of all, have you had any

14   contacts with them?  Raise your hand if you have?  Okay.

15         Do you all believe that you could follow my

16   instructions that you must evaluate the testimony of a law

17   enforcement officer by the same standards that you apply to

18   any other witness in the case?  If not, raise your hand.

19         Okay.  Do you have strong feelings against persons

20   who have committed crimes or who cooperate with the

21   government to provide information with the hope of receiving

22   a reduced sentence?

23         DR. LI:  I'm a dentist so I think maybe I'm bias

24   for the -- for the people who are using drugs because I know

25   all the rule.  So we have all the rule cannot give the

```
 1    patient prescription.  So maybe I don't think I'm gonna -- I
 2    will be more to the other side.
 3              THE COURT:  Well, this case is not about giving
 4    drugs to anyone.  This case is about money laundering or
 5    alleged money laundering of money from drug trafficking.
 6              Is that going to be something that you think you
 7    have a pre-existing view about?
 8              DR. LI:  Yeah, because I know a doctor, I know her
 9    in person, and she was in jail for 30 years because she give
10    patient prescription for the -- for the Narcon medication.
11    So that's why, uh, I think she has tendency to give
12    prescription to get money so I don't know.
13              THE COURT:  Well, I'm still going to wait for a
14    minute because I don't think that those really relate to this
15    case.  I understand you don't want to serve on the jury.  I
16    understand that you are committed to go back to work next
17    week, but let's have you stick around for a while and we will
18    see.
19              In the course of this case you may hear recordings
20    and see transcripts of telephone conversations that were
21    recorded without the knowledge of the participants.  Do you
22    have any feelings about the making or use of such recordings
23    that would affect your ability to be fair and impartial?
24              Please raise your hand if the answer is yes.
25              You're also going to hear about the police using a
```

```
 1   method of investigation called wall stop in which a suspect's
 2   car is stopped for a legitimate traffic violation, but also
 3   for the purpose of furthering an investigation.
 4           Do any of you have feelings about this
 5   investigation tactic that would affect your ability to be
 6   fair and impartial?
 7           Please raise your hand if the answer is yes.
 8           You also may hear testimony in this case about
 9   searchs that were done of a person's home or car.  Do you
10   feel the way the government conducts searchs of an individual
11   homes or cars in criminal investigations is unconstitutional
12   or unfair in any way?
13           Please raise your hand if the answer is yes.
14           Do you know or are you familiar with any of the
15   following individuals who may be witnesses in this case?
16           I think we've gone through the first list.  Now,
17   I'm going to ask you about some others.  Are you familiar
18   with any of the following individuals:
19           Sanjeev Bhola.
20           Balwat Bhola.
21           Bakshish Sidhu.
22           Sucha Singh.
23           Bradley John Martin.
24           Shannon Abut.
25           Christopher Fagon.
```

1          Jason Robert Carey.

2          Jose Luis Barraza.

3          Miguel Melindez Gastelum.

4          Alberto Espinoza.

5          Jesus Manuel Rios.

6          Jose Del Luis Montenegro.

7          Alberto Diaz.

8          Tina Pham.

9          Gurdeep Singh.

10          Harbans Singh.

11          Please raise your hand if you know any of those

12     people.

13          The potential punishment for the offenses charged

14     in the indictment is a matter that should never be considered

15     by the jury in any way in arriving at an impartial verdict as

16     to the guilt or innocence of the accused.  Will you be able

17     to conduct your duties as jurors in this case without

18     speculating about or being influenced in any way by whatever

19     punishment may or may not be imposed in this case?

20          Please raise your hand if you have any doubt about

21     that.

22          There are some people who are for moral, ethical

23     and religious reasons may find it difficult or uncomfortable

24     to pass judgment on the conduct of others.  Is there any one

25     of you who hold such beliefs or might be affected by such

1    beliefs?

2          Raise your hand if the answer is yes.

3          Irrespective of your personal feelings about any

4    issue that may arise in this case, will you follow the law as

5    the Court instructs you to during this case?

6          Please raise your hand if the answer is no.

7          Knowing what you now about this case, do you have

8    any reservations about your ability to hear the evidence,

9    deliberate and return a fair and impartial verdict?

10          Putting aside your earlier answers on the subject

11    which include those of Dr. Li, do any of you have any such

12    reservations?

13          Okay.  Now, a few more questions.

14          Do you speak, read or understand Punjabi or any

15    language native to India?

16          Please raise your hand if the answer is yes.

17          Do you have familiarity with the Punjabi culture or

18    the Seikh religion?

19          Please raise your hand if the answer is yes.

20          Do you have any general opinions about people from

21    India or other countries living in the United States?

22          Please raise your hand if the answer is yes.

23          Do you have any general opinions about people who

24    practice religion or have different faiths than your own?

25          Please raise your hand if the answer is yes.

1          Okay.  The defendant is Punjabi Indian and of the

2     Seikh faith.  Will that fact affect your ability to be a

3     juror in this case?

4          Please raise your hand if it will.

5          Do you have any feelings about religions of the

6     world that might affect your trust -- I'm sorry -- that might

7     impact your ability trust a religious official from a

8     particular religion?

9          Do you now or have you ever had friends from India?

10         Please raise your hand if the answer is yes.

11         Okay.  I'm aware of your other concerns, Dr. Li,

12     but will those friendships affect your ability to be fair and

13     impartial in this case?

14         DR. LI:  The person from India, I have a lot of

15     co-worker that Indian, yeah.

16         THE COURT:  But do you have any negative feelings

17     about them that would impact your ability --

18         DR. LI:  I'm friend with them because they're my

19     co-worker.

20         THE COURT:  Okay.  Have you ever lived outside the

21     United States?

22         Raise your hand if the answer is yes.

23         Okay.  Do you have any general opinions about

24     people from India?

25         Raise your hand if you do.

1          Um, individuals that may testify in this case may

2     wear turbans and dress in traditional Punjabi Indian or Seikh

3     religious clothing.  Would that impact your ability to be

4     fair and impartial?

5          Raise your hand if the answer is yes.

6          Do you have any general opinions about people from

7     other countries investing money in business in the United

8     States?

9          Please raise your hand if you have such opinions.

10          Do you have any opinions about trusting banks

11     outside the United States?

12          Again, raise your hand if you have some

13     pre-existing opinion.

14          Have you ever transferred money outside of the

15     country or accepted money being transferred outside the

16     country?

17          Raise your hand if the answer is yes.

18          Do you believe that the testimony of a law

19     enforcement officer is more worthy of belief than that of

20     other witnesses?

21          Raise your hand if you have that opinion.

22          Do you believe that you or any of your close

23     friends or relatives have ever been falsely accused of

24     committing a crime?

25          Please raise your hand if the answer is yes.

1    Have you or any members of your family or circle of

2    close friends ever worked for the Federal Bureau of

3    Investigation, the Drug Enforcement Administration, United

4    States Attorney's Office, the Department of Justice, the

5    District Attorney's Office, the Internal Revenue Service, and

6    any local police department or other local, state, federal or

7    military enforcement agency?

8    MR. OMELCZENKO:  I'm a retired federal civil

9    servant and I worked for the federal government for 35 years

10   and one of the four departments I worked for was Treasury.  I

11   was with the Internal Revenue Service.

12   THE COURT:  Do you think the fact that there may be

13   IRS agents testifying in this case would make it impossible

14   for you to evaluate their testimony like any other witness?

15   MR. OMELCZENKO:  Not at all.  I think I can be

16   fair.  I listen to evidence.  I've served on previous

17   superior courts and I think I would be fair.

18   THE COURT:  Okay.  Thank you so much.

19   Moving ahead.  Do you believe that because the

20   defendant was arrested he must be or is more likely to be

21   guilty?

22   Do you believe that because the defendant is being

23   prosecuted by the government, he must be or is more likely to

24   be guilty?

25   Okay.  So that concludes my questions.

1          Now, the next issue, although, Ms. Jeang is

2     outside, is let me see counsel first of all and discuss

3     Ms. Li.

4                    (Proceedings held at side bar.)

5          THE COURT:  Okay.  So what do we want to do about

6     Ms. Li?

7          MR. JOHNSON:  I would think she's appropriate for

8     striking for cause.

9          MS. CHEN:  The government would agree with that.

10         THE COURT:  Let's send her on her way.  That leaves

11    us with three plus the other.  I have a backup group.  I

12    truly don't want to go through this again, but if I have to,

13    I will.

14         MR. JOHNSON:  I raised it with the government

15    earlier, but Stephen Yu also says he starts college next

16    Wednesday.  And I think he needs follow-up to determine

17    whether he in fact does since he's the first one that is the

18    potential alternate that's already here.

19         THE COURT:  We will do that.  Okay.  Because we're

20    going to be here till midnight if we start all over again,

21    but we'll find out what he has to say once he is back in the

22    box.  Let's do this.  Let me excuse her, find out what the

23    other people do and see if we can wrap this up without going

24    to round three of inquiry.

25                    (Side bar concluded.)

```
 1              THE COURT:  So Dr. Li we are going to excuse you
 2   and let you go back to the jury assembly room based upon your
 3   commitments next week.  That leaves us from this group with
 4   Mr. Omelczenko and Mr. Bagsik.
 5              So let me ask you, Mr. Omelczenko, I think you told
 6   us what you did for a living.  What do you do now?
 7              MR. OMELCZENKO:  I'm involved in historic
 8   preservation transportation issues such as bicycle safety,
 9   also public safety.  And I recently served as a public
10   facilities commissioner in the city of West Hollywood.
11              THE COURT:  And you have served on a jury
12   previously; correct?
13              MR. OMELCZENKO:  Yes, I have.
14              THE COURT:  Okay.  And I take it based on the
15   various -- your failure to respond on the various questions I
16   asked that you believe you could be fair and impartial?
17              MR. OMELCZENKO:  Yes, I do.
18              THE COURT:  Now, let's go on to Mr. Bagsik.
19   Mr. Bagsik, tell me how you are employed?
20              MR. BAGSIK:  I'm currently a student at California
21   State University Northridge and that's all I'm doing right
22   now.
23              THE COURT:  Are you in school right now?
24              MR. BAGSIK:  I go back on the 21st.
25              THE COURT:  So that would work in this case.
```

```
 1              Have you served on a jury before?
 2              MR. BAGSIK:  Uh, I've been summoned, but I never
 3   like actually been on the jury before.
 4              THE COURT:  You haven't been on the jury, you've
 5   just been summoned?
 6              MR. BAGSIK:  Yeah.
 7              THE COURT:  And do you live with other people?
 8              MR. BAGSIK:  Uh, I live with my parents still.
 9              THE COURT:  How are they employed?
10              MR. BAGSIK:  Uh, my mom's a nurse and my dad's a
11   technician at UCLA.
12              THE COURT:  And I guess I didn't ask you,
13   Mr. Omelczenko, are there others in your household and if so,
14   how are they employed?
15              MR. OMELCZENKO:  There's no one in my household.
16              THE COURT:  Okay.  Very good.  Now, we have, I
17   think, as a hold over from the morning, Mr. Yu.
18              Mr. Yu, are you still here?
19              Just come back into the jury box where you were.  I
20   have a follow-up question for you, and then we're gonna call
21   the next person up is going to be Mr. Omelczenko, if you
22   would come up to the jury box.
23              Mr. Yu, I know you were in school and commence
24   classes next week.  This trial is set to go probably until
25   Friday of next week.  Maybe yes, maybe no.  Is that a problem
```

```
 1    for you?

 2              MR. YU:  Yes, because I would be missing three days

 3    of classes.

 4              THE COURT:  Okay.  What classes would you be

 5    missing?

 6              MR. YU:  Uh, pretty much all of my classes I'm

 7    taking.  I'm taking, uh, five different classes, three units

 8    each, all major specific.

 9              THE COURT:  And you're in class Tuesday, Wednesday,

10    Thursday?

11              MR. YU:  Monday, Wednesday and Tuesday and

12    Thursday.

13              THE COURT:  Well, Monday is not going to be a

14    problem because we aren't in trial.  Um, our questions are

15    Tuesday, Wednesday, Thursday.  What is your class schedule on

16    Tuesday?

17              MR. YU:  Well, actually, I go to San Diego state so

18    that's like two hours away.

19              THE COURT:  So you have to go there?

20              MR. YU:  Yeah.

21              THE COURT:  Okay.  Then, counsel, what do we want

22    to do?

23              MR. JOHNSON:  I think he's unavailable.

24              MS. CHEN:  It would appear that way, Your Honor.

25              THE COURT:  I agree.  Okay.  So Mr. Yu, we're going
```

1    to send you back to the jury assembly room, and then

2    Mr. Bagsik, I'm going to ask you to come up and take his

3    seat.  Let me see counsel at side bar to determine where we

4    go from here.

5                    (Proceedings held at side bar.)

6              THE COURT:  I don't believe we have a good

7    challenge for cause.  We may have a challenge for cause.

8              MR. JOHNSON:  I am not going to make a challenge

9    for cause.

10             THE COURT:  Okay.

11             MS. CHEN:  I don't believe there is a challenge for

12   cause.

13             THE COURT:  But now we're back to my favorite

14   peremptories.  The question is you each have one.  What do

15   you want to do?  We have five more people waiting to go

16   through the routine again.  Government goes first.

17             MS. CHEN:  Your Honor, we are okay.

18             MR. JOHNSON:  I would thank and excuse the first

19   alternate Victor Omelczenko.

20             THE COURT:  Okay.  Then that's what we'll do.

21                    (Side bar concluded.)

22             THE COURT:  We're going to thank and excuse

23   Mr. Omelczenko.  Ask you to report back to the jury assembly

24   room.  Thank you very much.

25             Okay.  Ladies and gentlemen, for those of you who

```
 1   have just joined us, we are in the process of selecting a

 2   jury in this case.  You have been brought down because we're

 3   out of prospective jurors.  We are in the process of choosing

 4   alternates.

 5          Alternates are extremely important because they

 6   will sit through the case, hear all the evidence and although

 7   you may be excused when the case is over, it is also equally

 8   possible if some juror can't serve, you will be called back

 9   and you will become part of the jury and have to recommence

10   deliberations.  So it's very important that you be available

11   and ready to serve.

12          So let me tell you little bit about this case.

13   First of all, we anticipate that we will be in trial the

14   balance of this week as well as all four days of next week.

15   There may be some days we have off, but it would be today

16   through Friday, and then Tuesday, Wednesday, Thursday and

17   Friday of next week.

18          This is a criminal case and the government is

19   seeking to have the jury find the defendant Harinder Singh

20   guilty of the following conduct.  And specifically the

21   indictment charges Mr. Singh, who we will introduce with his

22   attorney in a minute, with conspiracy to commit money

23   laundering in violation of Title 18 United States Code

24   Section 1956 H.  Conspiracy to operate an unlicensed money

25   transmitting business in violation of Section 371 of Title 18
```

of the United States Code, and finally with operating an

unlicensed money transmitting business in violation of

Title 18 Section 1960 of the United States Code.

Mr. Singh has pleaded not guilty to those charges

and he is presumed innocent.  Uh, he need not do anything to

put on a defense.  Rather, it is the government that has the

exclusive burden of proving his guilt beyond a reasonable

doubt.

Now, I'm gonna ask the government counsel to tell

you who is on the government team and who the government

anticipates calling as witnesses.  The reason I am doing that

I want to know if you as prospective alternates know or

believe you have family members who know any of these

witnesses or lawyers, and then we're going to have the same

question posed to the defense team.

MS. CHEN:  Thank you, Your Honor.

Good afternoon, everybody.  My name is Carol Chen.

This is Ellen Lansden and we are both Assistant United States

Attorneys.  Sitting next to me is Donald Claussen who is a

Special Agent with the Internal Revenue Service otherwise

known as the IRS.  The following individuals testifying on

behalf of the United States:

Special Agent Lindsay T. Burns from the Drug

Enforcement Administration, DEA.

Officer Mary Campuzano from Santa Ana Police

```
 1    Department.
 2              Officer Arturo Cruz from Pomona Police Department.
 3              Sergeant Jaime Gutierrez from Pomona Police
 4    Department.
 5              Gurkaran Isshpunani.
 6              Paul Allen Jacobs.
 7              Corporal Manny Ramos from the Pomona Police
 8    Department.
 9              Officer Fred Kittman from the Pomona Police
10    Department.
11              Officer Darren Nannini from the California Highway
12    Patrol Department.
13              Christian Pagtakhan from the Pomona Police
14    Department.
15              Expert witness Donald Semesky.
16              Ramesh Singh.
17              Taran Singh.
18              Special Agent Khanh Vo from DEA.
19              Officer Ariel Popoy from the Beverly Hills Police
20    Department.
21              Sanjiv Wadhwa.
22              THE COURT:  Okay.
23              MR. JOHNSON:  Good afternoon.  My name is Peter
24    Johnson and I represent Harinder Singh who's here.  We have
25    no additional names of witnesses.
```

1          THE COURT:  Okay.  And as I've said previously,

2    because the defendant is presumed innocent, the government

3    (sic) does not have to identify witnesses at this point in

4    time.  It may be that after the government puts on its case,

5    the defendant will have witnesses and at that time we'll

6    appraise you of those witnesses to be sure that none of you

7    knows them.

8          Okay.  I am going to first ask you to raise your

9    hand if you have any scheduling problems with the schedule

10   that I have laid out for you or any problems with the charges

11   in this case to the limited extent I've described them.

12          Okay.  We have three hands up.

13          MS. PITCHFORD:  Hi, I'm Trena Pitchford.  Um, the

14   scheduling issues are mainly work-related.  I'm the executive

15   director of a small nonprofit organization in Burbank.  And

16   we are in the process of various different board meetings to

17   make plans for 2018.  Those are taking place on Friday I

18   believe the following week so it's a lot of time management

19   issues.

20          THE COURT:  A week from Friday?

21          MS. PITCHFORD:  This Friday.

22          THE COURT:  Well, we may be dark that day.  I'm

23   just not sure so it may work out.  Let me make a note of

24   that.

25          MR. TRIPODES:  My name is James Tripodes.  I'm a

1    self-employed realtor.  Basically, on an on-call type

2    business.  If I had a client who wanted to see a property

3    tomorrow, theoretically, I would like to be available to meet

4    them.  I'm the sole income provider for my family.  My wife

5    doesn't work.  So it's hard for me to predict my future

6    schedule, but it's hard for me also to not, you know, every

7    hour, every day is potential income I would be losing.

8            THE COURT:  Well, the problem is this.  I can't

9    excuse you.  The most I could to do is send you back to the

10   jury assembly to sit and wait to be on another jury.  If

11   there is a problem, I'm sure we'll do our best to accommodate

12   you.

13           Uh, and I'm sure that you may have to for a couple

14   of days make an appointment later in the day or earlier in

15   the morning.  But I don't think on the current record that

16   I'm in a position to excuse you from service, but I've made a

17   note and I understand the issue, and we'll try to be as

18   mindful of the issue as possible.

19           MR. TRIPODES:  Thank you, Your Honor.

20           THE COURT:  Okay.  Anyone else?

21           MS. FRAIJO:  Hello.  My name is Lisa and I work at

22   a doctor's office which is Monday through Friday.  So my work

23   commitment is really tough.  I don't have coverage for myself

24   and due to both my children, I have a one year old who I

25   would have to take to a babysitter every day and my older son

1  who's in Kindergarten, I would have to drop him off before

2  8:30 and have someone pick him up by 1:30 as well.

3       THE COURT:  Okay.  Well, unfortunately, I think you

4  have an obligation to perform jury service.  I don't have the

5  ability to excuse you.  We will be running court from about

6  9:30 to 4:30 or 5:00 so you probably can drop the child off

7  in the morning.  Obviously, you're gonna need help for a few

8  days picking someone up.  We aren't in court on Monday.

9       And as I say, we're gonna do our level best to be

10  done as quickly as possible.  So I will make note of that.

11  And I don't think it's a basis for excusing you for cause,

12  but the lawyers are now aware of it.  And if they decide they

13  want to exercise a peremptory based on that, that's fine.

14       MS. LIU:  I'm Winnie.  I'm currently a full-time

15  student at UCLA and I have class Monday through Friday from

16  about 9:00 a.m. through 3:00 p.m.  So I'm actually missing

17  class today because school already started today.  I don't

18  think I can be a reliable alternate just because my schedule

19  itself is already very unpredictable.

20       THE COURT:  Okay.  Well, I think if I were to ask

21  counsel, I hate to speak for them, but we have excused other

22  students who have classes, and I think we're gonna have to

23  send you back to the jury assembly room.  If your jury

24  service is up, that's fine, but they're the ones who make the

25  final decision.

1          Okay.  Now, that said let me quickly and with the

2     agreement with counsel, I'm going to summarize some of these

3     issues so we can get our court reporter to her train on time.

4     I'm going to ask you a group of questions.  If your answer is

5     yes, please raise your hand.

6          First of all, if you're selected as a juror in this

7     case, you're going to be required to deliberate with 11 other

8     jurors.  This will require you to discuss the evidence and

9     the law with those people.  Do any of you believe that if you

10    were a juror, you would not be able to do that?

11         Please raise your hand if the answer is yes.

12         Also, does any of you have difficulty with language

13    skills, hearing, sight or medical problems that would impair

14    your ability to be a juror in the case?

15         Raise your hand if you do.

16         Now, this case as I indicated involves charges or

17    allegations of money laundering.  First of all, do you have

18    any feelings about laws against money laundering or financial

19    crimes which would affect your ability to be fair and

20    impartial?

21         Raise your hand if the answer is yes.

22         And have you or anyone close to you ever been

23    accused or charged with a money laundering offense?

24         We want an accurate answer.  If you need to speak

25    to us at side bar, we'll let you do that.  Please raise your

 1    hand first of all if you or a close friend has been charged

 2    with money laundering.

 3            Have you or anyone close to you been charged with a

 4    financial criminal offense of another kind than money

 5    laundering?

 6            Please raise your hand if the answer is yes.

 7            Do you have any views the government should stop

 8    prosecuting financial crimes?

 9            Have you ever been a member of a group that

10    advocates revision of the laws relating to money laundering

11    and other financial crimes?

12            Do you or someone close to you own or operate a

13    business that conducts a significant amount of its

14    transactions in cash?

15            If the answer is yes, raise your hand.

16            Are you familiar with the notion of a hawala money

17    laundering system?

18            Raise your hand if the answer is yes.

19            I'm now going to go to drug laws.

20            Do any of you believe that the laws prohibiting the

21    distribution of illegal drugs such as cocaine or

22    methamphetamine should be abolished, amended or not enforced?

23            Is there anything about the way you understand the

24    DEA, namely, the Drug Enforcement Agency, the IRS, the Pomona

25    Police Department, the Santa Ana Police Department, the

1    Beverly Hills Police Department, the California Highway

2    Patrol or any other law enforcement agency conducts its

3    investigations about drugs or money laundering that would

4    make it difficult for you to render a fair and impartial

5    verdict?

6             Has anyone in your family ever suffered from a drug

7    dependency problem or have you?

8             Please raise your hand if the answer is yes.

9             We'll take it up at side bar unless you can talk

10   about publicly.

11            Ms. Fraijo, do you want to come up and talk about

12   it privately?

13            MS. FRAIJO:  Yes.

14            THE COURT:  Okay.  Then let's have you come up and

15   talk about it.

16                 (Proceedings held at side bar.)

17            MS. FRAIJO:  I just had my dad and some family

18   members that have had issues with that.

19            THE COURT:  Do you think that's gonna interfere

20   with your ability to deal with a money laundering case?

21            MS. FRAIJO:  I'm indecisive right now.  Just

22   because I've grown up in a situation like that, I honestly

23   don't know how I would feel.  I just don't have a clear

24   answer if it's money laundering.

25            THE COURT:  The question on the table is can you

```
 1    decide the facts and the law as I give it to you?
 2              MS. FRAIJO:  Yes.
 3              THE COURT:  And divorce your personal experience
 4    from your family?
 5              MS. FRAIJO:  I believe so.
 6              MR. JOHNSON:  I would follow-up that Mr. Singh is
 7    presumed innocent.  Do you think you can carry that
 8    presumption of innocence in this case?
 9              MS. FRAIJO:  To what the Judge said, if it's
10    regarding what she just said, yes.
11              MR. JOHNSON:  What was behind the pause?
12              MS. FRAIJO:  No.  Just because what she asked and
13    my family, like I have close people that have had issues with
14    that in the past.
15              THE COURT:  Drug issues.
16              THE WITNESS:  Uh-huh.
17              MR. JOHNSON:  Would that impact your decision one
18    way or the other?
19              MS. FRAIJO:  No.
20              THE COURT:  Why don't we see where we go.  Okay.
21                   (Side bar concluded.)
22              THE COURT:  So moving ahead, have any of you had
23    favorable or unfavorable experiences with law enforcement or
24    do you have close friends who have had favorable or
25    unfavorable experience with law enforcement which would
```

1    affect your ability to be impartial in this case?

2             Please raise your hand if the answer is yes.

3             Do you believe that you or any close friends or

4    relatives have ever been falsely accused of committing a

5    crime?

6             Do you have any views that the law enforcement

7    system is not fair?

8             Okay, Mr. Tripodes.

9             MR. TRIPODES:  I believe that the war on drugs has

10   been an unfair process against minorities and impoverished

11   people.  I -- I wouldn't say that I believe in the

12   legalization of all drugs or decriminalization of all drugs,

13   but I would say that I have a pretty strong political opinion

14   against law enforcement's efforts to incarcerate people based

15   on their addictions.  And I think it's a problem in our state

16   and in our country as a whole.

17            THE COURT:  Okay.  Let me then focus you on what

18   this case is about.  The claim in this case is that the

19   defendant engaged in money laundering of drug proceeds from

20   drug organizations.  He, of course, has pleaded not guilty,

21   but we are not talking about the enforcement of drug laws in

22   this case.  Only the question of whether there has been

23   illicit money laundering.

24            Would those views that you hold interfere with your

25   ability to be fair and impartial on those claims?

1          MR. TRIPODES:  I don't think they would.

2          THE COURT:  Okay.  Next point.  You're gonna hear

3    testimony from various law enforcement officers in this case.

4    Do any of you have preordained views about law enforcement

5    agencies that would prevent you from being fair and

6    impartial?

7          There are going to be -- there will be testimony

8    from persons who have committed crimes who are cooperating

9    with the government to provide information with the hope of

10   receiving a reduced sentence.  Will you be able to be fair

11   and impartial and treat those persons as you would other

12   people and evaluate their motivations in the same way as you

13   would evaluate any other witness?

14         You will likely hear recordings and see transcripts

15   of telephone conversations that were recorded without the

16   consent of the participants.  Do you have any feelings about

17   making or the use of such recordings that would affect your

18   ability to be impartial?

19         You're gonna hear about something called a wall

20   stop which is where a car is stopped for a traffic

21   infraction, but also for purpose of further investigation.

22   Do you have any feelings about this technique that would

23   prevent you from being fair and impartial?

24         And you may hear testimony about searchs done of a

25   person's home or car.  Do you feel that the government is not

1    entitled to conduct any searchs of homes or cars in criminal

2    investigations?

3            Okay.  Now, let me give you the names of

4    individuals whose names may come up in this case.  I want to

5    be sure that you don't know them or believe you know them.

6            Sanjeev Bhola.

7            Balwat Bhola.

8            Bakshish Sidhu.

9            Sucha Singh.

10           Bradley John Martin.

11           Shannon Abut.

12           Christopher Fagon.

13           Jason Robert Carey.

14           Jose Luis Barraza.

15           Miguel Melindez Gastelum.

16           Alberto Espinoza.

17           Jesus Manuel Rios.

18           Jose De Luis Montenegro.

19           Alberto Diaz.

20           Tina Pham.

21           Gurdeep Singh.

22           Harbans Singh.

23           Do any of you know or think you have reason to know

24   those people?

25           Okay.  Regarding, uh, punishment in this case that

```
 1    is a matter for the Court.  Will you be able to conduct your
 2    duties as a juror in this case without speculating about or
 3    being influenced in any way by whatever punishment may or may
 4    not be imposed in this case?
 5              If no, raise your hand.
 6              Okay.  There are some people who for moral, ethical
 7    and religious reasons may find it difficult or uncomfortable
 8    to pass judgment on the conduct of others.  Do any of you
 9    hold beliefs that would make it difficult for you to pass
10    judgment on others?
11              If so, please your hand.
12              And irrespective of your personal feelings, do you
13    each agree to follow the law as I give it to you?
14              If not, please raise your hand.
15              And knowing what you know about this case and
16    leaving aside what you've already articulated, do you have
17    any additional reservations about your ability to be fair and
18    impartial?
19              A few more questions and then we will try to wrap
20    this up.
21              Do you speak, read or understand Punjabi or any
22    language native to India?
23              MS. YOUSUF:  I understand Hindi.
24              THE COURT:  Do you understand Punjabi?
25              MS. YOUSUF:  No.
```

```
 1              THE COURT:  Okay.  The case is -- obviously,
 2     English is the official language of the courtroom.  We may
 3     have Punjabi interpreters.  Will you be able to follow and
 4     rely solely on the English translations?
 5              In other words, you can't -- if you're a juror, you
 6     can't start using whatever language you have of Hindi and try
 7     to interpret the Punjabi.
 8              MS. YOUSUF:  I understand Hindi, but I don't speak
 9     well.
10              THE COURT:  Okay.  And you don't understand
11     Punjabi?
12              MS. YOUSUF:  No.  Maybe couple words.
13              THE COURT:  And my point is I'm going to tell you
14     you have to hear what the translators say are the facts in
15     the English translation not in Punjabi.  Are you willing to
16     listen to the English?
17              MS. YOUSUF:  Yes.
18              THE COURT:  And rely on English exclusively?
19              MS. YOUSUF:  Yes.
20              THE COURT:  Okay.  And then are you familiar with
21     the Punjabi culture or Seikh religion?
22              MS. YOUSUF:  Not much.  We watch Hindi movies so we
23     are related with it culturally.
24              THE COURT:  I understand.
25              And anyone else who has any familiarity with
```

1   Punjabi culture or the Seikh religion?

2          Do you have any general opinions about people from

3   India or other countries living in the United States?

4          Do you have any general opinions about people who

5   practice religion or have different faiths than your own?

6          The defendant as we've indicated is a Punjabi

7   Indian of the Seikh faith.  Will that affect your ability to

8   be fair and impartial in this case?

9          Do you have any feelings about any persons whose

10   religions are different than yours which would affect your

11   ability to be fair and impartial?

12          Have any of you lived outside of the United States?

13   Okay.  And I assume your answer is you've lived in India?

14          MS.  YOUSUF:  No, I lived in Japan.

15          THE COURT:  Okay.  I'm sorry.  Have you ever lived

16   in India?

17          MS. YOUSUF:  No, just tourist.

18          THE COURT:  Okay, okay.  And do any of you have any

19   opinions about people from India that would cause you not to

20   be fair and impartial?

21          Do you any of you think you would be affected

22   adversely and be unable to be fair and impartial if a witness

23   who appears in this court wore a turban or dressed in

24   traditional Punjabi dress or Seikh religious clothing?

25          Do any of you have opinions about people from other

1   countries investing money in businesses in the United States?

2   In other words, do you have opinions that would affect your

3   ability to be fair and impartial?

4          And do you have any opinions about trusting banks

5   outside the United States?  In other words, if someone says

6   that he or she doesn't trust banks outside the United States,

7   would that affect your ability to be fair and impartial?

8          Have any of you transferred money outside of the

9   country and accepted money being transferred outside the

10  country?

11         Raise your hand if the answer is yes.

12         Have any of you been engaged in businesses that

13  deal primarily in cash?

14         Raise your hand if the answer is yes.

15         And then the question is are you going to be able

16  to evaluate a law enforcement officer's testimony by the same

17  standards that you would evaluate anyone else?

18         And by that I mean do any of you feel you would be

19  influenced and believe a law enforcement officer simply

20  because that witness is a law enforcement officer?

21         Raise your hand if you feel you might be so

22  influenced.

23         Okay.  Have you or any members of your family or

24  close friends worked for any government agency including the

25  FBI, the DEA, the United States Attorney's Office, the

```
 1    Department of Justice, local district attorney's offices,

 2    local police departments, local state, federal or military

 3    enforcement agencies?

 4              MR. TRIPODES:  I have a friend who's a district

 5    attorney in San Jose.

 6              THE COURT:  Okay.  Do you think that based on that

 7    relationship, you would tend to believe law enforcement

 8    officers simply because they're law enforcement officers?

 9              MR. TRIPODES:  No.

10              THE COURT:  Okay.  And do you believe if I

11    instructed you that you have to evaluate a law enforcement

12    officer's testimony the same way as anyone else, you would be

13    able to do that?

14              MR. TRIPODES:  Yes.

15              THE COURT:  And do any of you have a belief that

16    because the defendant was arrested that he must be guilty or

17    is more likely than not to be guilty?

18              Raise your hand if the answer is yes.

19              Same question.  Do you have that belief because the

20    defendant is being prosecuted in this case?  Do you believe

21    that is an indication that either is guilty or is more likely

22    to be guilty?

23              Raise your hand if the answer is yes.

24              Okay.  So counsel, let's gather and see if we can

25    finish up.  Why don't you each tell us how you're employed.
```

1    I'm in too much of a hurry.

2             MS. PITCHFORD:  I'm employed as a nonprofit

3    executive director.

4             THE COURT:  And have you been on a jury before?

5             MS. PITCHFORD:  No.

6             THE COURT:  And Mr. Tripodes, I know you're a real

7    estate agent.  Um, are there other adults in your household

8    who are employed and if so, how?

9             MR. TRIPODES:  Just my wife and I have a daughter,

10   and my wife isn't employed.

11            THE COURT:  Have you served on a jury before?

12            MR. TRIPODES:  I've never served on a jury.

13            THE COURT:  Okay.  And Ms. Fraijo?

14            MS. FRAIJO:  I'm a pediatric medical assistant.

15            THE COURT:  Okay.  Any other adults in your house

16   who are employed?

17            MS. FRAIJO:  Yeah, my husband.  He works for the

18   City of Azusa and Azusa Unified School District.

19            THE COURT:  Okay.  What does he do?

20            MS. FRAIJO:  Just maintenance.

21            THE COURT:  Have you been on a jury before?

22            MS. FRAIJO:  No.

23            THE COURT:  Okay.  And we have Ms. Yousuf.

24            MS. YOUSUF:  I'm working LAUSD for assistant

25   teacher for three hour, and then I work five hour in private

```
 1   school as a teacher assistant.
 2            THE COURT:  Okay.  Are there other adults in your
 3   household?
 4            MS. YOUSUF:  Yeah, my husband and my daughter.
 5            THE COURT:  What do they do?
 6            MS. YOUSUF:  My husband working at Department of
 7   Social Service and my daughter she is doing her master's in
 8   Loma Linda University.
 9            THE COURT:  Have you been on a jury before?
10            MS. YOUSUF:  Yeah, I was summoned, but they didn't
11   select me.
12            THE COURT:  Okay.  All right.  Counsel, let's see
13   where we are now.
14            (Following proceedings held at side bar.)
15            MR. JOHNSON:  Can you ask Ms. Pitchford if there's
16   someone else in her home that's employed?
17            THE COURT:  Ms. Pitchford, is there someone else in
18   your household that's employed?
19            MS. PITCHFORD:  Yes, my husband.
20            THE COURT:  And what does he do?
21            MS. PITCHFORD:  He works for a market research
22   analyst for Neilson.
23            THE COURT:  Why don't you come up here because
24   you're next in line.  Do you have any challenges for cause.
25            MR. JOHNSON:  My challenge is for cause because she
```

said Friday, that this coming Friday, we may be dark, but she

also said that next week, too.  And I wasn't sure whether

that's firm or whether that's --

THE COURT:  Let me ask right now.  Ms. Pitchford, I

know you talked about a meeting of your nonprofit on Friday

of this week.  Do you have any conflicts next week?

MS. PITCHFORD:  Um, we're -- it's me and another

staff person and I'm the boss.  Without me there, it's hard

for the company to conduct business.

THE COURT:  Well, I understand.  We have recesses,

there are telephones.  So my question to you is do you

physically have to be at work next week?

MS. PITCHFORD:  Yes, but I mean, I have an

executive committee meeting this Friday.  Um, I'm trying to

think of my schedule for next week.  I have various different

meetings set up.

THE COURT:  The point is we're not in trial Monday

so you can set some meetings Monday presumably.  But I mean

the point being, if we were in trial Tuesday, Wednesday,

Thursday and Friday, could you be here?

MS. PITCHFORD:  Yeah, I'd have to cancel

everything, but yes.

THE COURT:  That's true of everyone that's on jury

duty.

MR. JOHNSON:  Yes, I agree with that.  I think

```
 1    there's a question of whether on Friday if the Court is gonna
 2    be dark, then that might be different issue than canceling
 3    for the rest of week.  Friday going to be dark, I wouldn't
 4    have a challenge for cause.
 5              THE COURT:  Well, you're gonna need from what you
 6    said a day off; right?
 7              MR. JOHNSON:  I requested more.
 8              THE COURT:  At least, though.  And my question to
 9    you is if you use Friday for that purpose, does that --
10    you'll have Friday, Saturday, Sunday, Monday.  And of course
11    they may never call the witness any way.
12              MR. JOHNSON:  That's I think a separate issue.  If
13    the court is dark on Friday, I have no objection as to cause
14    for this juror.  It sounds like Friday is something that
15    would --
16              THE COURT:  Let me just excuse her for cause and
17    move on to the next person.
18              MS. CHEN:  I think, Your Honor, we would say
19    Mr. Tripodes for cause based on his very passionate view on
20    drugs and we have a DEA agent who's going to testify.  Let's
21    then knowing that, we've got Fraijo and Yousuf and one
22    peremptory left.  I don't see that either of them provides a
23    challenge for cause.
24              MR. JOHNSON:  Which ones?
25              THE COURT:  The last two.  Fraijo, the medical
```

1    assistant or Yousuf.

2            MR. JOHNSON:  The only one that I would say is

3    cause there's -- she sounded -- speaking of Juror 59, having

4    a 9:30 to 4:30 -- well, I think that's the court schedule.

5    Two children, one drop off early, a difficulty scheduling

6    dropping off and picking up.

7            THE COURT:  I think she can drop off and she may

8    need help picking up.  But the problem, Mr. Johnson, is that

9    we ask people all the time to make these arrangements.  We

10   don't want people to miss school and flunk out of school, but

11   it's amazing how people find someone to pick up their child

12   when necessary.  If we have to for good reason go to another

13   panel that's fine and we'll all be here again.

14           MR. JOHNSON:  I don't think if -- there's no

15   challenge for cause for Ms. Yousuf.

16           THE COURT:  We've got Pitchford.

17           MR. JOHNSON:  I won't challenge her if she only

18   needs to have, if I'm going to be dark on Friday.  The way

19   this is going, I would prefer to be dark on Friday.

20           THE COURT:  I don't know if I'm going to be able to

21   do it because of where we are.

22           MR. JOHNSON:  I understand.  I'm just trying to

23   make sure that if there's a cause objection that I put a

24   cause objection on, and I think we have a lot of for cause

25   objections here.

1            THE COURT:  Well, here's what I'm going to do.  I

2      am not going to commit to you about Friday.  I don't know

3      what I'm going to do.  I know you have a strong preference,

4      but I don't know.  Do you have a challenge for cause

5      regarding Ms. Pitchford?

6            MR. JOHNSON:  I do have a challenge for cause

7      with -- regarding Ms. Pitchford.  And I just have to express

8      my view that she has expressed she has this conflict on

9      Friday.  I note it for the record.  If there's --

10            THE COURT:  Here's what I'm going to do then.  I'm

11      going to deny the challenge for cause and commit to you we'll

12      be in court in trial on Friday.  It's not do what intended to

13      do --

14            MR. JOHNSON:  I didn't understand anything after --

15            THE COURT:  What I'm saying is if the challenge

16      based on Friday, I can't commit to you one way or the other

17      on Friday.  I'm going to tell you my current intent is to be

18      in trial on -- be in trial on Friday and I will not be gone

19      which would have been my choice.

20            But I think I'm in a position now where I've got to

21      get a jury selected.  So if you're gonna make a challenge for

22      cause based on her unavailability, you know, the court not

23      being dark on Friday because I'm not going to agree right

24      now.  I am going to have a trial on Friday.

25            MS. LANSDEN:  I think his challenge for cause is if

1    we're not dark on Friday.

2          THE COURT:  You want the Friday off.

3          MR. JOHNSON:  I think if she's not available for

4    Friday, she said she can be clear to next week.  I think

5    that's great.  I don't have the challenge for cause.  So the

6    Friday, we can be dark on Friday and that would accommodate

7    what I believe might be a small investigation related to the

8    government's statements and that probably would solve the

9    issue.

10          THE COURT:  Okay.  Let me tell you this.  Whether

11    or not you make the challenge for cause, I am not going to

12    excuse her for cause and because she can be here most of the

13    days.  I do not want to engage in negotiation as to when to

14    be in trial.  Long and short of it is, if you are making a

15    challenge for cause, I deny it.  If you're not making a

16    challenge for cause that's fine, too.  But either way, I've

17    got to ask are you going to exercise a peremptory as to her?

18          MR. JOHNSON:  I'm not.

19          MS. LANSDEN:  He's done.

20          THE COURT:  Do you have a peremptory for her?

21          MS. CHEN:  We don't.

22          MR. JOHNSON:  Sorry for the confusion.

23                    (Side bar concluded.)

24          THE COURT:  Okay.  Ladies and gentlemen, you are

25    going to be the alternates.  I cannot tell you what I'm going

```
 1   to do about Friday right now.  I think it's more likely than
 2   not that we will be dark on Friday, but we will be in trial
 3   next week.
 4             MS. PITCHFORD:  So I have a Board of Directors
 5   meeting on Wednesday and then that Friday, I'm graduating
 6   from leadership Southern California.
 7             THE COURT:  Well, you should have told us earlier
 8   because we've got a problem here then.
 9             MS. PITCHFORD:  I'm sorry.  I don't have the
10   calendar in front of me.  Sorry.
11             THE COURT:  Counsel, do we need to discuss this
12   further?
13                  (Proceedings held at side bar:)
14             MS. LANSDEN:  I think although there's a lot of
15   witnesses, the law enforcement witnesses are going to be
16   really quick.  We'll get through them in the first couple of
17   days and then there will be one more day of the government's
18   case.  Ten law enforcement agents will talk about this and
19   that and they're off the stand.  I don't think we'll be going
20   to next Friday.
21             THE COURT:  She's got a Wednesday problem.
22             MS. LANSDEN:  The company is herself with one other
23   person.
24             THE COURT:  She has a board meeting.
25             MS. LANSDEN:  Maybe she phones in.  I understand
```

```
1    the graduation on Friday.  I'm not sure that supports a
2    challenge for cause having a meeting.
3           MR. JOHNSON:  It sounds like she just doesn't want
4    to be on the jury.  She's trying to get out next Friday.  I
5    think that is an issue for cause.
6                    (Side bar concluded.)
7           THE COURT:  Look, I've conferred with counsel.  I
8    think, Ms. Pitchford, I understand that you may have
9    conflicts.  You're gonna have to probably deal with them.
10   We'll do the very best we can to accommodate them, but this
11   is the problem.  We are literally out of people and I think
12   we need to empanel a jury.  Um, if you feel, you know, that
13   you can't serve, then we'll have to take that up separately.
14   Maybe we have to go with another alternate.
15          Counsel, should we have a third alternate?  How
16   about that?  So why don't we have another alternate.  That
17   means bringing up Mr. Tripodes.
18          THE COURT:  Let me talk to the government.
19              (Proceedings held at side bar.)
20          MS. CHEN:  We had previously I believe set forth
21   our belief he should be struck for cause based on his very
22   passionate statement about the war on drugs.  We just don't
23   believe he can be fair and impartial.
24          THE COURT:  I, of course, asked him about money
25   laundering versus drugs and it seemed to me his answer was
```

1    perfectly fine that he could -- that the views he held about

2    drugs would not interfere with his ability to find the

3    defendant guilty for money laundering.

4         MR. JOHNSON:  I actually am joining the government

5    in the cause objection because of his unavailability.  I

6    think it's just a different issue related to him as the sole

7    provider.

8         THE COURT:  He may have to show a house, but we

9    don't know that.

10        MR. JOHNSON:  I just wanted to put it on record.

11        MS. CHEN:  I understand you rehabilitated him.

12   This is mainly a DEA investigation.  We have DEA agents

13   testifying and we do believe he should be struck for cause.

14        THE COURT:  We'll let him go.  Ms. Fraijo or

15   Ms. Yousuf.  Is that okay?  I would let him go for cause, but

16   then we've got the other two.

17        MS. CHEN:  The government would use the

18   government's peremptory to strike Ms. Fraijo based on the

19   statements she made.

20        THE COURT:  So are we excusing Tripodes and moving

21   Yousuf to the position?

22        MS. CHEN:  I believe so.

23             (Side bar concluded.)

24        THE COURT:  Here is where we are.  We are going to

25   excuse Mr. Tripodes based on cause.  We are going to excuse

```
 1   Ms. Fraijo on cause.  Ms. Yousuf is going to be the third
 2   alternate.  And I understand the inconvenience, Ms. Pitchford
 3   and if you find you can't make the appropriate arrangements,
 4   then you will let us know.  We have another alternate to back
 5   you up.  But I think we just have to move forward because
 6   there are people waiting all over this courthouse who can't
 7   go home if we're still looking for the last alternate.
 8          I think this is the best solution.  And as I say, I
 9   hope because you were really the earlier choice, I hope you
10   will be able to rearrange your schedule, but if you can't,
11   you'll tell us that, and then we'll deal with it.
12          Okay.  We're going to swear you in, and then let
13   everyone go home and I will pre-instruct everyone tomorrow.
14                       (Jury sworn.)
15          THE COURT:  9:30 tomorrow.  We'll see you in the
16   morning at 9:30.
17                    (Jury not present.)
18          MR. JOHNSON:  I had a request.  Would the Court
19   approve a daily transcript of just the witnesses we have on
20   CJA?
21          THE COURT REPORTER:  Counsel has not approached me
22   about this before.
23          THE COURT:  Why don't you confer with Ms. Elias.
24   We will do our best to accommodate you, but I'm not sure we
25   can produce dailies on this short notice.  Okay.  Thank you,
```

1    everybody.  Have a good night.

2               (Proceedings were concluded at 5:35 p.m.)

1

2                        <u>CERTIFICATE OF REPORTER</u>

3

4    COUNTY OF LOS ANGELES      )

5                               )  SS.

6    STATE OF CALIFORNIA        )

7

8    I, LAURA ELIAS, OFFICIAL REPORTER, IN AND FOR THE UNITED

9    STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA,

10   DO HEREBY CERTIFY THAT I REPORTED, STENOGRAPHICALLY, THE

11   FOREGOING PROCEEDINGS AT THE TIME AND PLACE HEREINBEFORE SET

12   FORTH; THAT THE SAME WAS THEREAFTER REDUCED TO TYPEWRITTEN

13   FORM BY MEANS OF COMPUTER-AIDED TRANSCRIPTION; AND I DO

14   FURTHER CERTIFY THAT THIS IS A TRUE AND CORRECT TRANSCRIPTION

15   OF MY STENOGRAPHIC NOTES.

16

17

18   DATE:  <u>MARCH 5, 2019</u>

19

20   <u>    /s/  LAURA MILLER ELIAS    </u>

21   LAURA MILLER ELIAS, CSR 10019

22   FEDERAL OFFICIAL COURT REPORTER

23

24

25