1                    UNITED STATES OF AMERICA
                   UNITED STATES DISTRICT COURT
2                  CENTRAL DISTRICT OF CALIFORNIA
                          WESTERN DIVISION
3
                             - - -
4                  HONORABLE CHRISTINA A. SNYDER
            UNITED STATES DISTRICT JUDGE PRESIDING
5                            - - -

6
      UNITED STATES OF AMERICA,        )
7                                      )
                    PLAINTIFF,         )
8                                      )   CASE NO.:
      VS.                              )   CR 14-648-CAS
9                                      )
      HARINDER SINGH,                  )
10                                     )
                    DEFENDANT.         )
11    _____)

12

13

14           REPORTER'S TRANSCRIPT OF PROCEEDINGS

15              MONDAY, NOVEMBER 26, 2018

16               LOS ANGELES, CALIFORNIA

17

18

19

20

21

22            LAURA MILLER ELIAS, CSR 10019
            FEDERAL OFFICIAL COURT REPORTER
23          350 WEST 1ST STREET, ROOM 4455
            LOS ANGELES, CALIFORNIA 90012
24               PH:  (213)894-0374

25

1

2

APPEARANCES OF COUNSEL:

3

4

ON BEHALF OF PLAINTIFF:

5

6              UNITED STATES ATTORNEY'S OFFICE

7              BY: CAROL CHEN

8              ASSISTANT UNITED STATES ATTORNEY

9              312 NORTH SPRING STREET

10             LOS ANGELES, CA 90012

11

12

13   ON BEHALF OF DEFENDANT:

14

15             PETER JOHNSON, ESQ.

16

17

18

19

20

21

22

23

24

25

1

2

3                                    INDEX

4

5        PROCEEDING                                    PAGE

6

7        SENTENCING                                      4

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1        LOS ANGELES, CALIFORNIA, MONDAY, NOVEMBER 26, 2018
 2                           - - -
 3             THE CLERK:  Calling Calendar Item No. 7.
 4             Case No. CR 14-648.
 5             United States of America versus Harinder Singh.
 6             Counsel, please state your appearances.
 7             MS. CHEN:  Good afternoon, Your Honor.  Carol Chen
 8   on behalf of the United States.  Also with the Court's
 9   permission, if it's possible for IRS Special Agent Donald
10   Classen to be at the table?
11             THE COURT:  Yes.
12             MS. CHEN:  Thank you, Your Honor.
13             MR. JOHNSON:  Good afternoon, Your Honor.  Peter
14   Johnson on behalf of Mr. Harinder Singh who is present,
15   prepared for sentencing and assisted by the court's Punjabi
16   interpreter.
17             THE COURT:  Very well.  Good afternoon.
18             Okay.  Let's just review what I'm going to call the
19   preliminaries.  It appears that the presentence report in
20   this case was disclosed on March 21, 2018.  The Court has
21   reviewed the presentence report, the addendum to the
22   presentence report, the government's position regarding
23   sentencing, the defendant's position regarding sentencing.
24   The supplemental sentencing letters submitted on behalf of
25   the defendant and the letter from Professor Singh which was
```

1    included in the sentencing papers submitted by defendant.

2           Does that cover everything as best we can tell?

3           MS. CHEN:  And Your Honor, I apologize if I missed

4    it, but I belive there also a presentence investigation

5    report disclosed August 15, 2018.  I'm not sure if there were

6    any specific material differences.

7           THE COURT:  There was one, and then there was a

8    revised one.  Um, well, let's discuss that.  I think there

9    was a revised sentencing letter.  I'm not sure that there was

10   a revised PSR, but I thought there was an addendum.  I have

11   an addendum.  I have the original letter.  The sentencing

12   memorandum from Mr. Singh, the government's sentencing

13   memorandum.  I have a revised letter to which there is

14   attached -- okay.  There's a second addendum to the

15   presentencing report which is attached to the letter.  Is

16   that what you're referring to?

17          MS. CHEN:  It is, Your Honor.  I think that's

18   Document 1020.  There also appears to be a docket entry of

19   1019 which it also says presentence investigation report.  On

20   the bottom it says date report prepared March 21st, 2018 and

21   the date report revised was August 15, 2018.

22          THE COURT:  Yes.

23          MR. JOHNSON:  I have in my notes that there weren't

24   changes, but I just want to make sure that I don't skip

25   anything that might be important to the Court.  I will

```
 1   operate from my assumption in my notes that there weren't
 2   changes to that.  To the extent I am wrong, um, please let me
 3   know and I can look at it and go through it.
 4            THE COURT:  Well, let's be sure we're talking about
 5   the same thing.  The second addendum that I have, uh, notes
 6   changes based on United States versus Evans which was decided
 7   recently which goes to conditions of supervision.
 8            MS. CHEN:  And, Your Honor, that's Document 1020, I
 9   believe.  And I think on that same day in question, it
10   appears there was a presentence investigation report
11   disclosed also August 15, 2018.  It's 23 pages, but I believe
12   there are no material differences between that and the
13   March 21st, 2018.  It may be just that with the addendum, the
14   Probation Office also essentially refiled their presentence
15   report.
16            THE COURT:  Well, I think you're correct, but
17   Mr. Johnson, if you want to look at everything, I'm prepared
18   to let you do that.
19            MR. JOHNSON:  Um, I don't have the physical copy of
20   that addendum.  I'm pretty sure that I went through, uh, the
21   documents that were there at least in my notes that I have
22   that there were no changes to the guideline calculation.
23            THE COURT:  I'm not helpful because I don't have
24   the document number from the file.  I do have the actual
25   report and I do have the presentence report.  It says report
```

1    prepared March 21, 2018.

2             MS. CHEN:  And, Your Honor, I can show Mr. Johnson

3    very briefly, if you want, Document 1019 which is the one at

4    issue?

5             THE COURT:  Okay.  Why don't you do that.

6             MR. JOHNSON:  If I may, Your Honor?  Thank you.

7             MS. CHEN:  And I apologize, Your Honor.  I just

8    want to make sure the record is clear.

9             THE COURT:  I understand.

10            MR. JOHNSON:  Your Honor, I'm fine with the PSR.

11            THE COURT:  Okay.  Just to summarize and I don't

12   want to mischaracterize things, but I think that the most

13   recent second addendum really deals with the -- we get them

14   in almost every case now because of United States versus

15   Evans which changes certain of the conditions of supervision.

16   And I think that's why the second addendum was issued to

17   account for that.  Is that your understanding, Ms. Chen?

18            MS. CHEN:  Yes, Your Honor.

19            THE COURT:  Okay.  Do you have that, Mr. Johnson?

20   I just want to be sure that you have the second addendum.

21            MR. JOHNSON:  I -- I don't have the second

22   addendum, but to the extent that I can look at it?

23            THE COURT:  Sure.

24            MR. JOHNSON:  That's fine, Your Honor.  Thank you.

25            THE COURT:  Okay.  Basically, I think we've covered

```
1    what's been disclosed.  I think to summarize Probation found
2    an Offense Level of 34, a Criminal History Category of one
3    yielding an advisory 151 to 188 months.  The government
4    responded, uh, well the recommendation from Probation was
5    151 months.  The government agreed with 151 months.
6         And then for reasons which I will go into a minute,
7    Mr. Johnson, you argue that your client should be placed in
8    custody for no more than 12 months and a day.  To begin with
9    you argue that the offense level should be 23 which would
10   yield 46 to 57 month advisory range.  Um, and basically, you
11   object to the offense conduct because the statements of Sucha
12   Singh are improperly attributed to your client.
13        Secondly, you object to the plus 18 in offense
14   level because the amounts were not reasonably foreseeable by
15   your client and even if foreseeable, you argue that the
16   increase should be 16 not 18.
17        Then you object to the plus six in Paragraph 46
18   because of insufficient evidence that the -- demonstrating
19   that the money that was transferred was connected to drug
20   trafficking.  And then you also object to Paragraph 53
21   because, uh, there should be a three level decrease for
22   mitigating role for your client.
23        And so at the end of the day, you say that the
24   offense level of eight should at most be increased by 16 and
25   that the plus two is appropriate, but there should be a minus
```

1    three and you end up at 23, and I'll let you elaborate

2    further.  But in addition you argue that the 3553A factors

3    compel a downward variance based on your client's religious

4    background and what his expectations were regarding hwala

5    money transfers, uh, and based on his personal history, age

6    and lack of criminal history.  And I'm sure you have more to

7    say, but that's a short form summary.

8               MR. JOHNSON:  Yes, that's correct.

9               THE COURT:  Okay.  Let me say this.  Obviously, in

10   light of the sentences that have been given in this case, I

11   think 151 months is extreme and not warranted.  I am not

12   persuaded for the reasons I articulated at trial that there

13   is some cultural basis for departing.  I'm not convinced with

14   your argument that the loss at issue in this case was not

15   foreseeable by your client.  I do think there was substantial

16   evidence that your client knew that the proceeds and the

17   laundered funds were connected to drug proceeds.

18              I want to hear further from everyone regarding the

19   statements of Sucha Singh and whether they are relevant or

20   not.  I don't think Mr. Harinder Singh is entitled to minus

21   three for mitigating role given his participation in the

22   transaction.

23              So I guess what I'm prepared to say is that I think

24   the offense level of 34 is appropriate, but I do think there

25   are mitigating factors most particularly to avoid disparity

```
 1    of sentencing which should apply here.  And I searched

 2    through the docket sheet and I know that Mr. Sucha Singh was

 3    sentenced to 63 months in custody, Harmeet 42 months.  I

 4    think Mr. Wadhwa was 46 months and think right now --

 5              MR. JOHNSON:  41.

 6              THE COURT:  -- they're at the high level in this

 7    case.  So Ms. Chen, can you tell me if there's someone who is

 8    higher that I have missed?

 9              MS. CHEN:  Yes, Your Honor.  So I too went through

10    the docket and from my understanding, Sucha Singh get

11    63 months.  He was facing an advisory range of 108 to 135

12    months.

13              THE COURT:  Right.

14              MS. CHEN:  But he got credit for attempted

15    cooperation which is not news to anybody.  John Bradley

16    Martin who was a repeat courier got 63 months out of an 87 to

17    108 months advisory range.  Harmeet did get 42 months out of

18    a 70 to 87 months.  He did cooperate.  Again, it's public

19    knowledge.

20              There were two couriers Montenegro who was facing

21    an advisory range of 46 to 57 months and Baraza who was

22    facing 57 to 71 months and both got 24 months.  Sanjev Wadhwa

23    as we all know cooperated.

24              THE COURT:  He was initially at 70 months, and then

25    reduced.
```

```
1            MS. CHEN:  Yes, Your Honor.  And for the record,
2    while the government did submit the recommendation of
3    151 months, having reviewed all of the sentences given by
4    this court, we do agree that 151 months would create a
5    sentencing disparity and so we're actually prepared to adjust
6    our recommendation today.
7            THE COURT:  Mr. Johnson, why don't you go from
8    there.
9            MR. JOHNSON:  Your Honor, I can begin where we left
10   off at the last hearing, I think it was at the end of the
11   August, where the government actually agreed after
12   Mr. Singh's arrest in October of 2012 that he did not
13   continue on delivering.  And I begin there because I think
14   it's an important part of examining the -- what was going on
15   in Mr. Singh's mind.  It, I think, offers mitigation that
16   once he learned that what was actually going on, once he put
17   the puzzle together that he wasn't going to continue
18   delivering money.
19           Even when, and he can tell you, when solicited by
20   his uncle Sucha Singh to continue to deliver money after
21   October of 2012, he didn't do so.  Um, I think that's
22   important because on that day and thereafter, um, Mr. Singh,
23   Harinder Singh, was, um, met with the government.  He was
24   going with some of the agents to various places where he
25   picked up money in an effort to cooperate.  That cooperation
```

```
 1    didn't work out because there was no plea agreement and no
 2    admission related to that the money was connected to drugs.
 3            I think that I'll just as we go along, the
 4    objection related to the reasonably foreseeable, I think is
 5    right.  And it's right because if the Court recalls from
 6    trial, the money that was being delivered in the very
 7    beginning, um, there was no indication that this was from
 8    some illegal source.  There was the testimony by the expert
 9    that there are legal ways to deliver money that are
10    traditionally practiced within the Punjabi faith and culture.
11            The indictment described that as white hwala.  And
12    those beginning payments that I've listed out on page 4,
13    would be considered in at least Mr. Singh's mind white hwala.
14    There was no evidence at trial that they would be anything
15    other than white hwala.  No evidence that he was told that
16    this must be some form of illegal activity or drugs.
17            That was the early ones that I've -- that I've laid
18    out.  That's on page 4 I'm referring to where I say the
19    $522,000 in March of 2012 and $600,000 again in March.
20    Another $500,000 in April.
21            THE COURT:  Could I ask one question?
22            Let's assume you're correct.  At the beginning he
23    had every belief that they were white hwala payments.  Along
24    the way, though, he's asked to transport money and has reason
25    to believe that that money comes from drug sources.  Doesn't
```

```
 1    that impact the argument that the first four payments were
 2    white hwala?
 3           In other words, doesn't it make it more foreseeable
 4    for your client to believe that the earlier payments were of
 5    the same nature as the later payments?
 6           MR. JOHNSON:  No, and I can explain why.
 7           THE COURT:  Yes.
 8           MR. JOHNSON:  What I did was that I looked at the
 9    trial evidence, the evidence from Mr. Khukaran from Canada
10    and the person, uh, Mr. Wadhwa from India and the expert's
11    testimony, the testimony at trial.  The testimony was that at
12    the time of this when Khukaran was involved that Mr. Harinder
13    Singh was operating his own kind of hwala.
14           Now, we disagree with that, but there would be some
15    basis then in the facts to say, okay, this is different
16    somehow.  This was not my uncle telling me that I should
17    deliver this money from one, um, Punjabi Sikh to another
18    Punjabi Sikh.  Because those funds weren't delivered to what
19    the evidence said well, it may be somebody outside of the
20    faith.  These were internal deliveries of money.
21           So in, uh, based upon the evidence, there's --
22    there's really no evidence to show that this would have been
23    somehow illegal in nature because the evidence actually was
24    that, uh, there are legal payments -- from the expert, there
25    are legal payments of money in the church, in the Sikh faith
```

```
 1    that are transferred and it's in the billions of dollars
 2    every year.
 3            As well as from Mr. Taran Singh who said yes, there
 4    are legitimate for what he believed to Mr. Singh, Taran Singh
 5    said that all of it was illegal.  That's different from the
 6    government's theory that there is money being collected
 7    throughout the church and Punjabi Sikh businesses throughout
 8    Los Angeles that are collecting money and then delivering
 9    money to various sources.
10            In addition to that, in the journal there were
11    multiple, and that came out at trial during
12    cross-examination, there were multiple hwalas where
13    Mr. Harinder Singh was picking up money and delivering money.
14    Under those circumstances, there's no indication in and of
15    themselves that this is drug related.  I fully understand the
16    evidence.
17            While I disagree with it, again, I understand the
18    evidence that there is evidence to say if large amounts of
19    money are being delivered in a parking lot to an individual,
20    that is not of the Sikh faith.  I think that's where the
21    Court got to say there were some form of illegal activity
22    that characterized the illegal activity, but that didn't
23    exist in the first three portions where Mr. Harinder Singh
24    was involved.  And that's why I believe that those should not
25    be considered unreasonable.
```

1          Now, in addition to that, if those payments

2     occurred after, not before but after, then I think they would

3     be reasonably foreseeable.  But, again, under the

4     circumstances and the government's already conceded this

5     fact, that the last payment of $310,000 that he had already

6     withdrawn.  So that payment should not be included in the,

7     uh, in that calculation.

8          And I think there's -- actually, we would only be

9     assuming and making -- speculating about what the evidence

10    may be related to, uh, the payments in the early ones and I

11    just don't think it's reasonably foreseeable.  There's no

12    evidence to say that it is.

13         Your Honor, I'll turn next to the drug, uh, the

14    plus six.  The plus six is inappropriately applied and this

15    is why.  There is absolutely no evidence, no evidence not

16    from any one of the witnesses that testified at trial, um,

17    not from anybody that this money that Mr. Singh, Harinder

18    Singh, knew or believed, that's the standard, knew or

19    believed that the offense involved the distribution of a

20    controlled substance.

21         If the Court recalls that we -- we debated over the

22    jury instructions.  That it was, the standard was that the

23    Court decided what the government had to prove some form of

24    illegal activity.  I understand the evidence and many of

25    witnesses, Gurkaran Isshpunani Singh, Mr. Taran Singh,

```
 1    Mr. Wadhwa they all said oh, yeah, he should have known that
 2    it was something unlawful.  That he would have, uh, he would
 3    known from the context that it was something unlawful.
 4            But they weren't talking about drugs, Your Honor.
 5    And I think in the context of the culture and faith that what
 6    Professor Gill has laid out, that a reasonable person that
 7    was coming into the country, asked to deliver money that is
 8    inside, within the church, asked by his uncle, in the
 9    cultural context, I think, if -- and without ever being
10    introduced to evidence to say that there were conversations
11    with drugs, with people that delivered drugs, there's no way
12    to say that he knew that this, knew or reasonably believe
13    that this was related to drugs.
14            Um, you know, and I think they recorded as many
15    phone calls as they could in terms of the, um, the evidence
16    here and nobody -- Mr. Harinder Singh is not talking about
17    drugs.  I think in addition to that, pulling it all together
18    that he pulled out in October 16, 2012 before he was
19    indicted, he was indicted in May of 2015, that he really
20    didn't know that, um, this was somehow connected to drugs
21    even if they, uh, this evidence to say there was something
22    unlawful.
23            Um, I do believe the mitigating role of three level
24    applies, but I know the Court has read the papers and I won't
25    get into that.  I think that the more important part and it
```

```
 1   does overlap with what we're here about is the 3553 factors.

 2   Does the Court want me to get into that right now?

 3              THE COURT:  Not yet.

 4              MR. JOHNSON:  Then I'll end there.

 5              THE COURT:  Okay.  Ms. Chen, insofar as Mr. Johnson

 6   made his arguments, what do you have to say in response?

 7              MS. CHEN:  I'll try to be brief, Your Honor.

 8          So first off, I think the easier, I hope it's the

 9   easiest issue is that I believe Probation, uh, actually did

10   take out the December 2012 seizure, uh, because I don't think

11   the government will concede that he formally withdrew from

12   the conspiracy as in like legally sufficient, but he was

13   certainly arrested in October of 2012.  We are fine with not

14   putting the additional December 2012 seizure to the

15   calculations.

16          From what I'm looking at the presentence report,

17   Your Honor, again, it would Document 1019 which is the

18   August 15, 2018 one, it appears that on Paragraph 44,

19   Probation specifically does not take into account the

20   December seizure.  Um, I don't think Mr. Johnson talked about

21   it at this time, but in his sentencing position, he had

22   talked about also the double counting.

23          Specifically, I believe it was $170,000 because

24   there were, um, like $90,000, $80,000 amounts that were

25   discussed over the phone I think on October 9th and 10th.
```

```
 1   And, again, Probation my understanding is they took out
 2   $170,000.  I think that still is equivalent to a plus 18.
 3           There is an argument that the three seizure amounts
 4   from March and early April would be reasonably foreseeable to
 5   the defendant, but I think I also can recognize that there
 6   probably likely was an escalating level of knowledge for this
 7   defendant with regards to the black hwala versus white hwala.
 8   The three amounts discussed are very large amounts, $560,000
 9   essentially.
10           So I do think based on the evidence including the
11   testimony of cooperators where they indicated that the large
12   amount itself would be a red flag.  The money laundering
13   expert also discussed that.  Without waiving the government's
14   right to argue that the plus 18 does apply on appeal, we're
15   literally talking about a difference of two levels, plus 16
16   versus plus 18.
17           Um, I do think that 151 months like I stated again,
18   not to waive the government's rights, I do think 151 months
19   normally would be sufficient, but not greater than necessary,
20   but given the sentences imposed in this case, I think the
21   government would be fine if we just imposed the plus 16
22   enhancement to, uh, knock down one level of dispute, but
23   however, I do think plus 18 would be consistent with being
24   reasonably foreseeable.
25           THE COURT:  Well, let's just take that to its
```

```
 1   logical conclusion.  If for purposes of discussion and
 2   without committing the government to any position it was plus
 3   16, that would take him to 24.  If I understand, you still
 4   believe that he should have the plus six.
 5             MS. CHEN:  Yes, Your Honor.  So if I may briefly
 6   address that?
 7             THE COURT:  Yeah.
 8             MS. CHEN:  I believe that issue was taken care of
 9   at trial.
10             THE COURT:  I do, too.
11             MS. CHEN:  The only theory that the government
12   proceeded on at all times in this case including heavy
13   litigation preceding trial and at trial, the evidence was
14   that it was drug trafficking proceeds.  I believe the jury in
15   order to convict Mr. Singh on Count 1 had to find that each
16   and every element was proven and that includes that the
17   defendant knew that the money constitutes some proceeds of
18   some unlawful activity.
19             Obviously, we didn't have -- I don't believe the
20   verdict form had them specify which unlawful activity, but,
21   again, that was the only evidence that was introduced at
22   trial so I believe the plus six would apply.
23             With respect to whether or not a mitigating role
24   adjustment does apply, we don't believe so, Your Honor.  I'm
25   fully aware that Mr. Sucha Singh has been vilified both in
```

1    trial as well as sentencing papers and at sentencing

2    hearings.  He got sentenced.  He took responsibility.  He

3    plead.  Basically, who's up for sentencing now is this

4    defendant.

5             I fully understand that Mr. Sucha Singh got his

6    nephew involved, but I think the evidence also was

7    established at trial that as he got -- he put the puzzle

8    together as Mr. Johnson would say by July, August and became

9    a pretty indispensable individual for Gurkaran Isshpunani,

10   Sanjev Wadhwa.

11            There's evidence which was referenced in this

12   Court's order denying the motion for acquittal or for a new

13   trial.  Uh, it referenced the evidence that Mr. -- that this

14   defendant had contacted Mr. Isshpunani to want to invest his

15   own money.  There's also a call, finally, Your Honor, where

16   this defendant boasted about his ties for hwala, I believe,

17   with New York and New Jersey.

18            So while he may have started as a courier, we

19   certainly think that his role was established as much more as

20   a hwala broker along the lines of Taran Singh, Harmeet Singh

21   and Sucha Singh, and in fact he tried to cut out his uncle.

22            THE COURT:  All right.

23            MR. JOHNSON:  Your Honor, I addressed each of

24   those, the alleged cutting of the uncle, the relationship

25   with Gurkaran Singh, the issue of behind the curtain on page

```
1    7 and 8 of our brief, that's a direct response to what the
2    government has laid out.  Just basically that he is not, uh,
3    wasn't elevating at all within the hwala business, was acting
4    as a courier because he was trusted.  He was introduced to
5    Gurkaran Singh by Sucha Singh.
6            Um, Professor Gill who is present in the court
7    today has laid out the interpretation of those calls in his
8    letter.  I'm happy to put him on the stand if necessary if
9    the Court needs it, but I've laid out the -- the response to
10   what the government has suggested and talked about him being,
11   uh, the allegations of him being a broker.
12           I fully understand, you know, how the Court will
13   decide whether he's mitigating or minor role, but I think
14   those are the factual issues that are in dispute as well as
15   the idea, and I understand the Court disagrees with me,
16   regarding evidence related to the plus six.  I think we've
17   written that and laid out our argument.
18           THE COURT:  I think we exhausted that and I have to
19   say that I think the jury's finding is persuasive because I
20   think they did find that the proceeds were related to an
21   unlawful activity.  And as Ms. Chen said not specifically
22   drugs, but whether drugs or not, that obviously is an issue
23   that you're going to raise on appeal, but for my purposes, I
24   think the plus six is appropriate.
25           MR. JOHNSON:  Your Honor, not to belabor that
```

1   point, but just to be -- I want to make sure my argument is

2   clear.

3          THE COURT:  No, by all means.

4          MR. JOHNSON:  Thank you.

5          The standard is different on the guideline and I

6   tried to highlight that out.  It says the guideline is

7   different where the jury instruction didn't point to actual

8   drugs, but allowed the -- the jury to be more expansive and

9   say oh, some form of illegal activity or maybe he knew there

10  was some form of illegal activity when he, um, lied to the

11  police when he was pulled over or it was somehow illegal;

12  right?  But not that it was related to drugs.  That jury

13  finding didn't have that.

14         And what the guideline says is quote "knew or

15  believed that any of the laundered funds were the proceeds of

16  or intended to promote an offense involving the

17  manufacturing, importation and distribution of controlled

18  substances."  And that -- it adds six levels to an already --

19         THE COURT:  I know that, but what do you do about

20  Pindi and some of the other evidence in the case?

21         MR. JOHNSON:  Oh, Pindi never spoke to Mr. Singh.

22         THE COURT:  No, but he spoke to others.

23         MR. JOHNSON:  And the evidence of Gurkaran said oh,

24  I assumed he knew it was illegal, but there is a difference

25  between white hwala and back hwala.  Even there was some form

1   of illegal activity, what could it be?  Could it be the

2   importation of illegal products?  Could it be the actual --

3   could it be money laundering in some other form?  And that's

4   what the plus six adds.  Plus six adds another level to the

5   sentence that is related to drugs and it's just not here.

6           THE COURT:  Ms. Chen.

7           MS. CHEN:  Your Honor, if I can briefly address

8   that point.  First of all, I want to make clear the

9   government's position.  We are not just relying upon what the

10  jury likely found.  To the extent the Court can make the

11  finding based on the evidence that it reviewed itself, that

12  it sat through during this trial and at which, frankly, if

13  need be the government is happy to put it back on for

14  purposes of sentencing.

15          That there is evidence and we believe it's

16  sufficient evidence to show that the defendant knew that the

17  proceeds were some form of unlawful activity.  Specifically,

18  drug trafficking.  That's the first point.

19          The second point is the government had previously

20  objected and would renew its objection particularly for the

21  record to the letter that was written by Professor Gill who

22  had we intended to cross-examine Mr. Gill, if that had been

23  the case, I would have asked the witness to step out prior to

24  all of this.  But the Court had indicated that it was not

25  going to adopt the cultural basis for departing.

1          I would point out that the letter, I understand

2    Mr. Johnson's advocacy here and this is in no way means to

3    offend him, but the letter is highly inappropriate.  It seeks

4    to overturn the jury's finding.  It basically attempts to

5    testify for the defendant and tries to basically insinuate

6    what he was thinking at the time a few years ago when he was

7    actually conducting the behavior for which he was convicted

8    by a jury.

9          And Mr. Gill with all due respect likely should

10   have been called as a witness.  I believe Mr. Johnson had

11   indicated he was going to call him.  And now at sentencing

12   has decided to put together a letter which talks about all

13   these cultural bases for departing.  And it says that he's of

14   a firm belief that surely this defendant did not know what he

15   was doing was illegal.

16          I find it highly inappropriate and in particular,

17   Your Honor, we would object to the entire letter, but

18   specifically Exhibit B which for the first time transcribes a

19   call that was not played before this jury.  He also talks

20   about various interpretations.

21          And the only other thing I would mention,

22   Your Honor, if this Court will recall at the beginning of

23   trial, we were going to have a potential issue in the sense

24   that the interpreter that had translated the calls also

25   happened to be interpreting for the defendant at various

1    points in the trial and sat next to him.

2           And we averted that, if I remember correctly,

3    because Mr. Johnson and the government actually ended up

4    agreeing to the transcripts.  So to now come back and, uh,

5    add new color to the interpretation, I believe Professor Gill

6    talks about the government's transcript being woefully

7    inadequate, I'm not even sure he would have been qualified as

8    an expert at trial.

9           For the record and to keep my Appeals Unit happy, I

10   would object to that letter.  He's attempting to essentially

11   speak for the defendant.  I'm not sure what evidence he

12   reviewed.  He's trying to seek to basically overturn the jury

13   verdict and finally we would object.

14          I understand, obviously, the Court can consider

15   anything it wants at sentencing, but as this Court had

16   already indicated, it was not going to accept a cultural

17   basis for departing.  Unless the Court changes its mind, I

18   would ask, at that point I would want to cross-examine

19   Professor Gill.

20          THE COURT:  Okay.

21          MR. JOHNSON:  Your Honor, the Court can consider

22   any of the other transcript of calls to the extent that are

23   necessary.  The government actually didn't object last time.

24   I think the Court came out and suggested that we bring

25   Professor Gill here for the next hearing and we did.

1          THE COURT:  Well, I think more accurately you

2     sought CJA funds to provide to Professor Gill so he could do

3     an analysis for purposes of sentencing, and I said I was

4     prepared to authorize your requested funds.

5          MR. JOHNSON:  I think the Court, forgive me this is

6     my recollection of what happened last time.  The government

7     came in to the court and the Court took the bench and said

8     that you read the position papers and that you were sure that

9     the government probably would want to respond.  The

10    government said yes, they would like to respond.  I didn't

11    receive anything in writing or anything.  I asked for the

12    additional funds because we continued the sentencing hearing.

13         THE COURT:  I think we're speaking at

14    cross-purposes.

15         MR. JOHNSON:  I obviously think that Exhibit B is

16    relevant to the Court's determination.  The letter is

17    relevant to the Court's determination.  Even if the Court

18    struck the -- the belief that hey, Mr. Singh didn't know and

19    the Court -- Professor Gill was not an expert on what the

20    Court -- what evidence the Court must rule on right now.

21         That the, uh, if that's his belief, if that's

22    stricken from the letter or just taken from the letter or

23    even ignored, the other parts of the letter are very, very

24    important.  About the cultural, um, impact of a person coming

25    into the country, being accepted into the Sikh faith and the

```
 1   Punjabi culture.  The role of Sucha Singh as an individual.
 2   And it's actually interpreting not just that Exhibit B, but
 3   other calls as well.
 4        That is entirely correct that we disputed over the
 5   transcripts.  We agreed.  I was allowed to cross-examine as
 6   to what the calls meant without the ability to impeach
 7   because I wouldn't have Professor Gill's interpretation, but
 8   we're in a different stage.  We're at the sentencing stage
 9   and this is entirely important in terms of mitigation and
10   it's definitely important in terms of the plus six.
11        And it's important to see who he, uh, Mr. Singh is.
12   The personal history and characteristics are part of 3553A.
13   It's interwoven with his cultural background.  We can't
14   ignore that he was born in Punjabi and raised in the Sikh
15   faith and the -- I think that's entirely relevant and
16   important to the Court.
17        THE COURT:  Well, even if it is relevant and I can
18   consider it, let's assume that for a minute.  I don't find it
19   persuasive, that's the real problem.  Look, I don't want to
20   cut anyone off, but what we come down to in this case it
21   seems to me is a situation whether we accord a plus 16 or a
22   plus 18, the advisory range is quite high.  Because of the
23   other sentences I have imposed in the case, I think that a
24   lower range is appropriate.
25        The difficulty in this case which is driven by
```

1    guidelines, I believe that Sucha Singh is probably a

2    significant force in involving Harinder Singh in this

3    conspiracy.  The problem is that Sucha Singh chose the road

4    of pleading guilty and your client went to trial.  He was

5    entitled to go to trial.  He should not be punished because

6    he did go to trial.

7            But the guidelines do provide a minus three for

8    those who enter into plea agreements versus people who don't.

9    But even if I were to give your client the minus three, he

10   still would be well above the range of other people in the

11   case.  So the question for me is what is a principled basis

12   for departing.

13           I think the appropriate sentence is somewhere in

14   the range of 60 to 70 months.  I know the government

15   disagrees, but I think that's the appropriate range.  There

16   is a part of me that thinks it should be higher than Sucha

17   Singh.  There's a part of me that thinks it should be no

18   higher than Sucha Singh's sentence because I understand that

19   an elder came to your client and got him involved.

20           But after that I can't say that anyone transporting

21   those amounts of cash, uh, shouldn't have known that there

22   was some illegal activity notwithstanding the custom of white

23   hwala and all those things.  I mean, I don't think there's

24   much evidence, there may be some, that your client engaged in

25   white hwala for parts of this transaction.  Uh, this was his

1    hwala experience.

2          MR. JOHNSON:  Your Honor, I think that the -- this

3    is where I believe that the cultural and religious context

4    of -- and the expert's testimony that wasn't our expert that

5    testified that there are many thousands, millions of dollars

6    that are being collected in Sikh temples and distributed back

7    to India or collected from Punjabi and Sikh businesses as

8    laid out by the expert that has described how, you know,

9    culturally this is part of a practice that has a very, very

10   long history.  It's in the letter and in our papers.

11          I think that putting Sucha Singh, Harmeet Singh,

12   Gurkaran Singh on the same level of Harinder Singh is wrong.

13   And that is because Sucha Singh as the Court recalls the

14   evidence was a leader in this, negotiated exchange rates.

15          Uh, same thing with Mr. Wadhwa.  The same thing

16   with Harmeet Singh, all of these individuals and, uh, if I

17   didn't mention Mr. Wadhwa.  They were negotiating exchange

18   rates.  They're very clearly hwala brokers.  And each one of

19   the, uh, there was nothing to say that Harinder Singh was

20   negotiating exchange rates at that level.

21          In addition to that, Sucha Singh, Gurkaran Singh,

22   actually, I don't want to include Gurkaran Singh because I'm

23   not sure of the evidence, but definitely Sucha Singh,

24   definitely Taran Singh, definitely Mr. Wadhwa were dealing in

25   hwala for years.  I mean, I think Sucha Singh the evidence

1    was it was all the way back in the early 2000s, maybe the

2    1990s.  And Mr. Harinder Singh it was just within the period

3    that he arrived in the United States.

4            Harmeet Singh, the same thing, very, very long

5    period of time.  Taran Singh.  These were elders in the

6    community.  And I think that should be considered in terms of

7    the evidence to say that his sentence should be, I think it

8    would lead to a sentencing disparity to say that they are on

9    the same level.  Uh, that it should be much lower than Sucha

10   or Harmeet or Mr. Wadhwa.

11           I know the Court cited the guidelines where there's

12   a minus three, but the 3553A factors don't consider that.  I

13   mean, the Court has the power to look at that.  And it would

14   lead to a sentencing disparity to say that someone who's been

15   involved substantially over the years is now sentenced the

16   same way that what would be someone that was involved a

17   shorter period of time and then stopped on October 16, 2012.

18           When Mr. Sucha Singh knew that people were getting

19   arrested, but he kept going.  Gurkaran Singh kept going.  All

20   of them kept going.  But Mr. Harinder Singh, I think it's

21   relevant to his personal characteristics, and he stopped and

22   that's undisputed here.  It's not disputed that he stopped

23   and didn't keep going.

24           And I think that should be important for the Court

25   to consider under those factors to say once he learned, once

```
1   the lesson was learned, this is crazy.  I have two children.
2   When he's putting it all together, that's when he stops.  The
3   others are watching him get arrested, talking about him
4   getting arrested on the phone.  They don't care.  They just
5   kept going.
6        And I think that's a big distinction what they did
7   before and what they did after that would lead the Court to
8   accept a sentence that would be much lower than anyone else.
9   I think that Harmeet Singh received a sentence of 42 months
10  and Mr. Wadhwa received a sentence of 41 months.
11       THE COURT:  But Mr. Wadhwa cooperated such as he
12  did.  I know your client attempted to.
13       MR. JOHNSON:  My client did, but I'm sure that and
14  in fact, he's ready to cooperate to the extent that he needs
15  to now.  I mean, he just doesn't have the information.  He
16  wasn't involved.  He wasn't involved at that level where he
17  could cooperate.
18       But that shouldn't be -- just because Mr. Wadhwa
19  was intricately involved, and I think he went beyond drugs.
20  There were so many things that were involved in some form of
21  unlawful activity, and he was involved for years.  To the
22  extent he would come in and get a 41-month sentence and
23  comparing the two, I understand he cooperated, but he
24  cooperated cause he was so substantially involved.
25       THE COURT:  Well, he started out with a 70-month
```

```
 1    sentence and that lead to his decision to cooperate against
 2    your client apparently.
 3            MR. JOHNSON:  Yes, and I understand that.  But to
 4    the extent that they're in the same, uh, he had the
 5    cooperation.  He testified.  But to the extent that Mr. Singh
 6    had information, he could have testified, too.  I mean, I
 7    don't want the Court to discount the testimony of
 8    cooperators.  I understand the cooperators it's different.
 9    But I do believe that it shouldn't be oh, that's the
10    exception and not look at the sentencing disparity.  I think
11    it's very large to say that he would be around a 60 to 70
12    month sentence.
13            THE COURT:  Okay.
14            MS. CHEN:  Your Honor, may I just briefly respond?
15            So first of all with respect to once he learned his
16    lesson, he stopped and whereas other people didn't.  To be
17    clear he was arrested I believe October 16, 2012.  The very
18    next day he attempted to cooperate, and by that I mean he
19    actually spoke with Special Agent Lindsay Burns which meant
20    the wiretap, federal, local investigation was the cat out of
21    the bag at that point.
22            So he knew that we had wiretaps going.  He knew
23    that there was a much far-flung investigation.  Whereas the
24    other individuals were simply stopped by local law
25    enforcement and they were never told about that.
```

1        The second thing is to be clear and Special Agent

2    Burns did testify at trial, it wasn't just a matter of he had

3    information to cooperate on and it just never worked out.  As

4    Special Agent Burns testified about, he disassembled, he lied

5    during that interview so he had the opportunity to cooperate.

6        Your Honor, I think the main point here is this.

7    At the end of the day, we all agree 151 months is too much.

8    Nobody is trying to punish somebody for exercising the

9    constitutional right to testify -- sorry to go to trial.  But

10    I think the Court hit upon the main point which is there's

11    got to be a principled way to come up with a sentencing here.

12    And just looking at it, Your Honor, first of all, each of

13    these individuals, this Court varied, departed I can never

14    remember which one it is.

15        THE COURT:  Varied, I think.

16        MS. CHEN:  For each of these individuals, and I

17    think, for example, John Bradley Martin got 63 months.  He

18    was a repeat courier.  He did not do any of the things that

19    this defendant was convicted of and for which the evidence

20    established he actually became a hwala broker as of July,

21    August.

22        John Bradley Martin, I believe he actually

23    delivered as a courier.  There's no evidence that he actually

24    became a hwala broker, I believe, twice.  For that he got 63

25    months.  This Court departed, I believe the low end was

1  87 months.  He did not cooperate.  This Court departed

2  25 months.  If you look at the pattern, this Court departed

3  about roughly 20, 30 months for non-cooperators which I think

4  is fair.

5         For Bobbi, for Sanjev Wadhwa, Sucha Singh, Harmeet,

6  to be clear all three of them either cooperated or attempted

7  to cooperate and for that they got credit.  Whether or not

8  they testified at trial, they actually provided substantial

9  assistance in the government's mind and they got some sort of

10  credit.  For those individuals, Sanjev Wadhwa was supposed to

11  get 97 months, that was the low end.  Originally, got 70 and

12  ended up getting 41.

13         So ultimately, 97 from 41.  Each of the cooperators

14  from my very quick calculation, Your Honor, got about 40 to

15  50 months of credit.  I think there is a difference when

16  somebody does not take responsibility, goes to trial.  Part

17  of the risk is that this court gets to see the full scope of

18  the evidence.  I'm not, again, to be clear, nobody should be

19  punished for going to trial, however, he does not take

20  responsibility.

21         The other individuals not only took responsibility,

22  but also cooperated.  And I think the patterns in the

23  sentences being imposed in this case is that for those who

24  took responsibility and cooperated, and, of course, there's

25  self-interest in cooperating, they got a much bigger

1    variance.  Whereas I think if you say that he should get the

2    same amount as Sucha Singh, for somebody who actually for

3    good or for bad, he got him involved.

4           And I have to say, Your Honor, to the extent that

5    the Court indicated that an elder came and got him involved,

6    that sounds a little bit like crediting the cultural defense,

7    and I would object to that, Your Honor.  I think a lot of

8    these individuals, we can get into 3553A factors and I'm sure

9    we will, but I think a lot of those apply to the same --

10   other defendants as well.  They all come from the same

11   culture.

12          I understand Sucha Singh got him involved.

13   However, for him to get the same sentence as somebody who

14   took responsibility and cooperated, I think that actually

15   creates a sentencing disparity.  And, again, I point to John

16   Martin Bradley who plead guilty prior to trial, was sentenced

17   by this Court for 63 months for being a courier which is a

18   lesser role than this defendant who went to trial, did not

19   take responsibility.

20          And I would think, Your Honor, looking at it, I

21   think that the government is prepared to say a plus 16

22   applies as opposed to a plus 18.  Therefore, it would take it

23   to a base Offense Level of 32, Criminal History of 1 would be

24   121 to 151.

25          I do think given everything, based off of the other

1    sentences, relative culpability, as well as somewhat of the

2    3553A factors, although, again, most of it applies to other

3    defendants who have already been sentenced, I do think a

4    97-to-121-month sentence which is two levels off, even though

5    the Court has already stated he should not get a mitigating

6    role adjustment, I think a 97-month sentence or maybe even a

7    little bit less than that seems to be appropriate for the

8    government.

9            THE COURT:  Okay.

10           MR. JOHNSON:  Your Honor, I just want to respond

11   briefly.

12           Mr. Martin had drug-related offenses connected to

13   him as well and that's not the same as here with Mr. Singh.

14   He did attempt to cooperate, but I'm talking about

15   Mr. Harinder Singh, but he would not agree because it's not

16   true in his mind that he knew it was related to drugs and

17   that's what the hang-up issue in fact was, um, and at least

18   in the beginning.  I think the government did revise the plea

19   agreement to some form of unlawful activity.

20           I still believe that it should be much lower.  I

21   think I would be, you know, beating a dead horse already in

22   terms of the sentence, but those individuals that the

23   government has cited to where Sucha Singh gets 63 months,

24   Harmeet 42 and Bobbi Wadhwa, 41, I think the sentence should

25   be much lower than those sentences.

1          THE COURT:  Well, first of all, I want to hear from

2     Mr. Singh, but let me just make this generalized observation.

3     I know you're all trying to make the very best case, and I

4     don't mean it in a bad way, to place your respective client's

5     position in the best of light.  I don't know that any other

6     defendant in the case aside from Harinder Singh has depended

7     so heavily on the, uh, religious, social characteristics as

8     you have.

9          I could draw two inferences.  One, the rest of them

10    didn't think it was very significant or two, you were the

11    person who was careful enough to raise it as basis for

12    departure.  But in either event, the fact that the Court did

13    not depart on a cultural basis for the other defendants

14    strikes me as beside the point because I don't think the

15    other defendants really raised the issue in the first place

16    so the Court was probably not confronted with the issue.

17          As far as relative culpability, uh, I think that

18    the factors are at best unclear as to whether Mr. Harinder

19    Singh is so much more culpable than the other defendants that

20    he should have 97 months in custody.  As I said, I think that

21    the right number is somewhere between 60 and 70 months.  I

22    realize that's a larger departure for Mr. Singh than it would

23    have been for the other defendants in the case.

24          I also think that I have to throw into this the

25    age-old charge that I have to find a sentence that is

1    sufficient, but not overly punitive.  And so there are a lot

2    of factors at work here and that's why I always find

3    sentencing so difficult.  But I do think that given the

4    history of the case, given that the other defendants Sucha

5    Singh, Harmeet Singh, Mr. Wadhwa all cooperated in some

6    fashion or another, they are not the same as your client.

7            On the other hand, I think that their involvement

8    in the conspiracy was perhaps greater than your client's

9    because your client was induced to enter it.  On the other

10   hand, Ms. Chen is correct your client proceeded to engage in

11   the conduct and ultimately became not just a courier, but

12   became a broker.  It makes it a very, very difficult

13   situation.

14           And I have said 60 to 70 months.  I think 70 months

15   is probably where I would end up in the case, but I recognize

16   that everyone disagrees with me at some level or another and

17   maybe that's good.

18           MR. JOHNSON:  I understand where the Court's going

19   and I just want to make, I guess, a few more points.  Number

20   one is that the cultural issue is not something that I think

21   should be ignored the way it's being ignored.

22           THE COURT:  Well, I don't I'm ignoring it.  I am

23   saying to the extent it is relevant, uh, I am acknowledging

24   it.

25           MR. JOHNSON:  Um, to the extent that the Court has

1    to consider as well the other 3553 factors, I would ask the

2    Court to consider that he has been out over the six years.

3    He's been in full compliance over the time of the last three

4    on electronic monitoring.  Not a risk of flight or a danger

5    to the community.  And to the extent that that's a punishment

6    that's no more than necessary, um, I think that so the Court

7    understands where I believe 60 to 70 months is more than

8    necessary to let him know that this is illegal and shouldn't

9    be done when in fact he withdrew on October 12, 2016.  And

10   the rest of what we would have to say is in the papers.

11        THE COURT:  I've considered what's in your papers.

12   If I were to adopt the level 32, criminal history one, it

13   would yield the range that Ms. Chen referred to which I can

14   pull out, 129 to something.

15        MS. CHEN:  Your Honor, I believe 121 to 151.

16        THE COURT:  Okay, 121 to 151.  If that were the

17   starting point, 70 months is would still be an enormous

18   variance from that level.  I've indicated that I disagree

19   with your contention that Mr. Singh is entitled to a

20   three-level decrease for a mitigating role.  I disagree with

21   your objection to the plus six because I think there is

22   sufficient evidence to demonstrate that Mr. Singh knew he was

23   connected to drug trafficking.

24        So what we go to is variances and as I say, your

25   client uniquely offered as a basis for a variance religious

1    and cultural history.  Um, I'm not sure I buy it, but I'm

2    giving it some credence, obviously, in reaching 70 months

3    when the level might have been 121 months.

4          I'm also considering the other 3553A factors which

5    include the nature and history of our client, whether a

6    sentence of 70 months sends a message to him, if you will, or

7    to others similarly situated.  I think it does.

8          And I think that it also shows that he did not take

9    responsibility for his conduct which would have given him

10   perhaps a lower offense level, and I think that a 70-month

11   sentence fairly accounts for the sentences given to others in

12   the case that we've discussed so it seems to me that's where

13   I should end up.

14          That said if as I assume he will, Mr. Singh wishes

15   to be heard, I am more than pleased to hear from him.

16          MR. JOHNSON:  Okay, Your Honor.  May I have just a

17   moment?

18          THE COURT:  Sure.

19          MS. CHEN:  And, Your Honor, before we hear from

20   Mr. Singh, may I just make a couple of things clear just for

21   the record?

22          THE COURT:  Sure.

23          MS. CHEN:  And I'll wait for Mr. Johnson.

24          THE COURT:  Please.

25          MS. CHEN:  If I may put some things on the record?

1          THE COURT:  That's fine.  Let him finish and then

2     you can go ahead.

3          MR. JOHNSON:  I didn't hear.

4          THE COURT:  I think Ms. Chen wants to place

5     something on the record, but she wanted to do it when you

6     were not communicating with your client.

7          MR. JOHNSON:  So Mr. Singh does have something to

8     say.

9          Did you want to put something on the record?

10          MS. CHEN:  Only just for the record about -- and,

11     Your Honor, I, uh -- the government appreciates the time that

12     this Court has put into this case.  I recognize that it is a

13     difficult situation to try to sentence real people relative.

14     I never want to come off strident or cute, frankly, but I

15     would like to put this on the record, again, as my Appeals

16     Unit would want me to.

17          Uh, to the extent that this Court is recognizing

18     the religious and cultural aspects and to address the Court's

19     comments that no other defendant had so explicitly put that

20     on the record, I believe that's true.  My recollection was

21     faith and family was explicitly raised in front of the jury

22     over the government's objections and over I believe the

23     Court's sustaining of objections.  So this defense frankly

24     has permeated every aspect of this defendant's case.

25          I will say to the extent this Court has indicated

1    it is giving some credence to it, I would simply note, and

2    again, Your Honor, this is for the record that at trial it

3    was raised especially in wiretap calls that this individual

4    and, again, not to be cute, but has tattoos and earrings

5    which likely is not consistent with an orthodox faith.  So

6    it's unclear if he was practicing in the faith.

7              And I recognize that that has -- that was a defense

8    and that is now being used as a mitigating factor.  But I

9    want to make very clear that the government doesn't believe

10   it should apply.  And that even if it did would apply as a

11   mitigating circumstance, it wouldn't apply to this defendant.

12             THE COURT:  Okay.  Let me just be clear because I

13   think I haven't been clear.  The government objected to

14   Mr. Gill's testimony both that he was giving me social and

15   religious testimony and to the substance.  I think

16   Mr. Johnson then came back and said the Court has a right to

17   consider that in any event because this is sentencing.

18             What I think I said was to the extent that I have

19   the right to consider that information, I will do so, but I

20   don't buy into it.  I disagree that cultural and religious

21   factors come into play in this case.  I indicated the reason

22   for my variance related to lots of factors, uh, and to the

23   extent that, uh, the religious factors were offered, I have

24   considered them.

25             I was not granting a variance based on them because

```
 1    as I say, I didn't buy into it.  I think I wasn't clear.  But
 2    that said I indicated that there were a variety of factors
 3    that had been put forward in terms of perhaps Mr. Singh
 4    wasn't entitled to a minus three for his role in the offense,
 5    but it seemed to me that he was less culpable than some of
 6    the others.
 7          Some of the others received lesser sentences than I
 8    proposed to given in this case because they cooperated, uh,
 9    they took responsibility early on and there were other
10    factors that lead to their having lower sentences.  But once
11    again I was not saying that Mr. Singh was necessarily as
12    involved at every stage as some of the other people who
13    seemed to me to have had higher roles in the operation
14    including Mr. Wadhwa, Sucha Singh, Harmeet Singh to some
15    extent.
16          I don't know if I've clarified anything or not, but
17    your comments are certainly noted for the record.  And I just
18    wanted to be clear knowing that sometimes I'm not as clear as
19    I would like to be.
20          MR. JOHNSON:  Neither am I.  I wanted to make sure
21    that it's clear we are advancing that and would oppose any
22    objection to it.  That it's not a cultural departure or
23    variance simply because to say that the individual, I think
24    what the guideline as written say don't depart because of
25    that individual's race or culture.
```

```
 1            THE COURT:  Right.
 2            MR. JOHNSON:  That's not what the departure is for.
 3    The cultural and religious context goes right and fits right
 4    within the 3553A factors.  I understand what the Court is
 5    saying that even if that is the case, the Court rejects -- is
 6    not persuaded by it and I understand that.
 7            What I would like to note is that the government
 8    has consistently and in its papers as well and just now
 9    talked about the religious context so I think I would like to
10    address it.  When the government talks about mirroring in
11    that Mr. Harinder Singh was mirroring the behavior of Sucha
12    Singh, Gurkaran Singh, it is absolutely not the same thing
13    based upon Professor Gill's letter and the context this
14    occurred.  That these individuals were much higher in the
15    faith.  That Sucha Singh was a leader in the church who
16    prayed over the community.  So was Ramesh Singh, another
17    individual.  They were all much higher and had authority than
18    Mr. Harinder Singh would have been low on the totem pole.
19            The government talked about tattoos and earrings.
20    I think that goes further into showing that the deference he
21    would have for someone who would wear a turban and a beard.
22    It's because members of a congregation, including myself,
23    when you look up to a leader of a church, it doesn't mean
24    that you're perfect.  It means that you might be striving to
25    get to that level, and that's what Mr. Harinder Singh was
```

1   doing in our view in this context.

2          Where he may not have worn the turban or had

3   tattoos or he had earrings, but that doesn't mean he's not

4   striving for the ideal values in the Sikh faith.  I think it

5   shows that he would look up further to someone that actually

6   has the discipline to do so.

7          THE COURT:  And I understand your argument and with

8   all due respect, I just disagree.

9          MR. JOHNSON:  Thank you.

10          Mr. Singh has something short to say.

11          THE COURT:  Yes.

12          THE DEFENDANT:  Your Honor, what I want to say is

13   this case seems different than what it was.  The money that I

14   was gathering around 20 people would give money to the

15   San Jose Sikh temple.  I would go there for church, and I

16   would deliver to Harmeet Singh.  I did this for two,

17   three months.  And he told me this is like a Western Union.

18   Even when I wanted to send money and I would ask priest how

19   do I do it?  They told me this is the way.

20          And I know this was not wrong.  There were --

21   10,000 people were using the same system to send money.  And

22   then towards the end, Gurkaran told me he is not well.

23   Harmeet was not right.  So Gurkaran asked me that for a while

24   if you can deliver the money.  And he told me you don't have

25   to say anything to Sucha Singh.  It's not a big thing.

1        And I told him I want to go to India for my

2    sister's wedding, and then after that, I don't want to do

3    this.  I want to buy a truck.  There are more Sikh people in

4    Southern California than Northern California.  They have the

5    book, list of people.  You can bring Sucha Singh here and you

6    can ask him most of them are his relatives.  The book that

7    they have.  All I want to say, Your Honor, I am innocent.

8        MR. JOHNSON:  I know that concludes what he's

9    saying, but I think what, uh, Mr. Singh is trying to

10   articulate is that he felt -- this is why I sincerely believe

11   the cultural and religion impacted him.  He sincerely

12   believed as he's going along that he's trusting his uncle.

13   He's believing that the things he's delivering are

14   appropriate, and that's really the context of what he is.

15   And every indication was that his uncle was sending him to

16   these Gudwharas to pick up money from the Gudwhara.

17       THE COURT:  I understand that is his position and

18   your position.  And I -- at the risk of being too candid,

19   when I know a case is going to be appealed, I would not

20   expect a defendant to admit responsibility.  I understand

21   that he feels that what he did was proper, and that will be

22   decided obviously on another occasion.

23       That said, I do want to correct one thing that goes

24   to Ms. Chen's point.  The recommendation of Probation was --

25   the range was 151 to 188 months.  But I want to note for the

1    record that their sentencing recommendation was 100 months in

2    custody, not 151 months in custody which suggests that for

3    purposes of determining sentencing disparity and issues of

4    that nature, 70 months is even more reasonable than perhaps I

5    had indicated earlier because this is a departure of

6    approximately 30 months from the recommended sentence based

7    on the higher offense level of 34.

8            And as we've established, if we assume -- and the

9    government, of course, is not giving up its contentions, but

10   if we assume the offense level is 32, then we're talking 121

11   to 151 months.  And if that were the range, I assume the

12   recommendation from Probation is even less, but that's

13   speculation on my part.

14           But for the reasons I previously articulated, it

15   does seem to me that 70 months is the appropriate sentence to

16   meet the various issues and sentencing considerations of

17   Section 3553A so for that reason, that's what I'm going to

18   impose.

19           Does anyone have anything further to say?

20           Otherwise, I would proceed.

21           MR. JOHNSON:  Your Honor, I just want to make sure

22   that the record is complete.  If I may just have a minute to

23   speak with -- there was just one other thing I wanted to put

24   on the record.  I think what Mr. Harinder Singh was trying to

25   explain was that there are --

1          THE INTERPRETER:  Correction.  Your Honor,

2     Mr. Harinder Singh said there are more Sikh community in

3     Northern California than Southern California.

4          THE COURT:  Right.

5          THE INTERPRETER:  I wanted to clear that, and I

6     asked him again, and he said yes, and that's what he said.

7          MR. JOHNSON:  And that's what he was trying to put

8     in the context to say that those individuals that were in his

9     journal were from Sucha Singh.  They were the Sucha Singh

10    contacts that he was using from, uh, to pick up money from

11    the various Sikh temples.

12         Your Honor, just in terms of making sure that the

13    record is complete, is it possible to have Professor Gill

14    make a statement or take the stand?

15         MS. CHEN:  Your Honor, the government would object

16    to that.  I believe the letter apparently is in the record.

17    I would just object to that.

18         MR. JOHNSON:  The Court can consider any evidence

19    related to sentencing.

20         THE COURT:  Well, I can, but think about where we

21    are right now.  That's fine if you want to do it, but then

22    the government is going to have an opportunity to

23    cross-examine.  And I've indicated that I have considered his

24    letter and I just do not accept it as a basis for a variance

25    in this case.

```
 1              MR. JOHNSON:  I understand.  If I might just have a

 2    moment?

 3              THE COURT:  But if we're going to do that, we've

 4    got to take a short recess.

 5              MR. JOHNSON:  Your Honor, we understand what the

 6    Court's rulings are.  The Court has read the letter, and

 7    we'll leave it at that.

 8              THE COURT:  Anything further, Ms. Chen?

 9              MS. CHEN:  Your Honor, I think only to the extent

10    that there was no fulsome -- everything was quite fulsome,

11    but to the extent that there was no fulsome discussion about

12    3553A factors, I would just note that the government believes

13    again for the record that a 97-month sentence would be

14    extremely generous.  There's nothing in the defendant's

15    personal history especially with regard, I believe

16    Mr. Johnson raised immigration status.  Most of the

17    individuals in this case would likely be deported if they

18    weren't already deported so that would be inappropriate.

19              Mr. Johnson also noted that the sentencing

20    guidelines stated a person's culture or race should not be

21    considered and yet then stated that 3553A should be

22    considered a factor.  I'm not sure what the fine line between

23    those two arguments are.

24              With respect to, and to be very clear, I don't want

25    to make any argument, uh, having an argument not addressed.
```

1    To the extent that Mr. Johnson made the argument that this

2    defendant has been out on bond and fully complied, one, I'm

3    not really sure about that.

4         Two, to the extent that an individual who is facing

5    serious federal charges and decides to obey the terms and

6    conditions of bond, I don't believe that is something for him

7    to be rewarded in terms of a lighter sentence.  That's simply

8    following the law.

9         And then finally, in terms of the cultural defense,

10   again, while no other defendant raised this specifically, if

11   we're to apply, it would apply across the board.  I

12   understand that, again, to be very clear, Mr. Singh is

13   probably one of the younger individuals in this case, and I

14   understand that he got involved due to familial

15   relationships, but I don't believe -- Gurkaran Isshpunani,

16   Taran Singh, I don't believe they're high level priests in

17   any temple.

18        So, again, just putting it on the record, to the

19   extent that culture should be considered which I believe it

20   shouldn't be under the guidelines because if it can be

21   considered under 3553A factor, how is it then there is

22   prohibition considering it just in general?

23        Again, I believe 3553A factors raised by

24   Mr. Johnson in his papers are not that different from any

25   other defendant.  Every defendant has family and children.

1    In some ways having a wife run out of the house with a baby

2    in one arm and $388,000 in another hand might actually be an

3    aggravating factor.

4            So I just want to make that clear for the record,

5    Your Honor.

6            THE COURT:  Okay.  Well, having -- I will make

7    clear I agree with everything you say regarding those 3553A

8    factors, however, I have been concerned with sentencing

9    disparity, I have been concerned with the relative role of

10   this defendants versus other defendants in the case.

11           Recognizing that some of the other defendants whose

12   roles may have been more substantial, uh, had lesser

13   sentences because they either cooperated or they plead guilty

14   and all those factors also come into play, but I agree with

15   everything you just said as to those factors.

16           MR. JOHNSON:  And I -- and I hate to keep opening

17   up --

18           THE COURT:  No, go ahead.

19           MR. JOHNSON:  But what I think the government is

20   saying is absolutely wrong.

21           THE COURT:  I know and that's exactly why I said

22   that to the extent the government felt that I should not hear

23   Mr. Gill's testimony, I was prepared at least provisionally

24   to hear what he had to say.  And I made it very clear my

25   personal view is I disagree with him and that's all there is

1     to it.

2              MR. JOHNSON:  I understand.

3              The -- the -- the 3553A factors that -- that we've

4     outlined in our paper, um, are an addition if you cross out

5     the family and religious background is that his lack of

6     experience and communication, connection with drug

7     traffickers, I think that's absolutely true.

8              His -- his saying he accepted a job with Mr. Singh,

9     uh, with his uncle, to, uh -- as an alternative to be home

10    with his pregnant wife, that can be considered as well.  His

11    role in the beginning and certainly as a courier, considered

12    as well.

13             His ending on October 16th while others continued

14    is that that should be considered as well the -- the -- under

15    the circumstances of the offense as well as his compliance is

16    absolutely something that the Court can consider at

17    sentencing because it demonstrates that no new arrests or his

18    willingness to get involved again or be connected to criminal

19    activity.  Even if it's a small part, it should be considered

20    in the history and characteristics.

21             The extreme family circumstances of his wife having

22    two children after the initial arrest, his zero criminal

23    history with a low risk of recidivism, those are all factors

24    that the Court can consider under 3553.

25             THE COURT:  I agree those are factors that the

```
1    court can consider, however, as I've indicated, they're not
2    the factors I'm relying upon in reaching this conclusion.
3              MR. JOHNSON:  Understood.
4              THE COURT:  Okay.  Anything further?
5              MS. CHEN:  I don't believe so, Your Honor.
6              I think there was a request for bail pending appeal
7    and the government would oppose that.
8              THE COURT:  Okay.
9              MR. JOHNSON:  There is a request for bail pending
10   appeal.  As the Court is aware that what the defendant must
11   do is bring forth a plausible argument that may be successful
12   on appeal.  That he's demonstrated he's not a risk of flight
13   or danger to the community in the very beginning.  I think
14   he's demonstrated that and I think bail pending appeal should
15   be granted.
16             THE COURT:  All right.  I am disinclined to grant
17   bail pending appeal.  I will consider a surrender date.  I'm
18   not remanding him into custody.
19             MR. JOHNSON:  What I would like is that would the
20   Court be inclined with January 31st as a self-surrender date?
21             THE COURT:  I know the government probably opposes
22   it, but I would be prepared to do that.
23             MS. CHEN:  Your Honor, the government does not
24   oppose it.  That's fine.
25             MR. JOHNSON:  When the Court said, I want to be
```

1    clear for the record, is the Court would be inclined not to

2    grant bail pending appeal?

3              THE COURT:  I'll tell you why.

4              MR. JOHNSON:  Okay.

5              THE COURT:  First of all, I think there is a low

6    probability that a new trial will be granted.  I think

7    there's a low probability that the conviction will be

8    reversed on appeal.  And I believe that your client has

9    demonstrated at least up until now that he's not a risk of

10   flight although I do think that is a possibility given his

11   ability to travel, but I think that can be mitigated by the

12   existing circumstances or surrender of passport and things

13   along those lines.  I just don't think you have met the bar

14   in my mind for me to grant bail on appeal.

15             MR. JOHNSON:  In terms of the risk of flight and

16   danger to the community, he's continuously, he has electronic

17   monitoring.

18             THE COURT:  I'm aware of that.

19             MR. JOHNSON:  He has turned in his passport.

20             The standard in Handy 761 Fed.2d. 1279 is that is

21   there a debatable issue that would be raised on appeal that

22   would likely result in reversal being successful.

23             I think that, in fact, there are several debatable

24   issues that are listed on page 22 of the brief, that there

25   were several issues raised at trial, that, um -- including

the statements that the Court has ruled on, the jury

instructions -- the, uh, uh, the jury instructions related to

the money laundering as well as the offense in the 1960 as

well as the -- the defense that the entire -- the defendant

should have been entitled to cross-examine Sanjev Wadhwa

during the trial.  And I think these are debatable issues

that if granted will be, uh -- would actually lead to another

trial.

It's not determining whether they're great issues,

but if they are a debatable issue, and they -- if one of them

is granted by the 9th Circuit that that would actually lead

to a new trial.

So I think the standard is met for bail pending

appeal.

THE COURT:  Well, your arguments are noted for the

record and for the reasons I just indicated, I respectfully

disagree.

MR. JOHNSON:  Thank you, Your Honor.

THE COURT:  Okay.  Do you want to say anything in

response to that, Ms. Chen?

MS. CHEN:  Only with respect to the bail pending

appeal, Your Honor.

THE COURT:  Yes.

MS. CHEN:  Only that I believe that none of the

eight issues listed on page 22 of Mr. Johnson's sentencing

1    memorandum would actually satisfy the standard.  And in

2    particular with regard to Paragraph 4 with regards to his

3    entitlement to present evidence or discuss faith and family,

4    I believe he did get to do that at trial, perhaps not to

5    extent he wanted to.

6             I will otherwise submit as the reasons listed by

7    the Court.  And I do believe that only other thing I would

8    mention is now having been convicted and sentenced to a

9    lengthy sentence, I do believe that increases incentive for

10   flight.  On that I would submit, Your Honor.

11            THE COURT:  All right.

12            MR. JOHNSON:  Just on the bail pending appeal so

13   the record is clear, the Court didn't conclude that he was a

14   flight risk, those could be mitigated.  I don't think the

15   Court addressed danger.

16            THE COURT:  Let me be clear.  I think that there

17   are not really debatable issues as to whether a new trial

18   would be granted or the conviction reversed on appeal.  To

19   the extent that I have to address risk of flight and danger

20   to the community as part of the motion, and I think it's

21   pretty much mooted by a finding that there's little

22   likelihood of reversal on appeal and little likelihood that a

23   new trial would be granted.

24            But to the extent I do, it seems to me after I

25   impose a 70-month sentence, there is a greater risk of flight

1    and I think that the issue of danger to the community is a

2    neutral issue.  In other words, I don't think that Mr. Singh

3    presents a risk of danger to the community that cannot be

4    mitigated, but I do think that there's little likelihood of a

5    reversal or a new trial.

6              MR. JOHNSON:  I understand the Court's ruling and I

7    just want to be clear on the Court's ruling related to, uh,

8    is he a risk of flight?

9              THE COURT:  What I'm saying is he is to the extent

10   that I am imposing a 70-month sentence.  He has greater

11   incentive to flee in those circumstances.  I believe that for

12   the short term that we're talking about until the date of his

13   self-surrender, the fact that he is not in possession of his

14   passport and the fact he's on electronic monitoring for that

15   short period of time does something to mitigate that risk,

16   but I do not think it entirely mitigates the risk.

17              As I've experienced in numerous other cases where I

18   have delayed a self-surrender date and have believed that

19   there was not a great risk of flight and people have flown

20   the coup more times than I'd like to count.  So I can't tell

21   you there's no risk of flight.  Does that answer the

22   question?

23              MR. JOHNSON:  I think it does Your Honor.

24              THE COURT:  Ms. Chen, anything further?

25              MS. CHEN:  No, Your Honor.

1    THE COURT:  Okay.  Then it is ordered that the

2    defendant shall pay to the United States a special assessment

3    of $300 which is due immediately.  Any unpaid balance shall

4    be due during the period of imprisonment at the rate of not

5    less than $25 per quarter and pursuant to the Bureau of

6    Prisons Inmate Financial Responsibility Program.

7         Pursuant to Guideline Section 5E1.2(a), all fines

8    are waived as the Court finds that the defendant has

9    established that he is unable to pay and not likely to become

10   able to pay any fine.

11        MR. JOHNSON:  I'm sorry, Your Honor.  Can the Court

12   slow down?

13        THE COURT:  Absolutely, I'm sorry.  Let me start at

14   the beginning.

15        It is ordered that the defendant shall pay to the

16   United States a special assessment of $300 which is due

17   immediately.  Any unpaid balance shall be due during the

18   period of imprisonment at the rate of not less than $25 per

19   quarter and pursuant to the Bureau of Prisons Inmate

20   Financial Responsibility Program.

21        Pursuant to Guideline Section 5E1.2(a), all fines

22   are waived as the Court finds that the defendant has

23   established that he is unable to pay and is not likely to

24   become able to pay any fine.

25        Pursuant to the Sentencing Reform Act of 1984, it

is the judgment of the Court that the Defendant Harinder
Singh is hereby committed on Counts 1, 2 and 3 of the
indictment to the custody of the Bureau of Prisons for a term
of 70 months.  This term consists of 70 months on each of
Counts 1, 2 and 3 of the indictment to be served
concurrently.

Upon release from imprisonment, the defendant shall
be placed on supervised release for a term of three years.
This term consists of three years on each of Counts 1, 2 and
3 of the indictment, all such terms to run concurrently under
the following terms and conditions:

1.   The defendant shall comply with the rules and
regulations of the United States Probation Office and General
Order 05-02 with the exception of Conditions 5, 6 and 14 of
that order.

2.   The defendant shall not commit any violation of
local, state or federal law or ordinance.

3.   During the period of community supervision, the
defendant shall pay the special assessment in accordance with
this judgment's orders pertaining to such payment.

4.   The defendant shall cooperate in the collection
of a DNA sample from the defendant.

5.   As directed by the probation officer, the
defendant shall notify specific persons and organizations of
specific risks and shall permit the probation officer to

Case 2:14-cr-00648-CAS   Document 1113   Filed 03/05/19   Page 60 of 65   Page ID #:7482

60

confirm the defendant's compliance with such requirement and

to make such notifications.

6.   The defendant shall comply with the immigration

rules and regulations of the United States and if deported

from this country either voluntarily or involuntarily not

reenter the United States illegally.

The defendant is not required to report to the

probation office while residing outside of the United States.

However, within 72 hours of release from any custody or any

reentry to the United States during the period of court

ordered supervision, the defendant shall report for

instructions to the United States Probation Office located at

the United States Courthouse, 312 North Spring Street, Room

600, Los Angeles, California 90012.

The drug testing condition mandated by statute is

suspended based on the Court's determination that defendant

poses a low risk of future substance abuse.

It is further ordered that the defendant shall

surrender himself to the institution designated by the Bureau

of Prisons at or before 12:00 noon on January 31, 2019.  In

the absence of such designation, the defendant shall report

on or before the same date and time to the United States

Marshal located at Roybal Federal Building, 255 East Temple

Street, Los Angeles, California, 90012.

Okay.  Do we have a request?

```
 1            MR. JOHNSON:  For location?

 2            THE COURT:  Yes.

 3            MR. JOHNSON:  Yes, Your Honor, we do.

 4            THE COURT:  And that is?

 5            MR. JOHNSON:  That he be in Southern California

 6   close to his family and his children.

 7            THE COURT:  And the Court will make that

 8   recommendation that the defendant be placed at a facility in

 9   the Southern California area which is hopefully near his

10   family.

11            Um, Mr. Singh, to the extent you have a right to

12   appeal and you do, you must do so within 14 days of today.

13   If you cannot afford to pay for counsel, counsel will be

14   provided for you at no cost.  Do you understand that?

15            THE DEFENDANT:  Yes.

16            THE COURT:  Okay.

17            MR. JOHNSON:  Your Honor, I have two statements

18   regarding the sentencing.

19            THE COURT:  Sure.

20            MR. JOHNSON:  I believe the Court has imposed a

21   sentence of 70 months for each count that they run

22   concurrent.  I believe Counts 2 and 3 have a 60-month cap.

23            THE COURT:  Thank you for clarifying that.

24            MR. JOHNSON:  I would also like to -- to object

25   generally just for the record, generally to the supervised
```

```
 1    release conditions and certainly just for appeal purposes and
 2    in particular but including DNA, the requirement that he, uh,
 3    be required to submit to DNA testing.
 4              THE COURT:  Okay.  Let me first of all say that the
 5    sentence is to 70 months on Count 1, 60 months on Count 2,
 6    60 months on Count 3, and all such counts shall be served
 7    concurrently.
 8              With regard to the objections, uh, to the
 9    conditions of supervised release, I believe that while I'm
10    going to note them for the record, the objections are not
11    well taken, and I intend to overrule the objections based on
12    the orders -- general order of this court regarding
13    conditions of supervision.
14              Um, and to the extent that I need to, uh, deal with
15    the 3553A factors, I think I have already done so in the
16    course of these proceedings, and I have indicated that the
17    key factors in my mind are not only the defendant's history
18    and characteristics excluding what I think -- well, let me
19    put it this way, history and characteristics, namely that
20    he's young, he was brought to this crime by Mr. Sucha Singh,
21    uh, and may have been influenced by elders, the fact of the
22    matter is I think he committed the crime fully knowing, uh,
23    its objects.
24              And last but not least, I have indicated that the
25    reasons that I have varied his sentence to 70 months is
```

```
 1    principally to avoid what I believe are unwarranted

 2    sentencing disparities in the case.  Um, obviously, everyone

 3    preserves their objections.

 4            Now, the one thing that I do need to clarify,

 5    everybody, is I intend to find that the criminal history is

 6    34, and that the, uh -- uh, I'm sorry.  I misspoke.  The

 7    offense level is 34, and the criminal history category is 1.

 8    Um, for purposes of the statement of reasons recognizing that

 9    that there has been a concession by the government at least

10    for purposes of this hearing without waving anything that the

11    offense level is 32.

12            Does anyone find a problem in my doing that?

13            MR. JOHNSON:  Well, obviously, preserving the

14    objections that the defendant has raised, I -- I don't know

15    that we would weigh in.

16            THE COURT:  Okay.

17            MS. CHEN:  And, Your Honor, I don't find any issues

18    with that as well.

19            THE COURT:  Okay.  And then should we provide that

20    bond will be exonerated upon surrender?

21            MR. JOHNSON:  Yes.

22            MS. CHEN:  Yes, Your Honor.

23            THE COURT:  Okay.  Thank you, everyone.

24            MS. CHEN:  Thank you, Your Honor.

25            MR. JOHNSON:  Thank you, Your Honor.
```

1          THE CLERK:   This court is adjourned.

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                           CERTIFICATE OF REPORTER

3

4    COUNTY OF LOS ANGELES       )

5                                )  SS.

6    STATE OF CALIFORNIA         )

7

8    I, LAURA ELIAS, OFFICIAL REPORTER, IN AND FOR THE UNITED

9    STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA,

10   DO HEREBY CERTIFY THAT I REPORTED, STENOGRAPHICALLY, THE

11   FOREGOING PROCEEDINGS AT THE TIME AND PLACE HEREINBEFORE SET

12   FORTH; THAT THE SAME WAS THEREAFTER REDUCED TO TYPEWRITTEN

13   FORM BY MEANS OF COMPUTER-AIDED TRANSCRIPTION; AND I DO

14   FURTHER CERTIFY THAT THIS IS A TRUE AND CORRECT TRANSCRIPTION

15   OF MY STENOGRAPHIC NOTES.

16

17

18   DATE: JANUARY 24, 2019_____

19

20      ____/s/  LAURA MILLER ELIAS_____

21   LAURA MILLER ELIAS, CSR 10019

22   FEDERAL OFFICIAL COURT REPORTER

23

24

25